IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Action No. 1:07-CV-01649-CKK

| | | |
|---|---|---|
| ARISTA RECORDS, LLC, *et al*, | ) | |
| | ) | |
| Plaintiffs, | ) | **MOTION BY DEFENDANT DOE #3 TO** |
| | ) | **VACATE THE ORDER GRANTING** |
| vs. | ) | **EXPEDITED DISCOVERY, TO DISMISS** |
| | ) | **THE COMPLAINT, TO QUASH THE** |
| DOES 1 – 19, | ) | **SUBPOENA, AND TO DISMISS FOR** |
| | ) | **IMPROPER JOINDER** |
| Defendants. | ) | |
| | ) | |

        NOW COMES Defendant, Doe #3, by and through counsel, and moves the Court to

vacate the Order granting expedited discovery to Plaintiffs, [docket entry #6] ("Order") pursuant

to 47 U.S.C. § 551(c)(2)(B), 17 U.S.C. §§ 512(a), (c)(3)(A), (h), and (k)(1)(A); to dismiss the

Complaint pursuant to Fed. R. Civ. P. 12(b)(6), to quash the subpoena issued by Plaintiffs'

counsel to non-party George Washington University ("GWU") pursuant to 20 U.S.C. § 1232g,

17 U.S.C. § 512(h), and Fed. R. Civ. P. 45(c)(3); and, to dismiss the claims against Doe #3 for

improper joinder under Rule 20 Fed. R. Civ. P..

                Respectfully submitted,

                By: /s/ Lawrence Harbin
                Lawrence Harbin, DC Bar # 236,190
                MCINTYRE, HARBIN & KING, LLP
                Attorney for Defendant Doe #3
                500 Ninth Street SE
                Washington, DC 20003
                Telephone: (202) 546-1100
                Facsimile: (202) 543-9230
                lharbin@mhk-law.com
                *Local counsel*

1

By: /s/ Stephen E. Robertson
Stephen E. Robertson
ROBERTSON, MEDLIN & BLOCKER, PLLC
Attorney for Defendant Doe #3
125 South Elm Street, Suite 100
Greensboro, NC  27401
Telephone: (336) 378-9881
Facsimile: (336) 378-9886
srobertson@robertsonmedlin.com
*admission pending December 3, 2007*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 13th day of November, 2007, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Matthew Jan Oppenheim
MATTHEW J OPPENHEIM, ESQ.
7304 River Falls Drive
Potomac, MD 20854
matt@oppenheimgroup.net

And I hereby certify that I will serve the document by e-mail to the following non-party:

Thomas B. Smith
Associate General Counsel - Litigation
The George Washington University
2100 Pennsylvania Avenue, NW
Washington, D.C.  20052
tbsmith@gwu.edu

By: /s/ Lawrence Harbin
Lawrence Harbin, DC Bar # 236,190
MCINTYRE, HARBIN & KING, LLP
Attorney for Defendant Doe #3
500 Ninth Street SE
Washington, DC 20003
Telephone: (202) 546-1100
Facsimile: (202) 543-9230
lharbin@mhk-law.com

By:  /s/ Stephen E. Robertson
Stephen E. Robertson
ROBERTSON, MEDLIN & BLOCKER, PLLC
Attorney for Defendant Does #3
125 South Elm Street, Suite 100
Greensboro, NC  27401
Telephone: (336) 378-9881
Facsimile: (336) 378-9886
srobertson@robertsonmedlin.com

3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Action No. 1:07-CV-01649-CKK

| | | |
|---|---|---|
| ARISTA RECORDS, LLC, *et al*, | ) | |
| | ) | |
| Plaintiffs, | ) | **STATEMENT OF POINTS AND** |
| | ) | **AUTHORITIES IN SUPPORT OF** |
| vs. | ) | **MOTION BY DEFENDANT DOE #3 TO** |
| | ) | **VACATE THE ORDER GRANTING** |
| DOES 1 – 19, | ) | **EXPEDITED DISCOVERY, TO DISMISS** |
| | ) | **THE COMPLAINT, TO QUASH THE** |
| Defendants. | ) | **SUBPOENA, AND TO DISMISS FOR** |
| | ) | **IMPROPER JOINDER** |

_____

## I.    <u>INTRODUCTION</u>

Defendant, Doe #3, by and through counsel, submits the following statement of points

and authorities with supporting evidence, pursuant to Local Rule 7(a), (D.D.C.) in support of the

motion to vacate the Order granting expedited discovery to Plaintiffs, [docket entry #6]

("Order") pursuant to 47 U.S.C. § 551(c)(2)(B), 17 U.S.C. §§ 512(a), (c)(3)(A), (h), and

(k)(1)(A); to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6), to quash the subpoena

issued by Plaintiffs' counsel to non-party George Washington University ("GWU") pursuant to

20 U.S.C. § 1232g, 17 U.S.C. § 512(h), and Fed. R. Civ. P. 45(c)(3); and, to dismiss the claims

against Doe #3 for improper joinder under Rule 20 Fed. R. Civ. P..

Plaintiffs have not caused any summons to be issued by the Clerk of Court and have not

served Doe #3 with the Complaint and summons as reflected in the Court's record.  Defendant

Doe #3 makes an appearance for the limited purpose of this motion.  Doe #3 reserves all rights to

challenge the Complaint, jurisdiction, venue, and to assert any and all defenses available to

him/her in accordance with the Federal Rules of Civil Procedure.

Plaintiffs claim to own the copyrights in a number of sound recordings created by artists. Plaintiffs are member companies of the Recording Industry Association of America ("RIAA"). Over the last several years, Plaintiffs, other record companies, and the RIAA, have sued tens of thousands of individuals, perhaps as many as fifty thousand, alleging that these individuals have "uploaded," "downloaded," and "made available" sound recordings, although Plaintiffs rarely, if ever, have actual knowledge of any copying or dissemination of the recordings themselves.

These individuals, facing the resources of an industry that generates billions of dollars in revenue annually, seldom have the means to contest the claims. Many who do contest the claims conclusively show that Plaintiffs have misidentified their targets. On such occasions, spokespersons for Plaintiffs compared their suits against innocent individuals to "catching dolphins" while "fishing with a driftnet."

As part of their campaign against digital downloading, Plaintiffs frequently file mass actions against numerous so-called "John Does." The purpose of these Doe suits is not, as it should be, to engage in a legitimate determination of Plaintiffs' rights under the Copyright Act. Instead, these actions are solely for purposes of discovering the identities and other private personal information of individual account holders with a particular Internet Service Provider ("ISP"), in this case a university, whose records are protected by federal privacy laws. 20 U.S.C. § 1232g prohibits disclosure of student information by recipients of federal education funds, including universities.

The Doe Defendants here are the targets of the immediate *ex parte* discovery, by way of subpoena addressed to GWU. At least three other subpoenas addressed to universities are being

challenged as of the date of filing this motion and statement of points and authorities.[1]  The

subpoenas in each of these lawsuits lump dozens of Defendants together, although there is no

common nexus of fact that would provide a basis to sue them *en masse*.  The dates, times, and

recordings at issue for each of the Does are different and mostly unique.  The Does rarely know

each other, unless by coincidence, and there is no allegation of coordinated action among them.

To make matters worse, many of the "Plaintiffs" have no claims against several of the nineteen

Does.  Combining Defendants into a single suit causes confusion, prejudices the Defendants,

harms the administration of justice, disproportionately consumes the Court's resources, and lacks

any justification from the facts alleged.

This lawsuit is the product of unsworn and unsubstantiated claims that each Defendant

used an online media distribution system to download and/or distribute copyrighted recordings.

Plaintiffs do not make any specific allegation that there has been unauthorized copying of music

or that music was not lawfully acquired by the Does.[2]

In *Theofel v. Farey Jones*[3], the Ninth Circuit had occasion to review the propriety of a

private subpoena for electronic records.  The Court stated:

> The subpoena power is a substantial delegation of authority to private parties,
> and those who invoke it have a grave responsibility to insure it is not abused.
> Informing the person served of his right to object is a good start, see Fed. R.
> Civ. P. 45(a)(1)(D), but it is no substitute for the exercise of independent
> judgment about the subpoena's reasonableness.  Fighting a subpoena in court
> is not cheap, and many may be cowed into compliance with even overbroad

---

[1] The three other John Doe lawsuits are: *Arista Records, LLC, et al v.Does 1-21*, 07-CV-10834, U.S.D.C., District of Massachusetts; *Arista Records, LLC, et al v. Does 1-11*, 07-CV-568, U.S.D.C. Western District, Oklahoma; and, *Interscope et al  v. Does 1-40*, 07-CV-1008, U.S.D.C. Middle District, Florida.
[2] Plaintiffs allege: "… Defendant[s]… disseminated over the internet copyrighted works…" Complaint ¶3, and  "Plaintiffs are informed and believe that each Defendant, without the permission or consent of Plaintiffs, has continuously used, and continues to use, an online media distribution system to download and/or distribute to the public certain of the Copyrighted Recordings." Complaint ¶19.
[3] 359 F.3d 1066, 1074-1075 (9th Cir. 2004), *cert. denied* 543 U.S. 813, 125 S.Ct. 48 (2004).

subpoenas, especially if they are not represented by counsel or have no personal interest at stake.

These Defendants are college students very likely without the resources to meet a billion dollar industry on equal footing in this Court.  Plaintiffs' request for expedited discovery largely relies on several unpublished cases, likely uncontested, where the industry was able to avail itself of the extraordinary process it espouses.

## II.    <u>ARGUMENT</u>

This Court should quash the subpoena directed at GWU and dismiss this act.  First, the subpoena should be quashed because, on the facts alleged, expedited discovery is not warranted according to the Cable Communications Policy Act of 1984 ("CCPA"), 47 U.S.C. § 551(c)(2)(B), the Digital Millennium Copyright Act ("DMCA"), specifically 17 U.S.C.  512(h), Federal Rules of Civil Procedure 26 and 45, and applicable case law.  Second, the suit should be dismissed because Plaintiffs have failed to state a claim upon which relief can be granted because they have not alleged facts sufficient to support a claim of copyright infringement. Third, the suit should be dismissed because the Defendants are improperly joined under Rule 20, Fed. R. Civ. P.

### A.  <u>THE ORDER SHOULD BE SET ASIDE, AND THE SUBPOENA QUASHED</u>

The Order granting expedited discovery should be set aside and the subpoena quashed for four separate reasons.  First, GWU is not a cable operator according to 47 U.S.C. § 551(c)(2)(B). Second, the DMCA does not provide authority for a subpoena under the circumstances at issue. Third, the subpoena is not appropriate under Federal Rules of Civil Procedure 26 and 45. Finally, the subpoena is overbroad and will unnecessarily disclose confidential information.

1.    **The Subpoena Should Be Quashed Because GWU is Not a Cable Operator According to 47 U.S.C. §551(c)(2)(B).**

The Order granting expedited discovery is supported by the Court's Memorandum Opinion [docket entry #7] stating, in pertinent part, "[t]he disclosure of this information is ordered pursuant to 47 U.S.C. § 551(2)(B), which authorizes cable operators to disclose personally identifiable information when cable operators are ordered to do so by a court."[4] Washington DC residents have two options for cable television service: Comcast and Starpower.[5] GWU is neither.  Cable operators are defined under the Cable Communications Policy Act as:

> any person or group of persons (A) who provides cable service over a cable system and directly or through one or more affiliates owns a significant interest in such cable system, or (B) who otherwise controls or is responsible for, through any arrangement, the management and operation of such a cable system.[6]

Earlier this year, in an identical case, The College of William & Mary faced the same subpoena that GWU now faces.  In refusing to grant the same expedited discovery Plaintiffs seek, the Court in *Interscope et al v. Does 1-7* said, "Plaintiffs have not established that the College falls within this definition and common sense dictates otherwise."[7]

Dismissing Plaintiffs' reliance on the Cable Communications Act of 1984 out of hand, the Court laid out, *sua sponte*, the argument that only the Digital Millennium Copyright Act ("DMCA") expressly provides subpoena authority for internet related copyright infringement cases.[8]  The Virginia District Court chose to follow the DC Circuit, the Eighth Circuit, and the

---

[4] Memorandum Opinion at 2.
[5] http://octt.dc.gov/services/dccable/index.shtm, last visited November 8, 2007 (Exhibit A of Appendix).
[6] 47 U.S.C. A.§ 502(5).
[7] *Interscope et al v. Does 1-7*, 494 F.Supp. 2d 388, at 390.
[8] 17 U.S.C.A. §§ 512(a), 512(c)(3)(A), 512(h) and 512(k)(1)(A).

Middle District of North Carolina in holding that the DMCA does not extend to an ISP who acts as a mere transmitter of data that is not cached, stored or located by the ISP.[9]  Plaintiffs do not, therefore, have any authority by which they can intrude upon an Internet users' fundamental right to privacy and anonymity in their online communications.

### 2. The Subpoena Should Be Quashed Because The DMCA Does Not Provide Authority.

The DC Circuit Court of Appeals has carefully considered whether a subpoena is appropriate under the DMCA:

> … there is no policy justification for limiting the reach of the DMCA subpoena provisions to situations in which the ISP stores infringing material on its system, considering that many more acts of copyright infringement are committed in the P2P realm, in which the ISP merely transmits the material for others, and that the burden upon an ISP required to identify an infringing subscriber is minimal.

> We are not unsympathetic either to the RIAA's concern regarding the widespread infringement of its members' copyrights, or to the need for legal tools to protect those rights. It is not the province of the courts, however, to rewrite the DMCA in order to make it fit a new and unforeseen internet architecture, no matter how damaging that development has been to the music industry or threatens being to the motion picture and software industries. The plight of copyright holders must be addressed in the first instance by the Congress; only the "Congress has the constitutional authority and the institutional ability to accommodate fully the varied permutations of competing interests that are inevitably implicated by such new technology." *See Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 431, 104 S.Ct. 774, 783, 78 L.Ed.2d 574 (1984).[10]

While the *Verizon* case addressed a pre-litigation subpoena, the same reasoning applies to this post-litigation subpoena.  As the DC Circuit Court of Appeals held "[w]e conclude from both the terms of § 512(h) and the overall structure of § 512, that . . . a subpoena may be issued

---

[9] *Recording Indus. Ass'n Am. v. Verizon Internet Servs.*, 351 F.3d, 1229 (D.C. Cir. 2003), In *re Charter Commc'ns., Inc., Subpoena Enforcement Matter*, 393 F.3d 771 (8th Cir. 2005) and *Recording Indus. Ass'n Am. v. Univ. of N.C. at Chapel Hill*, 367 F.Supp.2d 945 (M.D.N.C. 2005).
[10] *Recording Indus. Ass'n Am. v. Verizon Internet Servs.*, 351 F.3d, 1229, at 1238.

9

only to an ISP engaged in storing on its servers material that is infringing or the subject of infringing activity."[11]  Plaintiffs do not allege that GWU has done so.  As such, *Verizon* is binding precedent that the DMCA does not provide Plaintiffs with authority to subpoena GWU.

The DC Court of Appeals instruction to the Plaintiffs, extended by the Eastern Virginia District Court in *Interscope et al v. Does 1-7*, was clear.  The Court understands your problem, but is without authority to remedy it.  The "varied permutations of competing interests" cannot be properly addressed by courts.  The DMCA must be rewritten.  Instead of heeding the instruction from the DC Circuit, Plaintiffs now claim that a plain Rule 45 subpoena is all that is required to compel a private university to attempt to identify alleged infringers from a mere IP address.  Plaintiffs take this position despite the fact that, if this were true, Congress would have had no reason to include the § 512(h) subpoena provision in the DMCA.

**3.    The Subpoena Should Be Quashed Because the Federal Rules of Civil Procedure Do Not Permit Subpoenas in Such Circumstances.**

At GWU all that is needed to access the wireless network is a student ID and password. These bits of data, intended to provide some modest modicum of security, are easily lost, stolen, borrowed and loaned.  Plaintiffs' subpoena seeks information that GWU does not readily possess. In order to attempt to comply with the subpoena, GWU would be forced to undertake an investigation to create discovery for Plaintiffs -- an obligation not imposed by Rule 45. There is, literally, no way to know, without thorough investigation, who may be on the end of a given IP address at a given time.

Federal courts have long disfavored the use of unidentified "John Doe" defendants in complaints[12] and expedited discovery obtained on an *ex parte* basis.  As a rule, discovery may

---

[11] *Id.* at 1233.

only take place after service of the defendants.[13]  A plaintiff in a copyright infringement case

who seeks expedited discovery to uncover the identity of an unknown "John Doe" defendant

must therefore make "a concrete showing of a *prima facie* claim of copyright infringement."[14]

To obtain discovery as to the identity of a John Doe defendant, a plaintiff must make an

evidentiary showing "that an act giving rise to civil liability *actually occurred* and that the

discovery is aimed at revealing specific identifying features of the person or entity who

committed the act."[15] (emphasis added)  In *Doe v. 2themaart.com Inc.*, the court explained the

interests at stake:

> If Internet users could be stripped of [the ability to communicate
> anonymously on the internet] by a civil subpoena enforced under the liberal
> rules of civil discovery, this would have a significant chilling effect on
> Internet communications and thus on basic First Amendment rights.
> Therefore, discovery requests seeking to identify anonymous Internet users
> must be subjected to careful scrutiny by the courts.[16]

Further, Defendant Doe #3 refutes the statement from Exhibit A of Plaintiffs' *ex parte*

Motion to Take Expedited Discovery that the method of identification referred to is quick and

easy.  Plaintiffs' method is not at all reliable.[17] Simply put, many opportunities exist to inject a

communication stream behind an individual's ISP account.  In addition to the ease with which

---

[12] *Petway v. City of New York*, 02 Civ. 2715, 2005 WL 2137805 at 4 (E.D.N.Y. Sept. 2, 2005); *In re Ticketplanet.com*, 313 B.R. 46, 55 n.4 (Bankr. S.D.N.Y. 2004); *Strauss v. City of Chicago*, 760 F.2d 765, 770 n.6 (7th Cir. 1985).

[13] *Columbia Insuraance Co., v. Seescandy.com,* 185 F.R.D. 573, 577 (N.D.Cal. 1999).

[14] *Sony Music Entertainment Inc., v. Does 1-40*, F.Supp. 2d, 556, 564-565 (S.D.N.Y. 2004).

[15] *Columbia Insurance Co., supra*, 140 F.Supp.2d at 1093.

[16] 140 F.Supp. 1088 (W.D. Wash. 2001).

[17] Declaration of Carlos Linares in Support of ex parte Application for Leave to Take Immediate Discovery, ¶16.

11

GWU student IDs and passwords are lost, stolen, borrowed and loaned; any, or all, of the GWU

Does could have been the target of an individual pirating the ISP.[18]

      To protect against an unjustified invasion of a John Doe defendant's right to privacy and

anonymity, a plaintiff seeking discovery to identify such a defendant must therefore demonstrate

"a real evidentiary basis … that the defendant has engaged in wrongful conduct."[19]  This means

that the plaintiff:

> Must adduce *competent evidence* – and the evidence plaintiff adduces must
> address *all* of the inferences of fact that plaintiff would need to prove in order
> to prevail under at least one of the causes of action plaintiff asserts.  In other
> words, the evidence that plaintiff adduces must, if unrebutted, tend to support
> a finding of *each* fact that is essential to a given cause of action.[20] (emphasis
> in original).

      In its Memorandum in Support of *Ex Parte* Application for Leave to Take Immediate

Discovery [docket no. 2, attachment 1], Plaintiffs proffer the "good cause standard" as the test

for the Court to determine whether expedited discovery should be allowed.  There is, in fact, a

split as to whether the test should be based more upon preliminary injunction factors, or the good

cause standard.[21]  In either event, the cases relied upon by Plaintiffs, favor Defendant's position.

In *Dimension Data* and *Quest Communs. Int'l, Inc., v. Worldquest Networks, Inc.*,[22] the Court

denied Plaintiff's request for expedited discovery of documents because Plaintiff did not seek a

preliminary injunction.  That is exactly the same procedural context as the instant case, except

---

[18] Declaration of Tom Swanton in Support of Brief in Support of Motion by Defendant Doe #3 to Vacate
the Order Granting Expedited Discovery, to Dismiss the Complaint, to Quash the Subpoena, and to
Dismiss for Improper Joinder. (Exhibit B of Appendix).
[19] *Highfields CapitalManagement, L.P. v. Doe*, 385 F.Supp. 2d 969, 970 (N.D. Cal. 2005).
[20] *Ibid*. at 975-76; *see also: Dendrite International, Inc. v. Doe No. 3*, 342 N.J. Super. 134, 141, 157-159,
775 A.2d 756, 760, 771-72 (N.J. App. 2001) affirming denial of plaintiff's motion for expedited
discovery to obtain identity of John Doe defendant; plaintiff failed to make evidentiary showing
supporting each element of its prima facie case.
[21] *See Dimension Data North America, Inc., v. Netstar-1, Inc.*, 226 F.R.D. 528 (E.D.N.C. 2005) for a
comparison.
[22] 213 F.R.D. 418 (D. Colo. 2003).

the Plaintiffs here seek the issuance of a subpoena demanding personal, private information.  In

*Quest*, they sought less potentially insidious discovery, corporate documents that might show

trademark infringement.  Plaintiffs in the instant case have asked for permanent injunctive relief,

but not for a preliminary injunction.  The unpublished case, *Benham Jewelry Corp v. Aron Basha*

*Corp.*,[23] decides a motion for preliminary injunction, not expedited discovery, by applying the

test that: "[i]njunctive relief against a putative infringer should be granted when the moving party

shows: (1) either (a) likelihood of success on the merits, or (b) sufficiently serious questions on

the merits and a balance of hardships tipping decidedly in plaintiff's favor; and (2) likelihood of

irreparable injury."[24]  But, temporary restraining orders granted on an *ex parte* basis pursuant to

Fed. R. Civ. P. 65, are only for a limited period of time and upon sufficient bond.  The Plaintiffs

here do not need and do not seek a preliminary injunction.  As the District Court of New Mexico

stated in denying an identical request to issue a subpoena for information from the University of

New Mexico, "Plaintiffs contend that unless the Court allows *ex parte* immediate discovery, they

will be irreparably harmed. While the Court does not dispute that infringement of a copyright

results in harm, it requires a Coleridgian "suspension of disbelief" to accept that the harm is

irreparable, especially when monetary damages can cure any alleged violation.[25]  Plaintiffs rely

on cases involving document discovery and depositions in the preliminary injunction context.

Plaintiffs cite no authority for expedited subpoena issuance according to Rule 45 without a

prayer for preliminary injunctive relief.

    4.    **The Subpoena Should Be Quashed Because It is Overbroad and Will**
             **Result in Improper Disclosure of Confidential Student Information.**

---

[23] 1997 WL 639037 (S.D.N.Y.1997). (Exhibit C of Appendix).
[24] *Ibid*. at 8.
[25] *Capital Records, Inc. et al v. Does 1-16*, No 07-485, 2007 WL 1893603 (D.N.M. May 24, 2007).
(Exhibit D of Appendix).

The subpoena itself requests information related to the Internet usage of each student Doe, collectively.  The collective response to the subpoena will expose each student Doe's student records, protected under 20 U.S.C. §1232g, to each other Doe who has been joined in the matter, even though the information is completely irrelevant to the claims against any other Doe. Accordingly, until such time as each Doe is sued individually, the subpoena response will result in the improper disclosure of federally-protected confidential information.

The New Mexico Court was concerned that the disclosure of University of New Mexico Doe subscriber log files may contain highly confidential and sensitive files, disclosure of which could well be violative of the subscribers' privacy rights. Access to a subscriber's Internet information may include a wealth of information including name, address, social security numbers, credit card information, purchase histories, a road map of the subscribers' Internet activities, and perhaps disclosure of their private e-mail communications.[26]  This Court should quash the subpoena based upon these statutory student privacy protections.

**B.  THE ORDER SHOULD BE SET ASIDE AND THE SUIT DISMISSED AS PLAINTIFFS COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED**

To support their claim for copyright infringement, Plaintiffs must allege two elements: (1) that a copyright subsists in the allegedly infringed material, and (2) that the alleged infringer violated at least one of the six exclusive rights granted to copyright owners under 17 U.S.C. § 106.[27]  Even assuming that one of the Plaintiffs can show that it owned the copyright to a sound recording alleged to reside on one of the nineteen Doe computers, Plaintiffs have failed to allege any of the exclusive rights.

---

[26] *Ibid* at *1.
[27] See 17 U.S.C. 501(a) - infringement occurs when alleged infringer engages in activity listed in Section 106.

The copyright Act does not give a copyright owner exclusive control over every possible use of his or her work.  Rather, the Copyright Act limits a copyright owner's control to the six exclusive rights specifically enumerated in Section 106: (1) to reproduce, (2) to prepare derivative works, (3) to distribute copies of, (4) to perform publicly literary, musical, dramatic, and choreographic works; pantomimes, motion pictures, and other audiovisual works, (5) to display publicly; and (6) to perform publicly sound recordings.

The Complaint alleges, upon information and belief, that each Doe, without the permission of the Plaintiffs "… has continuously used, and continues to use, an online media distribution system to download and/or distribute to the public certain of the Copyrighted Recordings to the public." Complaint ¶19.  The only right that could conceivably be implicated by the act described in the Complaint is Section 106(3), which reserves to the copyright owner the authority "to distribute copies or phonorecords of the copyrighted work to the public…."  The general rule on this point, as stated by the two leading copyright treatises, could not be more clear: "[i]nfringement of [the distribution] right requires an actual dissemination of either copies or phonorecords," not a mere offering.[28]

The theory advanced by Plaintiffs, that storing copyrighted files on a computer in a place where Plaintiffs' agent was able to make copies is an illegal "distribution," is incorrect under the law.  A copyright owner's exclusive right to distribution prohibits a person in possession of a copy of a computer program or phonorecord from disposing of possession by rental, lease, or lending (collectively referred to as "distributing") "for the purposes of direct or indirect commercial advantage."[29]  Nothing in the Complaint or any memoranda of law from Plaintiffs

---

[28] NIMMER ON COPYRIGHT, § 8.11[a]. at 9-137; and Goldstein, 2 Copyright § 5.5.1 at 5:102.
[29] Section 109(b)(4).

15

alleges that any Doe received a commercial advantage, even if third parties copied their music files from their computers.

Plaintiffs' theory of copyright infringement has been consistently rejected by a range of circuit and district court decisions.  In *Nat'l Car Rental Sys., Inc. v. Computer Assocs., Int'l, Inc.*, the Eighth Circuit held no distribution occurred when the defendant, without the copyright owner's permission, permitted third parties to use a copyrighted computer program.[30]  Summary judgment was denied to the record company where the defendant's website in *Arista Records, Inc. v. MP3Board, Inc.*[31] permitted internet file sharing and copying of computer-stored version of plaintiff's recordings, and not copying from any commercially available source.

Similarly, in *Paramount Pictures Corp. v. Labus*, a district court held that an offer to distribute videotapes to members of the public did not constitute infringement – copyright infringement occurs only upon an actual rental of the videotapes;[32] in *Oblensky v. G. P. Putnam's Sons*, a district court in New York held no infringement occurs where "defendant offers to sell copyrighted materials but does not consummate a sale; equally, there is no infringement of the [distribution] right where there is copying, but no sale of the material copied."[33]

No actual copyright infringement on the part of individual users of GWU's internet services whose identities are sought has been alleged.  Plaintiffs have not alleged that the individual users invited anyone to copy their music files or were aware that anyone had copied their music files.  Plaintiffs have not alleged that the individual users were even aware that their

---

[30] 991 F.2d 426, 434, (8th Cir. 1993), *cert. denied* 510 U.S. 861, 114 S.Ct. 176 (1993).
[31] 2002 WL 1997918, (S.D.N.Y. 2002). (Exhibit E to Appendix).
[32] 16 U.S.P.Q.2d (BNA) 1142 (W.D. Wis. 1990) (Exhibit F to Appendix).
[33] *Oblensky v. G.P. Putnam's Sons*, 628 F.Supp. 1552, 1555-56 (S.D.N.Y.), aff'd 795 F.2d 1005 (2d Cir. 1986).

music files could be copied by third parties, and Plaintiffs have not alleged that individual users have a duty to protect their music files from copying by third parties over the Internet.  In sum, Plaintiffs have not made factual allegations sufficient to support their claim for relief.[34]  In *Interscope v. Rodriguez*, the Plaintiff record companies' uncontested motion for default judgment was denied, *sua sponte*, on a near identical Complaint.[35]  The Southern California District Court characterized the Complaint as "a boilerplate listing of the elements of copyright infringement without any facts pertaining specifically to the instant Defendant,"[36] and the pertinent allegation as a "conclusory statement" on information and belief.[37]  Plaintiffs' slapdash style is highlighted by a cursory examination of its Exhibit A List to the Complaint [docket entry 1, Exhibit #2].  Curiously, the same IP address is named as Doe #1 and #2; and the same IP address is named as Doe #14, #15, #16, #17, and #18.  Plaintiffs aver, each IP address identifies

---

[34] *Bell Atl. Corp. v. Twombly*, 547 U.S. ---, 127 S. Ct. 1955, 1965 (2007).  *See also  Temple v. Circuit City Stores, Inc.*, Nos. 06-cv-5303, 06-cv-5304, 2007 WL 2790154, at *7 (E.D.N.Y. Sept. 25, 2007) (using *Twombly* to support a dismissal of Sherman Act claims because plaintiffs "mention[ed] no facts to support the claim that such an agreement or conspiracy existed, and the 'naked assertion of conspiracy,' however often repeated, does not do the trick") (quoting *Twombly*, 127 S. Ct. at 1966); *Savokinas v. Pittston Twp.*, No. 3:06-cv-00121, 2007 WL 2688729, at *4-5 (M.D. Pa. Sept. 11, 2007) (dismissing free speech claims where plaintiff "does not allege when the speech occurred, the forum where the speech occurred, the recipients of the speech, or the content of the speech"); *In re Elevator Antitrust Litig.*,  --- F.3d ---, 2007 WL 2471805, at *2 (2d Cir. Sept. 4, 2007) (affirming dismissal of complaint because plaintiffs' claims were vague and general and did not provide "plausible grounds to infer an agreement" as required under *Twombly*); *Pancotti v. Boehringer Ingelheim Pharms., Inc.*, No. 3:06cv1674 (PCD), 2007 WL 2071624, at *2, *4, *7 (D. Conn. July 17, 2007) (citing *Twombly* to dismiss ERISA claims for failure to plead facts sufficient to support an essential element of the claims); *Ass'n of Cleveland Fire Fighters v. City of Cleveland,* --- F.3d ---, 2007 WL 2768285, at *2-3 (6th Cir. Apr. 27, 2007) (affirming grant of defendant's motion to dismiss where plaintiffs failed to bring allegations that raised a right to relief "above the speculative level" as required by *Twombly*); *Burke v. APT Found.*, --- F. Supp. 2d. --- 2007 WL 2682865, at *5-6 (D. Conn. Sept. 12, 2007) (applying the *Twombly* standard to dismiss a Section 1983 claim for failure to allege facts sufficient to support an element of the claim).
[35] *Interscope Records v. Rodriguez*, Slip Copy, 2007 WL 2408484, (S.D.Cal. 2007).  (Exhibit G to Appendix).  The Court relied on the *Twombley* "plausibility standard." "[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombley*, ---U.S. ---,127 S. Ct. 1955 (2007).
[36] *Ibid*. at *2.
[37] *Ibid*. at *3.

a unique individual, but Plaintiffs name the same address for two allegedly different Does, and

the same address five separate times for 5 allegedly different Does, in direct contradiction of that

assertion.

### C.    THE COURT SHOULD DISMISS ALL CLAIMS AGAINST DOE #3 FOR IMPROPER JOINDER.

#### 1.    In order to join the Doe defendants, Plaintiff must allege a right to relief arising out of the same transaction, occurrence, or series of transactions.

Rule 20, Fed. R. Civ. P., provides in pertinent part:

(a) Permissive Joinder.

> …All persons (and any vessel, cargo or other property subject to admiralty process in rem) may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action…

If the plaintiff's fail to allege that their claims arise from the same "transaction,

occurrence, or series of transactions," then they fail to meet the requirements of Rule 20 allowing

joinder. *Alexander v. Fulton County*, 207 F.3d 1303 1323 (11th Cir. 2000). The Court should then

dismiss the improperly-joined Does from the action. Rule 20 (b), Fed. R. Civ. P. (granting the

Court discretion to make such orders necessary to effectuate the purpose of the Rule.)

#### a.    Plaintiff's have failed to show a common "transaction, occurrence, or series of transactions" where the defendants did not act in concert, the alleged infringements occurred on separate times and dates, the copyrighted works at issue are unique to each defendant, and different plaintiff's raise claims against different defendants.

Plaintiff's Complaint sets out a conclusory basis for joinder in paragraph 20:

Although Plaintiff's do not know the true names of Defendants, each Defendant is alleged to have committed violations of the same law (e.g., copyright law), by

> committing the same acts, (e.g. the downloading and distributions of sound
> recordings owned by Plaintiffs), and by using the same means (e.g. a file-sharing
> network) that each Defendant accessed using the same ISP. Accordingly,
> Plaintiffs' right to relief arises out of the same series of transactions or
> occurrences, and there are questions of law or fact common to all Defendants such
> that joinder is warranted and appropriate here.

This allegation does not meet the requirements of the Rule, and its conclusory factual allegations cannot even withstand the examination of the exhibits incorporated in the Complaint. Mere allegations of similar acts violating a single law, even if those acts use a common infrastructure such as the Internet or a particular network, do not create the common nexus of facts required to meet the transactional test set forth in the Rule. A set of individual drunk drivers, committing the same act on the same infrastructure (public roadways) in violation of a single law, could not be joined as co-defendants if they injured different plaintiffs on different dates and times. But the result urged by Plaintiffs would be a virtually identical action.

There is no bright-line rule to determine whether the transactional test has been met, but courts will instead apply a case-by-case analysis.[38]  In cases where copyright holders sue multiple independent defendants, courts generally will require either concerted action or some other direct connection between the Defendants beyond the infrastructure they use and the fact that they all happened to be accused of a similar act.

### b.  Joinder requires the same transaction, not a similar transaction.

Judges in various districts have already recognized this requirement in other, nearly identical, cases brought by these very same Plaintiffs. For example, the Eastern District of Pennsylvania found that different defendants will require separate trials[39] and, in 2004, the Middle District in Florida severed and dismissed claims against twenty-five unrelated "Doe"

---

[38] *Mosley v. General Motors Corp.*, 497F.2d 1330, 1333 (8th Cir. 1974).
[39] *BMG Music v. Does 1-203*, 04-CV-650 (E.D. Pa. March 5, 2004). (Exhibit H of Appendix).

defendants, holding that the independent individuals accused of copyright violations by record companies lacked the factual connection required for joinder.[40] The Court adopted the magistrate's "well-reasoned memorandum opinion"; severing all defendants, except the first, and requiring record-company plaintiffs to initiate individual actions against each defendant.

*Interscope Records v. Does 1-25* is virtually identical to this case. The same record-company plaintiffs tried to bring copyright claims against twenty-five John Doe defendants allegedly copying and distributing copyrighted sound recordings via peer-to-peer file-sharing networks. The magistrate judge in *Interscope Records v. Does 1-25* examined the complaint - again, virtually identical to the complaint in this case - and found that the allegations did not meet the transactional test.  That court found only two factual connections among the defendants – first, that they all accessed the Internet through a single common service provider (in that case Bright House) and used the same peer-to-peer network to share files ("Fast Track.").[41]  In particular, the *Interscope Records v. Does 1-25* report and recommendation noted that, like this case, "[n]one of the Defendants disseminated the same copyrighted material or songs belonging to the same Plaintiffs," and that each defendant "offered for download a unique set of copyrighted songs owned by an unique set of owner-Plaintiffs."[42] The Court then concluded, "[v]iewing this scenario as satisfying the same transaction or occurrence standard effectively nullifies that test."[43] Furthermore, the court held that the clear meaning of Fed. R. Civ. P. 20 "refers to the same transaction or occurrence not to similar transactions or occurrences," and

---

[40] *Interscope Records v. Does 1-25*, 06:04-CV-197-ACC-DAB, (M.D. Fla. April 1, 2004), report and recommendation adopted, 06:04-CV-197-ACC-DAB, (M.D. Fla. April 27, 2004). (Exhibit I of Appendix).
[41] *Id.* Report and Recommendation at *6.
[42] *Id.*.
[43] *Id.*.

concluded that the allegations against the Does, virtually identical to those in this case, were not the same transactions or occurrence.[44]

In this case, Plaintiffs are attempting to join 19 unnamed defendants who, as in *Interscope v. Does 1-25,* are each allegedly sharing a unique set of songs belonging to a unique set of owner-plaintiffs. Review of the complaint shows the complete lack of connection among the various Doe defendants. For example, comparing Does number 1 and 3, there is no commonality of song titles or artists, only 3 of the named Plaintiffs are common to both, and the date of Plaintiffs' intrusion into the alleged Does' respective systems was more than 2 months apart.

There is no allegation of common action or communication between the Does, or that any Doe obtained songs from any other. At a minimum, then, these two Does should be severed from each other, into their own individual cases, regardless of the position of the other Does.

Similar cases alleging copyright infringement also weigh against joinder.  In *Bridgeport Music, Inc. v. 11C Music,*[45] owner-Plaintiffs sued a number of alleged "samplers" of copyrighted music. The "sampling" was done by different defendants at different times, and using different copyrighted works. Likewise, in *Rappaport v. Steven Spielberg, Inc.,*[46] where the court severed claims against a number of defendants who allegedly infringed on copyrights for a number of separate audiovisual works.

These individual defendants have been improperly joined, because there is no common transaction or occurrence (or series of them) to tie the defendants together for Rule 20 purposes.

---

[44] *Id.*. Report and Recommendation, p. 6-7.
[45] 202 F.R.D.229, 231 (M.D. Tenn. 2001),
[46] 16 F.Supp.2d 481, 496-97 (D.N.J. 1998).

This Court should sever the claims against all defendants and require Plaintiffs to file individual actions against each defendant.  If any suit is permitted to survive, then it should be only Doe #1.

### c.  This improper joinder is unfair to defendants and impedes the administration of justice.

This court also has discretion under Rule 20 (b), Fed. R. Civ. P., to "order separate trials or make other orders to prevent delay or prejudice." In this case, the confusion resulting from the improper joinder of 19 unrelated defendants has two effects: it prejudices the defendants, and it impedes the effective and efficient administration of justice.

### 2.  Improper joinder prejudices these Defendants by increasing expenses for each defendant, by opening the door to jury confusion as to the allegations against each defendant, and by leading to improper disclosure of confidential student information to other defendants.

The pernicious effects of gang-pleading against numerous unrelated Does include having sixteen plaintiffs, with hundreds of separate claims, against thirty-eight different defendants. Each defendant will be subjected to an overwhelming onslaught of materials and information unrelated to the specific claims against them – all of which they are required to pay their attorneys to review.

In a case like this one, where the plaintiffs are billion-dollar companies with virtually unlimited litigation resources, and defendants are individual college students with the limited resources one would expect, imposing such a burden on defendants would be singularly unfair. In addition, each defendant who has been wrongfully identified – as has happened in several of these record-company lawsuits – would suffer the prejudice at trial of being lumped in with every other defendant, and hoping that the jury can keep straight which IP address belonged to which defendants.

22

The onslaught of information presents another unique peril: illegal disclosure of the defendants' confidential information to each other. While plaintiffs with legitimate claims might show an entitlement to that information, there is no legitimate need for any defendant to obtain information relating to any other defendant. As long as these defendants are improperly joined, such disclosure is inevitable. The only way to prevent this improper disclosure is to sever each student defendant and proceed against each individually.

> 3.     **Improper joinder hinders this Court's administration of justice by disproportionately weighing on its resources without paying the accompanying filing fees and by skewing the court's tracking of case dispositions.**

The *Interscope v. Does 1-25* court also noticed that the indiscriminate lumping of unrelated defendants in a single action hinders the administration of justice. Such an action causes a "great inconvenience to the Court" and "imposes a significant burden on the Clerk's office," due to the increased complexity involved in coordination and service of multiple defendants. [47] Courts would have difficulty holding hearings or conferences where the parties and their attorneys might not even fit in the courtroom.  Notably, when faced with four separate record company Doe suits, the Western District of Texas hinted that the improper joinder is merely an attempt by the plaintiffs to avoid filing the proper fees for each party.[48]  Allowing plaintiffs to dodge the filing fee requirements strains the court's resources.  Similarly, the North Carolina courts have faced, and may continue to face, multiple waves of cases, repeated *en masse.* These record company John Doe filings threaten to increase the costs for other litigants who pay their fair share.

---

[47]*Interscope v. Does 1-25.* Report and Recommendation, p. 10.
[48] *In re: Cases Filed By Recording Companies*, 5:07-CV-568-R (W.D. Texas, August 6, 2007) (Exhibit J of Appendix).

Further, the Texas Court noted that improper joinder also skews the court's ability to track its docket, saying, "[m]oreover, the closing of one 151-defendant case is treated as a single case for statistical purposes, when in fact each defendant should be treated as a single case for such purposes, given that the claim against each defendant is separate."[49]

If multiple cases involving improperly-joined defendants are allowed to clog this court's docket, the successful resolution of some or even most of them will not be reflected in the court's own records, skewing its tracking and hindering its efforts to serve justice efficiently and fairly for all those who approach.

## III.   CONCLUSION

The federal courts today are dealing with an onslaught of litigation by an industry facing a paradigm shift.  In 2000, the 107th Congress, sympathetic to consumers, visited the issue of song downloading and the legislation (the DMCA) designed to deal with it.  According to Judiciary Committee Chair, Orrin Hatch, "it was believed that a stable, predictable legal environment would encourage the deployment of business models which would make properly licensed content more widely available. Sadly, this has not yet occurred to any great extent in the music industry, and the DMCA is now nearly two years old."[50]  The DMCA is now nine years old, song downloading, both legal and illegal, is still prevalent.[51]  In an October, 2007 announcement, coffee giant Starbucks said it will give away 1.5 million songs every day for a total of more than 50 million free songs, as a major promotion to push its iTunes Wi-Fi Music

---

[49] *Id*. at *2.

[50] Statement of Senator Orrin Hatch, *Senate Judiciary Committee Hearing on "The Future of Digital Music: Is There an Upside to Downloading?* July 11, 2000.  (Exhibit K of Appendix).

[51] One industry estimate has 1 billion tracks exchanged illegally per month vs. Apple's iTunes service, which has sold just over 2 billion songs since it launched back in 2003. *http://www.afterdawn.com/news/archive/8623.cfm*, February 7, 2007, last visited October 16, 2007 (Exhibit L of Appendix).

Store in Starbucks locations.[52]  YouTube and MySpace have emerged as other ubiquitous means by which consumers enjoy music for free.  Consumers are confused as to what is and is not allowed.  Congress, not the courts is the proper forum to "decide whether to rewrite the DMCA."[53]  Until it does, neither statute, nor the Federal Rules of Civil Procedure support Plaintiffs application for expedited discovery in the form of a subpoena to GWU.  The Court should vacate the Order granting expedited discovery to Plaintiffs and dismiss the Complaint, or, in the alternative, quash the subpoena to GWU, or, in the alternative, dismiss the claims against Doe #3 for improper joinder.

      Respectfully submitted,

              This the 13th day of November, 2007.

              Respectfully submitted,

              By: /s/ Lawrence Harbin
              Lawrence Harbin, DC Bar # 236,190
              MCINTYRE, HARBIN & KING, LLP
              Attorney for Defendant Doe #3
              500 Ninth Street SE
              Washington, DC 20003
              Telephone: (202) 546-1100
              Facsimile: (202) 543-9230
              lharbin@mhk-law.com
              *Local counsel*

              By:  /s/ Stephen E. Robertson
              Stephen E. Robertson
              ROBERTSON, MEDLIN & BLOCKER, PLLC
              Attorney for Defendant Does #3
              125 South Elm Street, Suite 100
              Greensboro, NC  27401

---

[52] *http://www.msnbc.msn.com/id/20944937,*  AP, Sept. 24, 2007, last visited October 16, 2007 (Exhibit M of Appendix).
[53] *Recording Indus. Ass'n Am. v. Verizon Internet Servs*., *supra,*  351 F.3d, 1229*, at 1238.

Telephone: (336) 378-9881
Facsimile: (336) 378-9886
srobertson@robertsonmedlin.com
*Author of the Statement of Points and Authorities, lead attorney*
*admission pending, December 3, 2007.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of November, 2007, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Matthew Jan Oppenheim
MATTHEW J OPPENHEIM, ESQ.
7304 River Falls Drive
Potomac, MD 20854
matt@oppenheimgroup.net

And I hereby certify that I will serve the document by e-mail to the following non-party:

Thomas B. Smith
Associate General Counsel - Litigation
The George Washington University
2100 Pennsylvania Avenue, NW
Washington, D.C.  20052
tbsmith@gwu.edu

By: /s/ Lawrence Harbin
Lawrence Harbin, DC Bar # 236,190
MCINTYRE, HARBIN & KING, LLP
Attorney for Defendant Doe #3
500 Ninth Street SE
Washington, DC 20003
Telephone: (202) 546-1100
Facsimile: (202) 543-9230
lharbin@mhk-law.com


By:  /s/ Stephen E. Robertson
Stephen E. Robertson
ROBERTSON, MEDLIN & BLOCKER, PLLC
Attorney for Defendant Does #3
125 South Elm Street, Suite 100
Greensboro, NC  27401
Telephone: (336) 378-9881
Facsimile: (336) 378-9886
srobertson@robertsonmedlin.com

**Office of Cable Television**

**OCT HOME**

**OCT TV-13 SERVICES**

**OCT TV-16 SERVICES**

**INFORMATION**
**Customer Service FAQ**
**Customer Service Officer**
**OCT Cable Inspector**
**Cable Service Complaints**
**Quejas Sobre el Servicio**
**Cable Service Providers**
**Documents**
**Facilities**
**Programming Policy**
**DC Gov. Video Production**

**ONLINE SERVICE  REQUESTS**

# Cable Television Service Providers

DC residents have two options for cable television service: Comcast and Starpower.

### Comcast Cablevision of the District, LLC
Comcast provides cable television and high-speed internet services.

For Comcast customer service, please call (202) 635-5100.

- Comcast Corporate Website
- Comcast-Related Documents

### RCN Corporation
RCN provides cable television, high-speed internet and phone services.

For RCN customer service, please call (800) 746-4726.

- RCN Corporate Website
- RCN-Related Documents

Telephone Directory by Topic · Agencies · DC Council · Search · Elected Officials
Feedback · Translations · Accessibility · Privacy & Security · Terms & Conditions

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Action No. 1:07-CV-01649-CKK

ARISTA RECORDS, LLC, *et al*,  )
                               )
            Plaintiffs,        )     **DECLARATION IN SUPPORT OF**
                               )     **MOTION BY DEFENDANT DOE #3 TO**
    vs.                        )     **VACATE THE ORDER GRANTING**
                               )     **EXPEDITED DISCOVERY, TO DISMISS**
DOES 1 – 19,                   )     **THE COMPLAINT, TO QUASH THE**
                               )     **SUBPOENA, AND TO DISMISS FOR**
            Defendants.        )     **IMPROPER JOINDER**
                               )

---

Under penalty of perjury, I, Thomas A. Swanton, hereby depose and say that:

1. I have extensive experience in the field of computer science, as follows:

   a. I am employed as a Senior Consultant for the Forsythe Solutions
      Group.

   b. I am professionally certified by EMC and VMWare.

   c. I work professionally in the field of computer and network storage
      and have knowledge of IP networking.

2. I have reviewed the Declaration of Carlos Linares filed in the above-
   entitled action and disagree with the statement made at paragraph 16 that:

   > Once provided with the IP address, plus the date and time of
   > the infringing activity, the infringer's ISP quickly and easily
   > can identify the computer from which the infringement
   > occurred (and the name and address of the subscriber that
   > controls that computer) sometimes within a matter of minutes.

3. The reasons for my opinion include, but are not limited to: An ISP
   (Internet service provider) is a network aggregator in a network of
   networks model such as the Internet.  George Washington University

("GWU") is the ISP in this case. GWU, as an ISP, can provide a connection between a given IP address and timestamp combination with an individual account if their logging capabilities are enabled. However, this does not assure that the individual identified is the originator of a given series of packets associated with a targeted communication stream. In fact, there are many opportunities with existing networking technology deployed on the Internet today to inject a communication stream behind an individual's ISP account without their knowledge. Two examples are: (1) wireless networks, like GWUs, that present opportunity to join a sub-network without the owner's knowledge; and, (2) malicious code that can be introduced on a computer to provide remote control capabilities, Botnet, Trojan, and Back Door are examples of malicious codes that can take over the victim's machine without their knowledge of permission. As wireless networking technologies have proliferated, there are increasing opportunities to use unsuspecting individual's networks as injection points for unauthorized activities. In fact, many wireless control points are sold with "open" or insecure default configurations. Vendors are motivated to sell products that are easy to install and configure. Configuring secure networks can be complicated and require knowledge many vendors do not wish to require of their customers. An example of the dangers of open networks is the case of Walter Nowakoski. Nowakoski connected to unsecured home networks and used the bandwidth via unencrypted wireless networks to download child pornography. This is an example of

criminals using networks of others to commit crimes so that the innocent are victims twice – once for the theft of their own network resource and then when they are wrongly accused for the illegal activity. An additional significant threat is malicious code. It is so much of a threat that the antivirus industry reported total revenues of $4 billion in 2005, a 13.6 percent increase over the prior year. Individuals, companies, and universities must defend against malicious threats to the integrity of their computing devices and networks. The fact that there is such a large and fast-growing business devoted to defending networks suggests that there is not a sufficient solution to defeat unauthorized packet injection without significant sophistication.

4.  I declare under the perjury laws of the United States of America that the foregoing is true and correct.

Executed on the 12th day of November 2007 at Greensboro, North Carolina:

Thomas A. Swanton

Not Reported in F.Supp.                                                    Page 1
Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078
**(Cite as: Not Reported in F.Supp.)**

▷
Benham Jewelry Corp. v. Aron Basha
Corp.
S.D.N.Y.,1997.

United States District Court, S.D. New
York.
BENHAM JEWELRY CORPORATION
and J.D. Finesse, Inc. d/b/a/ Linea Aurea,
Plaintiffs,
v.
ARON BASHA CORPORATION, Defend-
ant.
Aron Basha, Aron Basha Corporation,
Counterclaimants
v.
Benham Jewelry Corporation, J.D. Finesse,
Inc. d/b/a/ Linea Aurea, and Katherine
Tess Jewelry, Counterclaim Defendants
**No. 97 Civ. 3841(RWS).**

Oct. 14, 1997.

Levisohn, Lerner, Berger, and Langsam,
New York City, by Thomas M. Furth, Peter
L. Berger, Jane P. Linowitz, for plaintiff.
Gottlieb Rackman and Reisman, New York
City, by George Gottleib, Amy B. Gold-
smith, for defendant Aron Basha Corpora-
tion.
Tess Jewelry, Amster Rothstein and Eben-
stein, New York City, Nancy Dodderidge,
for counterclaim defendant Katherine.
SWEET, J.
**\*1** Defendants and counterclaim plaintiffs
Aron Basha and Aron Basha Corporation
("Basha") have moved for a preliminary in-
junction precluding Plaintiffs Behnam Jew-
elry Corporation ("Behnam"), J.D. Finesse,
Inc. d/b/a/ Linea Aurea ("Finesse"), and
Katherine Tess Jewelry ("Tess")
(collectively "Counterclaim Defendants")
from manufacturing or selling certain baby
shoe pendants ("baby shoe pendants" or
"pendants") which infringe Basha's copy-

right. Basha has also moved for recall of
any infringing baby shoe sold by the Coun-
terclaim Defendants to their customers and
for expedited discovery.

For the reasons set forth below, the mo-
tions are granted.

### Parties

Basha is a corporation organized and exist-
ing under the laws of the State of New
York with a place of business on 680
Madison Avenue, New York, New York.
Basha is owned by Aron Basha, and is in
the business of designing and marketing
fine jewelry, both wholesale and retail.

Finesse is a corporation organized and ex-
isting under the laws of the State of New
York, with offices at 576 Fifth Avenue,
New York, New York. Finesse is a manu-
facturer and distributor of diamonds, gold
and jewelry. Through the entity Linea
Aurea, Finesse distributes jewelry to stores
around the United States. Finesse is owned
and run by Robert Etessami ("Robert Etes-
sami" or "Robert"). Linea Aurea is man-
aged by Robert Etessami's brother, Kevin
Etessami, ("Kevin Etessami" or "Kevin").

Tess is a company with a principal office
located at 11 Middlesex Road, Great Neck,
New York 11021. Tess is owned and run
by Katherine Tess Etessami, who is mar-
ried to Robert Etessami.

Behnam is a corporation organized and ex-
isting under the laws of the State of New
York, with offices at 23 West 47th Street,
New York, New York 10036. Behnam is in
the business of the manufacture and the
distribution of jewelry at the wholesale
level. Jerry Fox ("Fox") is Behnam's sales
manager.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 2
Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078
**(Cite as: Not Reported in F.Supp.)**

### Prior Proceedings

On May 27, 1997, Behnam and Finesse filed a declaratory judgment action, seeking a determination that: (a) Basha's copyright registration of its baby shoe pendants was invalid; (b) Basha's pendant designs are merely variants of designs long available in the marketplace; (c) Behnam's baby shoe pendant were not copied from any of Basha's designs and were not substantially similar; (d) Finesse's baby shoe pendants were not copies of Basha's designs and were not substantially similar.

On May 28, 1997, Basha filed its answer to the declaratory judgment action, asserting counterclaims for violation of federal copyright and trademark laws, injury to business reputation and dilution of trademark under the New York General Business Law, and common law unfair competition. Also on May 28, 1997, Basha filed the instant motion for a preliminary injunction and temporary restraining order, precluding Behnam and Finesse from manufacturing, displaying or selling infringing baby shoe pendants. On May 29, 1997, this Court granted a three day temporary restraining order, preventing the defendants from displaying or selling any infringing baby shoe pendants at the JCK trade show in Las Vegas, held from May 28 to June 3, 1997.

**\*2** On June 16, 17, 18 and 19, the Court held an evidentiary hearing regarding the preliminary injunction. On June 24 and June 25, the Court received additional papers from Basha and Finesse, at which time the motion was considered fully submitted.

### Findings of Fact

### I. Basha's Acquisition of Rights in Baby Shoe Pendants Designed by Staurino Fratelli

Basha has been in the jewelry business since 1959. He formed Aron Basha Corporation in 1991 to sell fine jewelry at the retail and wholesale levels. Basha's retail business is located on Madison Avenue in Manhattan. Since December 1996, Basha has held a license for the exclusive distribution of baby shoe pendants manufactured by Staurino Fratelli, an Italian jewelry design firm, and has owned the United States copyright for the pendants. At the wholesale level, Basha sells only Staurino Fratelli baby shoe pendants and accessories that complement the pendants. Basha also offers Staurino Fratelli baby shoe pendants for retail sale. The pendants are made from 18 karat gold, and 18 karat gold, and come in three basic shapes: (a) with a bow set on a band across the toe; (b) with a strap across the instep and a band across the toe; (c) with a strap across the instep and no band. The shoes are made of 14 karat gold or silver. Some are ornamented with french enamel in bright pastel colors and/or precious stones in various arrangements. The price of the pendants ranges from $900 to $3,600, depending on the number of diamonds set in the shoe, and the intricacy of the ornamentation.

The pendants were designed by Staurino Fratelli, an Italian firm in the business of the design, manufacture and wholesale of fine jewelry. The baby shoe pendants were first designed in April of 1994, after discussions of the concept between Luigi Staurino, David Staurino and a designer named Barbara Dragoni ("Dragoni"). Luigi Staurino instructed Dragoni to design baby shoe pendants in a specific shape, using bows or straps and colorful ornamentation. After Dragoni drafted the design, David Staurino created the first sample in plaster and then in wax. He spent two months adjusting the proportions of the original design as to length, width, and the use of a bow or strap, as well as ornamentation with precious stones and/or french enamel.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078
**(Cite as: Not Reported in F.Supp.)**

Neither Dragoni nor David Staurino consulted actual baby shoes in designing the baby shoe charms.

Staurino Fratelli began marketing the baby shoe pendants in June 1994 at the Vicenza jewelry trade show in June 1994.[FN1] Subsequently, the baby shoes were prominently displayed in the window showcases at the Staurino Fratelli booth in all the major jewelry trade shows. Each of the baby shoe pendants are made according to the shapes and proportions established in the original model. Although the shoes are sold individually, Staurino Fratelli consistently advertises and displays the shoes in a group in order to create a strong impression of the design.

> **FN1.** The major jewelry trade shows include: the Vicenza trade show, (the "Vicenza show"), which attracts a worldwide attendance and is held three times a year; the Valenza trade show, (the "Valenza show"), which occurs twice a year; the Basel trade show, (the "Basel show"), which attracts worldwide attendance and occurs once a year. (Collectively, the "major trade shows.")

**\*3** Staurino Fratelli advertised its baby shoes widely in the following magazines: Valenza Gioielli, an Italian trade magazine for jewelry, in March and April 1995, February, March and April 1996, and January 1997; Vogue Gioielli in December 1995, December 1996 and April 1997; and Vicenza Magazine in June 1996 and June 1997. These magazines are shipped to members to the jewelry trade, buyers coming to exhibitions and a number of shops around the world. Staurino Fratelli has spent approximately $100,000 on advertising.

As a result of their advertisements and trade show displays, Staurino Fratelli has received telephone orders from the United States, South America and the Far East. The first sales of Staurino Fratelli's baby shoe pendants were made to Japanese and British companies in August of 1994. Staurino Fratelli obtained a patent for their baby shoe pendant designs from the Italian Government on July 23, 1996. As a result of the number of pieces sold, the income accruing from these sales, and the amount of money invested in advertising, the baby shoe charms are now the most important product made by Staurino Fratelli.

Basha first saw Staurino Fratelli's baby shoes pendants at the Vicenza show in June 1995. Although Basha has attended the major jewelry trade shows since 1993, he had never noticed any other baby shoe pendants. Basha bought ten to fifteen baby shoe pendants from Staurino Fratelli for retail sale in his shop in 1995 and 500 pendants in 1996.

On December 23, 1996, Basha entered an agreement with Staurino Fratelli for the exclusive right to sell its baby shoe pendants in the United States. On December 26, 1996, Basha obtained copyright registration for the baby shoe pendants. The registration application stated that the registered work, entitled "It's Shoe Time", is a jewelry design authored by Staurino Fratelli first published in November of 1994. The application was accompanied by one of Basha's photographic advertisements depicting twelve different versions of Staurino Fratelli's baby-shoe pendant, six with bows and six with straps, and each ornamented differently with diamonds, french enamel or both.[FN2]

> **FN2.** In detail, the pendants depicted in the deposit photograph may be described as follows: (a) four

pendants in enamel-covered gold with straps and bands, and seven diamonds set on the toe; (b) four pendants in enamel-covered gold with a diamond-covered bow set on a diamond-covered band across the toe; (c) two pendants, one in gold, one in silver, with a bow set on a band, entirely covered with precious stones; (d) one pendant made of silver with a strap, no band, and diamonds covering the toe only; (e) one pendant in enamel-covered gold with a diamond-covered strap across the instep, a band across the toe.

Basha displays the baby shoes prominently in the window of his Madison Avenue store. He has advertised the shoes in national magazines such as Manhattan File, Hampton magazine, Vogue Gioielli, W, Town and Country, and Parenting. Basha also mailed approximately 3,000 postcards to customers of American Express, displaying a photograph of the baby shoe pendants. The advertisements identify the pendants as baby shoes "designed exclusively for Aron Basha by Staurino Fratelli." Basha spent over $150,000 on advertising the pendants. In response to his advertisements, Basha has received numerous phone orders for the baby shoe pendants. So far in 1997, he has sold 1,200 to 1,500 pendants.

In early 1997, Basha became aware of baby shoe pendants offered for sale by Finesse d/b/a Linea Aurea, Tess and Behnam. Basha immediately instructed his counsel to send cease and desist letters to each of the alleged infringers. FN3 The letter was sent to Tess on May 2, 1997, to Finesse on May 14, 1997, and to Behnam on May 13, 1997. On May 29, 1997 Basha obtained a temporary restraining order from this court, prohibiting Finesse, Tess and Behnam from displaying any infringing baby shoe

pendants at the JCK Jewelry Trade Show which taking place in Las Vegas from May 28 to June 3, 1997, (the "Las Vegas show").

> FN3. Basha sent an additional warning to other participants in the Las Vegas show, advising that Basha's baby shoe line of jewelry products was protected by copyright. Basha also placed an advertisement in National Jeweler magazine, which is distributed to the jewelry trade twice a month, warning against infringement of Basha's copyright in the "It's Shoe Time" line of baby shoe jewelry. The warning included the photograph of the baby shoes pendant which was deposited with the copyright registration.

**\*4** Once at the Las Vegas show, Basha inspected the Finesse d/b/a Linea Aurea booth to determine whether they were abiding by the temporary restraining order issued by this Court prohibiting display or sale of infringing baby shoe pendants. In the Linea Aurea display window, Basha saw six baby shoe pendants which were made of gold, with straps or bows and a band across the toe, covered with two colors of french enamel and set with diamonds. In short, the pendants closely resembled his own.

Basha also obtained an invoice from Behnam which indicated that, despite the restraining order, baby shoe pendants had been offered for sale and ordered by a customer.

## II. Infringement by Finesse d/b/a Linea Aurea

Finesse and Linea Aurea appear to have copied Basha's pendants by importing baby shoe pendants from another Italian com-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.    Page 5
Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078
**(Cite as: Not Reported in F.Supp.)**

pany which copied the Staurino Fratelli design, and by using the imported copies to manufacture its own pendants.[FN4]

> [FN4.] Before relating the circumstances which establish this inference, it may be helpful to describe the two processes by which the imported baby shoe pendant could be copied.
>
> In first process, called the "lost wax" process, the model maker uses the finished piece as a physical design, and sculpts a wax model, excluding any stones set in the finished piece. The wax model is given to a caster, who attaches the model to a tree, a wax rod that holds the model in place. Model and tree are placed within a steel cylinder which is set onto a rubber base, the tree fixed into a hole in the rubber base. The caster then pours plaster of paris, which is called the "investment", around the wax model and tree. After the plaster sets, the wax model and tree are burned out of the plaster, and silver is poured into the plaster. The investment is broken open, leaving a silver model of the pendant attached to a silver rod. The silver model is filed and cleaned. If the product is to be finely crafted, the caster will drill holes in the silver cast to allow stone settings to be soldered into it at a future point. If it is not to be a fine piece of work, the caster will drill holes in the silver casting and solder in settings so that the settings will become part of the next version of the model. The caster then makes a rubber mold of the silver model by placing raw rubber in a frame, and placing the silver model between the layers of rubber. The rubber is vulcanized and cut into two halves, which become the two halves of the mold. Molten wax is shot into the rubber mold, and the investment process is repeated. The resulting plaster mold can be used to cast the finished pieces in gold, brass or silver. The size of the copy will vary according to the skill of the model-maker in carving wax, and according to variables in the vulcanizing process.
>
> The second method is called the "knock off" method. In this process any stones would be removed and the original pendant might also be silver-plated to add thickness for later filing and polishing of the copy. The original is then attached to a sprue, a rod, and placed within layers of raw rubber which is vulcanized. The lost wax process is then utilized to create a silver model and a plaster mold. The finished casts are filed and polished, and stones are set. The dimensions of the copy would be smaller than those of the original.

In 1996 Kevin Etessami imported five to ten baby shoe pendants manufactured by an Italian jewelry manufacturer, Mario Della Carbonare, also called MDC (the "MDC baby shoe pendants"), which had been found to be infringing copies of Staurino Fratelli's designs by a trade fair jury at the Vicenza show in June of 1996. The trade fair jury is an organization that polices the use of jewelry designs at trade shows. The jury found the MDC shoes to be infringing copies, and ordered MDC to remove the pieces from their exhibit and the show catalogue and to cease any sales of the pieces. David Staurino later learned that, although MDC had removed the baby shoes from their window display, they had continued to offer the shoes for sale.[FN5] In September of 1996, Finesse, through Linea

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078
**(Cite as: Not Reported in F.Supp.)**

Case 1:07-cv-01649-CKK    Document 8-4    Filed 11/13/2007    Page 6 of 21    Page 6

Aurea, purchased these pendants from MDC and began to sell the imported MDC baby shoe pendants in the United States.

> FN5. Staurino Fratelli sent MDC a warning letter dated July 4, 1996, directing MDC to cease production, exhibition or sales of its baby shoe jewelry, and, according to David Staurino, continues to pursue its claim against MDC in Italy.

The Etessamis also unsuccessfully attempted to import the actual Staurino Fratelli pendants. In January of 1997, Kevin Etessami visited the Staurino Fratelli booth at the Vicenza trade show with his sister-in-law Katherine Tess and expressed an interest in marketing the Staurino Fratelli baby shoe pendants in the United States. Etessami did not mention that he was already importing the MDC baby shoe pendants. David Staurino informed Etessami that the exclusive agreement with Aron Basha prevented Staurino Fratelli from selling the shoes to other American distributors. Etessami then remarked that he might distribute the shoes in the Far East and South America, and placed an order for four models. Katherine Tess also ordered some baby shoe pendants for her personal use. Two weeks later, Staurino Fratelli sent Etessami a letter declining to ship his order because it conflicted with agreements with other Staurino Fratelli distributors in the Far East, South America, as well as the agreement with Basha in the United States.

As regards the Etessamis manufacture of pendants in the United States, conflicting testimony was heard as to whether the Etessamis copied the MDC copy of Staurino Fratelli's design, or whether they used pendant designs which had been created independently of the Staurino Fratelli designs to manufacture their pendants.

**\*5** Robert Etessami testified that in late 1984, he had seen a photograph of a baby shoe pendant in Sotheby's catalogue, and asked a designer named Mario Archangel ("Archangel") to create a baby shoe pendant design of baby shoe pendants. Between 1984 and 1996, the resulting models were not used.

Archangel testified that he was approached by Robert Etessami in 1984 to design a baby shoe pendant based on a photograph in a Sotheby's catalogue. Archangel created thirteen drawings based on the Sotheby's photograph, and nine silver models based on the drawings. He gave the drawings and models to Robert Etessami in 1985. Archangel had no further conversations with Robert regarding baby shoes until the fall of 1996, when Robert called and told Archangel that Finesse had imported some baby shoe pendants from Italy and intended to produce pendants from the baby shoe models made in 1985.

Kevin and Robert Etessami testified that the Archangel models were used to manufacture Linea Aurea's pendants in 1996. However, the weight of testimony by both the Etessamis is lessened by their self-interest in proving independent creation of the pendants. Moreover, certain discrepancies in other parts of Kevin Etessami's testimony further weakened his credibility.FN6

> FN6. For example, Kevin Etessami testified that he saw Basha's expert witness, Isaac Ainetchi, at the Las Vegas show with Basha. However, Ainetchi established that during the show he was not in Las Vegas.

Daniel Baez, the mold-maker employed by Kevin Etessami testified that he made baby shoe pendant molds for the Etessamis sometime before December, 1996.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078
**(Cite as: Not Reported in F.Supp.)**

Case 1:07-cv-01649-CKK    Document 8-4    Filed 11/13/2007    Page 7 of 21    Page 7

However, he could not positively identify the Archangel models as the basis for those molds. Baez also testified that one of the models from which molds were made for the Etessamis has been lost since February or March, 1997.

The pendants created from this missing model closely resemble one of the imported MDC pendants which in turn appear to be a copy of Staurino Fratelli's designs. Staurino Fratelli makes a gold pendant with a diamond-covered bow set on a diamond-covered band across the toe. The MDC pendant is made of gold, with a plain bow set on a diamond-covered band across the toe. The Linea Aurea pendant is made of gold, with a diamond-covered bow set on a diamond-covered band across the toe. All three pendants are very similar in their rounded proportions and size. The Linea Aurea pendant is very slightly smaller than the MDC pendant. The similarity between the MDC pendant and the Linea Aurea pendant raises the inference that the Linea Aurea pendants were manufactured by copying the MDC pendant rather than using models made by Archangel.

According to testimony of an expert in the jewelry business, a credible and qualified witness, the Linea Aurea pendant was copied from the MDC pendant. The smaller size of the Linea Aurea pendant would result from the copying process, during which the copy of the baby shoe would lose 10 percent of its weight and mass.

The production of Linea Aurea's U.S. manufactured baby shoe pendants was completed sometime between August or September and December of 1996. Kevin Etessami first sold the U.S. manufactured pieces in December of 1996. He first displayed the pieces at a jewelry trade show in Orlando in early February of 1997. Etessami testified that he has sold approxim-

ately $100,000 worth of baby shoe pendants, both imported and U.S. made, between September 1996 and May 1997.

*6 In May 1997, the Etessamis published an advertisement for Linea Aurea jewelry in the brochure for the Las Vegas Show. The photograph in Linea Aurea's ad included two baby shoe pendants, one of which was the MDC pendant. On May 14, Finesse received a cease and desist letter from Basha. After issue of the temporary restraining order from this Court, Kevin Etessami removed the MDC shoes from his display at the Las Vegas show, but he continued to display the Linea Aurea made baby shoe pendants. As described above, the displayed pendants closely resembled those carried by Basha.

### III. Infringement by Katherine Tess Jewelry

Tess sells accessories and jewelry in a business which she began in Great Neck Long Island two years ago. As set forth above, in January 1997, Tess visited the Staurino Fratelli both at the Vicenza show with her brother-in-law, Kevin Etessami. During the visit Tess attempted to purchase several Staurino Fratelli pendants as part of Kevin Etessami's larger order. However, when Kevin's order was canceled, Tess' order was also not filled.

In January or February of 1997, Tess saw one of Basha's promotional postcards depicting baby shoe pendants. In March or April 1997, Tess obtained 29 baby shoe pendants from Kevin Etessami and prepared a post card to advertise her own business. Kevin Etessami testified that eight of the shoes depicted in the postcard were made from Archangel models, and thirteen of the shoes were made from the model lost by the mold-maker, Daniel Baez. The remaining eight pendants were purchased

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078
**(Cite as: Not Reported in F.Supp.)**

Case 1:07-cv-01649-CKK    Document 8-4    Filed 11/13/2007    Page 8 of 21    Page 8

from an Italian supplier, who was also the supplier of the MDC pendants.

Tess' postcard resembled Basha's in the arrangement of the pendants. Both postcards show a thick chain across the top linking the pendants. Both carry the name of the business in fancy script above the chain. Both display an array of other pendants below the chain, although Basha's pendants are linked by a fine gold chain and Tess' pendants are not. The cards are also approximately the same size, although Tess' is slightly narrower.

The individual pendants depicted in Tess' postcard, which she obtained from Linea Aurea, also resemble pendants depicted in Basha's postcard:
(a) sixteen of Tess' pendants are made of enamel-covered gold, with a diamond-covered bow and contrasting color on toe and heel; several of Basha's pendants meet that same description;
(b) three of Tess' pendants are made of enamel-covered gold, with a diamond-covered strap, and a gold band across the toe; several of Basha's pendants do as well;
(c) two of Tess' pendants have a diamond-covered strap and a plain gold or silver surface; none of the pendants in Basha's postcard meet that description, but Basha does carry such a pendant;

(d) three of Tess' pendants have a bow set on a band across the toe and are completely covered with diamonds, or are covered with diamonds on the bow and toe only; several of Basha's pendants have a bow set on a band and are completely covered with diamonds, although none are covered with diamonds on the bow and toe only.

**\*7** On May 2, 1997 Tess received a warning letter from Basha regarding infringement of his copyright in the baby shoe pendants and of his advertisement design.

In response, Tess entered an agreement with Basha that she would no longer offer baby shoe pendants for sale.

### V. Behnam's Infringement

Jerry Fox, the sales manager of Behnam jewelry responsible for developing a new baby shoe product for Behnam, testified that he first thought of marketing baby shoe pendants in 1996 as a result of a trend in baby jewelry. Fox had attended the Vicenza show in January of 1996 and the Basel show in April of 1996 at which Staurino Fratelli baby shoe pendants were prominently displayed. Behnam does not itself manufacture jewelry, but contracts with model makers and casters outside the firm. In September of 1996 Fox asked a designer named Christine Szeto to create baby shoe pendants, and gave her some sketches he had made. Fox's sketches were not presented into evidence and he did not know whether Szeto used the sketches or other sources to create her designs. Behnam did not make Szeto available for testimony. Moreover, there were several differences between the Szeto designs and some of the finished Behnam baby shoes. For example, one Szeto design depicted a metal bow and stones set around the opening of the baby shoe, but the corresponding finished Behnam pendant had stones set in the bow, but not at the opening. This latter arrangement of stones more closely resembles the Staurino Fratelli design than designs by Szeto. Finally, no testimony from the model-maker or caster of the maker of the Behnam shoes was offered which would establish the use of the Szeto designs.

Behnam's first sales of the baby shoes were to Macy's of California in November of 1996. All its shoes were made in 14 karat gold and the average retail selling prices of Behnam's shoes was about $199.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Case 1:07-cv-01649-CKK Document 8-4 Filed 11/13/2007 Page 9 of 21 Page 9
Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078
**(Cite as: Not Reported in F.Supp.)**

In April of 1997, Behnam sent a mailing of approximately 6,000 postcards depicting six of its baby shoe pendants. A comparison of the pendants in the Behnam postcard to those carried by Basha reveal a strong resemblance, as follows:

(a) two of Behnam's pendants are made of gold, with a bow set on a band across the toe, and diamonds covering both bow and band, one with an emerald set in the center of the bow; Basha offers a gold baby shoe pendant with a bow set on a band across the toe, with diamonds covering bow and band;

(b) two of Behnam's pendants are made of gold, with a diamond-covered strap across the instep, a band across the toe, and diamonds set on the toe, four in a cluster on the right hand side, and three set in a triangle pattern on the left hand side; Basha offers a gold pendant with a diamond-covered strap across the instep, a band across the toe, and diamonds set on the toe in the identical pattern, although Basha's pendant is also covered with french enamel in two colors;

(c) one of Behnam's pendants is made of gold, with a strap across the instep and diamonds covering the toe; Basha offers a gold pendant with a strap across the instep and diamonds covering the toe;

**\*8** (d) one of Behnam's pendants is made of gold, with a diamond-covered strap across the instep and a band on the toe; Basha offers a pendant made of gold with a diamond-covered strap across the instep, although there is no band on the toe.

Finally, Behnam's pendants are similarly proportioned and approximately the same size as those carried by Basha.

On May 13, 1997, Behnam received a cease and desist letter from Basha's attorneys, directing it to stop marketing its baby shoe pendants and to send all records to Basha's counsel. After learning of the temporary restraining order issued by this Court, Fox directed the Behnam staff at the Las Vegas show to remove display photographs and printed material regarding the shoes, and to remove the shoe pendants themselves from the showcase. However, an order form from Behnam dated June 1, 1997, the period of the Las Vegas show, lists six different types of baby shoe pendants which were ordered by one of Behnam's customers.

### VI. Affect of Infringement on Basha

Basha had received numerous complaints from his customers and authorized retailers regarding the presence of "knock-offs" being sold in the marketplace at a lower price than Basha's baby shoe pendants. The baby shoe pendants marketed by Finesse, Tess and Behnam are manufactured with gold of lesser quality, fewer precious stones and their design is less intricate and detailed. Basha reports that consumers who are familiar with his baby shoes will believe that Basha has gone into the lower market business, and that the confusion and complaints caused by the alleged infringement has reduced his business by 30 percent. Several exclusive retailers have informed him that they will not market his baby shoe pendants if knock-offs are generally available in the marketplace.

### Conclusions of Law

Basha has asserted his request for injunctive relief based on his counterclaim for copyright infringement and has not pressed or briefed his claims for trade dress infringement, dilution or unfair competition. Injunctive relief against a putative infringer should be granted when the moving party shows: (1) either (a) likelihood of success on the merits, or (b) sufficiently serious questions on the merits and a balance of hardships tipping decidedly in plaintiff's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-01649-CKK    Document 8-4    Filed 11/13/2007    Page 10 of 21

Not Reported in F.Supp.                                                                                    Page 10
Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078
**(Cite as: Not Reported in F.Supp.)**

favor; and (2) likelihood of irreparable injury. *Richard Feiner and Company, Inc. v. Turner Entertainment Co., MGM/UAU, 98 F.3d 33, 34 (2d Cir.1996); Fisher-Price, Inc. v. Well-Made Toy Manufacturing Corp., 25 F.3d 119, 122 (2d Cir.1994); Topps Company, Inc. v. Gerrit J. Verburg Co.,* No. 96 Civ. 7302, 1996 WL 719381 (S.D.N.Y. Dec.13, 1996).

### I. Basha has Demonstrated Likelihood of Success in His Infringement Claim

In order to establish a claim for copyright infringement, a plaintiff must show ownership of a valid copyright and the defendant's infringement by unauthorized copying. *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.), 71 F.3d 996, 1002 (2d Cir.1995); Fisher-Price, 25 F.3d at 122-23; Laureyssens v. Idea Group, Inc., 964 F.2d 131, 139 (2d Cir.1992); Roger v. Koons, 960 F.2d 301, 306 (2d Cir.1992).* To prove infringement, a plaintiff must demonstrate that (1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's. *Fisher-Price, 25 F.3d at 122-23; Laureyssens, 964 F.2d at 140*.

### A. Basha's Copyright is Valid and Basha has Standing to Bring an Infringement Action as to All Staurino Fratelli Pendants

**\*9** Apart from certain exceptions not applicable here, a copyright claimant must obtain a registration from the United States before bringing suit for copyright infringement. *17 U.S.C.A. § 411* (West 1996); *Pristine Industries, Inc. v. Hallmark Cards, Inc., 753 F.Supp. 140, 148 (S.D.N.Y.1990)* (valid federal copyright registration is a necessary element of infringement action).

Basha obtained a single registration for the baby-shoe pendants. The application stated that the work is a jewelry design entitled "It's Shoe Time", authored by Staurino Fratelli and first published in November of 1994. The application was accompanied by a photograph depicting twelve different baby shoe pendants.

The Copyright statute permits registration of multiple related works under a single copyright application.[FN7] *17 U.S.C.A. § 408(c)* (West 1996). Single registration of multiple works was established in the 1976 amendment to *§ 408(c)* in order to encourage authors to seek copyright registration. The House Report to the 1976 amendment states:

> [FN7]. The section states in relevant part: The Register of Copyrights is authorized to specify by regulation the administrative classes into which works are to be placed for purposes of deposit and registration, and the nature of the copies or phonorecords to be deposited in the various classes specified. The regulations may require or permit, for particular classes, ... a single registration for a group of related works. *17 U.S.C.A. § 408(c)(1)* (West 1996).

The provision empowering the Register to allow a number of related works to be registered together as a group represents a needed and important liberalization of the law now in effect. At present the requirement for separate registrations where related works or parts of a work are published separately has created administrative problems and has resulted in unnecessary burdens and expenses on authors and other copyright owners. In a number of cases the technical necessity for separate applications and fees has caused copyright owners to forego copyright altogether. Examples of cases where these undesirable and unne-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 11
Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078
**(Cite as: Not Reported in F.Supp.)**

cessary results could be avoided by allowing a single registration include ...*a group of related jewelry designs...*

House Report on the 1976 Amendment of the Copyright Act, H.R.Rep. No. 1476, 94th Cong., 1st Sess. (1976) *reprinted in* 17 U.S.C.A. § 408 at 466 (West 1996) (emphasis added). The regulation governing single registration, set forth at 37 C.F.R. § 202.3, states in relevant part:

(i) *Registration as a single work.* (1) For the purpose of registration on a single application and upon payment of a single registration fee, the following shall be considered a single work: (A) in the case of published works: All copyrightable elements that are otherwise recognizable as self-contained works, that are included in a single unit of publication, and in which the copyright claimant is the same ...

37 C.F.R. § 202.3(b)(3)(i)(A) (1996).

The Counterclaim Defendants assert that, because the baby shoe pendants are sold separately, they are not eligible for registration as a single work. They cite two cases in support of this position: *Tabra Inc. v. Treasured Paradise Designs, Inc.,* 15 U.S.P.Q.2d 1234 (N.D.Cal.1990) and *Bruce & Company v. B.H. MultiCom. Corp.,* ---F.Supp.---- No. 96 Civ. 8083, 964 F.Supp. 265, 1997 WL 277998 (N.D.Ill. May 15, 1997). However, both cases turn on the question of relatedness of design rather than any evidence that the designs at issue were sold as a single unit.

**\*10** In *Tabra,* the plaintiff's copyright was found invalid because the jewelry designs were not related works; the issue of publication as a "single unit" was not even raised. The plaintiff in *Tabra* included 250 jewelry designs in six separate copyright registrations, grouped by year only, without any attempt to connect the jewelry by distinguishing characteristics. The court found

that the jewelry pieces covered by each of these registrations were a "conglomeration of designs" not necessarily bear any resemblance to each other: "The only apparent relationship is that many pieces are earrings and have a primitive look." *Tabra,* 15 U.S.P.Q.2d at 1237. In contrast, Basha registered twelve closely related designs in its single application. All the pieces are baby shoe pendants shaped according to the specific dimensions created by Staurino Fratelli.

In *Black,* the defendant moved for summary judgment on the grounds that the plaintiff had defectively registered a group of unrelated rings in a single application. The Court agreed that the identifying materials submitted with the registration depicted "a conglomeration of ring designs which bear no resemblance to each other." *Black,* 964 F.Supp. 265, 1997 WL 277998 at *4. The plaintiff countered that the relatedness requirement set forth in 17 U.S.C. § 408(c) was satisfied because "the works are included in a 'single unit of publication' ... [where] the rings are offered for sale together as a line and appear together in their marketing material ..." The court found that "[w] hether the rings are sold separately or together as a line and whether that is sufficient" presented an issue of material fact, and denied summary judgment. *Id.* The court's reasoning in *Black* does not establish that group sale is a condition precedent for single registration of related works. Rather, the court considered without deciding whether "single unit of publication" would be an adequate proxy for the relatedness requirement of § 408(c). *Id.*

One other case has addressed the validity of a single registration for multiple related works. In *Original Appalachian Artworks v. Toy Loft,* 489 F.Supp. 174 (N.D.Ga.1980), *aff'd,* 684 F.2d 821 (11th

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078
**(Cite as: Not Reported in F.Supp.)**

Cir.1982), the plaintiff brought an infringement action regarding a group of soft sculpture dolls registered under the title "The Little People". Like Basha's baby-shoe pendants, the assorted dolls were variations on the same basic design. Although they were sold individually, the dolls were marketed as a single line. The plaintiff corporation would ship its dolls with written information suggesting the manner in which the dolls should be displayed and sold. The court found that the single registration number established a valid copyright for all of the plaintiff's doll designs:

The court has .... concluded that the defendants have infringed plaintiff's copyright ... In reaching this conclusion, the court notes that the plaintiff's copyright registration number VA 35-804 is sufficient to cover all of the differently-styled "Little People" that the plaintiff is presently manufacturing. *See* 37 C.F.R. 202.3(b)(3).

**\*11** *Id.* at 180.

Like the dolls in *Original Appalachian,* Basha's baby shoe pendants are marketed as a single line. Basha consistently displays the pendants in a group in his shop window and advertisements. The pendants are variations on the same basic design; they are related by size, shape, proportion, use of bows or straps, and ornamentation with diamonds or french enamel. Thus, the pendants satisfy the relatedness requirement of § 408(c), and, as in *Original Appalachian,* this relatedness in appearance permits single registration of multiple works.

This conclusion comports with the purpose of § 408(c), which has been "consistently described as a 'permissive' registration provision". Jane C. Ginsburg, *Copyright for the Nineties,* (4th ed.1993) at 381. The language and legislative history of the statute indicates that the only requirement for

single registration of multiple works is "relatedness." There is no evidence in legislative history or case law that the "published in a single unit" language in 37 C.F.R. § 202.3 is meant to constitute an additional condition precedent to valid registration. FN8 In fact, this conclusion is contradicted by the House Report on the 1976 amendment of 17 U.S.C. § 408(c), which explicitly states that the purpose of the amended section is to eliminate the "requirement of separate registrations where related works ... are published separately", thereby encouraging registration of such works as related jewelry designs. H.R.Rep. No. 1476 *reprinted in* 17 U.S.C.A. § 408 at 466. If the works satisfy the requirement of relatedness, as in the case of the Basha's baby-shoe pendants, an additional requirement that the works also be "published in a single unit" would undermine the purpose of the statute.

> FN8. The regulatory language appears to have been drafted in order to protect copyrightable elements included in multi-media works, such as movies and computer games. *See* 2 Melville B. Nimmer, *Nimmer on Copyright,* § 7.18[C][3] (1994) & n. 26 (noting that certain courts have "accorded too much weight to the formality of registration").

Counterclaim defendants also contend that not all of Basha's pendants are covered by the copyright, because the photograph which Basha appended to his application only included twelve versions of the shoe. A copyright registrant is required to submit two complete copies of the best edition of the work within three months after the date of such publication. 17 U.S.C.A. § 407(a) (West 1996):

The requirement of *complete* copies ... means that the copies as deposited must be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078
**(Cite as: Not Reported in F.Supp.)**

fully as complete in all elements ... as were the copies theretofore published. Thus if only a ... portion of the published work is deposited (such as the first of several published chapters) this will not comply with the statutory requirement of complete copies.

2 *Nimmer,* § 7.17[E][2][a] at 7-183 (1991) (emphasis in original).FN9

> FN9. If the work is unwieldy, the registrant may deposit identifying material instead of copies. *Id.* § 408(c); House Report 1476*reprinted in*17 U.S.C.A. § 408 at 466; 2 *Nimmer,* § 7.17[E][2][e].

Failure to deposit a complete copy of the work does not forfeit copyright protection, but it is a prerequisite for bringing an infringement action. *Whimsicality, Inc. v. Rubie's Costume Co., Inc.,* 891 F.2d 452, 453 (2d Cir.1989); *Fonar Corporation v. Magnetic Resonance Plus, Inc.,* 920 F.Supp. 580, 513 (S.D.N.Y.1996). However, errors contained in copyright registration, if committed without deceptive intent, are harmless and do not invalidate the copyright. *Thomas Wilson & Co. v. Irving J. Dorfman, Co.,* 433 F.2d 409, 412 (2d Cir.1970) (failure of second copyright application to refer to first, while "potentially more serious", would not bar copyright protection because made innocently); *Gund, Inc. v. Swank, Inc.,* 673 F.Supp. 1233, 1237 (S.D.N.Y.1987) (error in date of creation and failure to refer to stuffed lion as derivative work not fatal to standing to bring action); *Data General Corp. v. Grumman Systems Support Corp.,* 825 F.Supp. 340 (D.Mass.1993) (several clerical errors in deposit copy of software program not fatal to standing to bring action); *See also* 2 *Nimmer,* § 7.20 (discussing long history of courts permitting plaintiff to bring infringement action where errors in registra-

tion were unaccompanied by fraud.) Thus, Basha's copyright in the pendants omitted from the deposit photograph is valid, and because there is no evidence that Basha submitted the photograph with an intent to deceive, his standing to bring this action is intact as to all pendants.

### B. Evidence of Actual Copying

**\*12** A plaintiff in a copyright infringement action may prove actual copying either by direct evidence, or by indirect evidence showing the defendant's access to the copyrighted work and similarities that are probative of copying between the works termed "probative similarity". *Fisher-Price,* 25 F.3d at 123; *Laureyssens,* 964 F.2d at 140.

Access is established either by demonstrating that (1) the infringed work has been widely disseminated, or (2) a particular chain of events exists by which the alleged infringer might have gained access to the copyrighted work. *Repp v. Webber,* 892 F.Supp. 552, 556-57 (S.D.N.Y.1995). The term "probative similarity" is used to distinguish the analysis used to determine whether copying occurred from the substantial similarity analysis used to determine whether that copying constitutes infringement.

Probative similarity analysis requires consideration of the entire work, while substantial similarity analysis requires comparison only of the protected features. *Fisher-Price,* 25 F.3d at 123 (citing Alan Latman, *Probative Similarity as Proof of Copying: Toward Dispelling Some Myths in Copyright Infringement,* 90 Colum.L.Rev. 1187, 1214 (1990)); *Kurt S. Adler, Inc. v. World Bazaars, Inc.,* 897 F.Supp. 92, 93 (S.D.N.Y.1995); *Tienshan, Inc. v. C.C.A. International,* 895 F.Supp. 651, 656 (S.D.N.Y.1995); 3 *Nimmer,* §

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-01649-CKK    Document 8-4    Filed 11/13/2007    Page 14 of 21

13.03 [[[A], at 13-29 (1996).

### 1. Actual Copying by Finesse

As to one particular gold and diamond bowed pendant, direct evidence was presented that Finesse d/b/a Linea Aurea copied Staurino Fratelli's design. The Etessamis acknowledged importing baby shoe pendants manufactured by MDC in Italy, which a jewelry trade show jury had found to be copies of Staurino Fratelli's design. After importing MDC pendants, Linea Aurea themselves manufactured baby shoe pendants. Although the Etessamis maintained that they had used models created in 1985 by the designer Archangel to manufacture their pendants, they had lost the model used to create one particular line of pendants and their mold-maker could not recall whether he had used the Archangel model to manufacture those pendants. Comparison of the Linea Aurea pendant made from this missing model and an MDC pendant reveals an almost identical appearance; both are made of gold, with a diamond-covered bow set on a band across the toe, and are similarly proportioned, although the Linea Aurea shoe is very slightly smaller than the MDC shoe. Both of these pendants are almost identical to one made by Staurino Fratelli. A reliable expert witness testified that the Linea Aurea gold pendant was copied from the MDC pendant, which would result in a slightly smaller size.

As to the rest of Linea Aurea's pendants, indirect evidence of copying by Linea Aurea was provided by a demonstration of access and probative similarity. Linea Aurea had access to the baby shoe pendants both in Europe and the United States. Since 1994 Staurino Fratelli has displayed its baby shoe pendants at all the major European trade shows, as well as in extensive advertising in European and spe-cifically Italian jewelry trade magazines. Both Etessamis attended several of the European shows. The Etessamis also receive the trade magazines cayrrying Staurino Fratelli's advertisements.[FN10] Kevin Etessami visited the Staurino Fratelli Booth at the Vicenza show in January 1997 and ordered several baby shoes. The Etessamis also had access to the baby shoe pendants in the United States through Basha's displays at trade shows and advertisements in various magazines and postcards. This evidence supports a determination that the Etessamis had access to the Staurino Fratelli designs. *See Kurt S. Adler*, 897 F.Supp. at 93-94 (finding access established by the display at two trade shows attended by defendant).

> FN10. Although Robert Etessami denied having seen any ads for Staurino Fratelli baby shoe pendants, his testimony carries less weight because he is a self-interested witness.

**\*13** Probative similarity has been established between Basha's pendants and those produced by Linea Aurea as follows:

(a) one of Basha's pendants is a gold shoe with a diamond-covered bow set on a diamond-covered band across the toe. Linea Aurea imported a pendant made by MDC which is gold, with a diamond-covered bow set on a plain band across the toe. Linea Aurea also manufactured a gold shoe pendant with a diamond-covered bow set on a diamond-covered band across the toe. Both the imported MDC pendant and Linea Aurea manufactured pendant are similar in proportion to the Basha pendant, albeit slightly smaller in size. The MDC pendant carries its trademark inside on the sole of the shoe. The Linea Aurea manufactured pendant carries a mark designating its gold content also inside on the sole. The Basha

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078
**(Cite as: Not Reported in F.Supp.)**

Case 1:07-cv-01649-CKK    Document 8-4    Filed 11/13/2007    Page 15 of 21    Page 15

shoe also has a trademark stamped inside on the sole of the shoe, albeit slightly closer to the heel;

(b) one of Basha's pendants is made of enamel-covered gold and has a diamond-covered bow set on a diamond-covered band running across the toe. The toe of the shoe is covered in red french enamel, and black enamel covers the sides and back. A trademark is stamped on the inside sole of the shoe towards the heel. The Linea Aurea pendant is also made of enamel-covered gold. The bow is white french enamel, with a diamond set on the center knot. The toe of the shoe is covered in red french enamel and dark blue enamel covers the sides and back. There is no markstamped inside the shoe.

(c) one of Basha's pendants is made of plain gold with a diamond-covered strap across the instep. There is no band or ornamentation on the toe. A trademark is stamped on the inside sole of the shoe towards the heel. The Linea Aurea pendant is also made of gold with a diamond-covered strap across the instep. There is a plain gold band across the toe. There is no trademark stamped on the inside sole.

(d) one of Basha's pendants is made of enamel-covered gold and has a diamond-covered strap across the instep and a gold band across the toe. Black enamel covers the toe, and white covers the sides and back. There is a trademark stamped on the inside sole near the heel. The Linea Aurea pendant is made of enamel-covered gold with a silver strap across the instep and blue enamel on the toe, sides and back. There is a trademark stamped on the inside sole near the heel.

In general, the Linea Aurea pendants are similarly proportioned as the Basha pendants, and follow two of the three basic variations established in Staurino Fratelli's designs, either bow set on a band across the toe, or strap across the instep with a band across the toe. Besides the differences noted above, the Linea Aurea pendants are smaller in size. However, the sum of the many similarities is sufficiently probative to conclude that Linea Aurea actually copied its pendants.

Linea Aurea attempts to rebut Basha's prima facie case of actual copying by asserting that its pendants were made from designs independently created by Archangel in 1984. "If the plaintiff meets its burden of establishing access and similarity, the defendant must then come forward with credible evidence of independent creation to negative the inference of copying." *Arrow Novelty Company Inc. v. ENCO National Corp., 393 F.Supp. 157, 160 (S.D.N.Y.1974)* *aff'd* 515 F.2d 504 (2d Cir.1975). However, "even with such evidence from the defendant, there may be such substantial similarity that no other explanation other than copying is reasonably possible." *Novelty Textile Mills Inc. v. Joan Fabrics Corp., 558 F.2d 1090, 1092 n. 2 (2d Cir.1977); Imperial Textile Co. of New York, Inc. v. Amitex Fabrics Inc., 682 F.Supp. 18, 19 (S.D.N.Y.1987); Arrow Novelty, 393 F.Supp. at 160.* 3 *Nimmer,* § 13.01[B] at 13-13.

**\*14** In *Imperial Textile,* the defendant presented several witnesses who testified that it had independently created its fabric design, which contained the same pattern and colors as the plaintiffs most successful design. The court accepted the defendant's contention that the source of its pattern came from in-house fabrics the defendant already had on hand, but rejected the defendant's conception that the spacing concept, size, selection of colors and arrangement of the pattern were the result of independent creation. The court based its

rejection on strong evidence of access and a similarity so close that "to conclude otherwise would be to find coincidence that defies belief." *Imperial Textile, 682 F.Supp. at 19*. The facts in the instant case are similar. While the Etessamis may have used Archangel's models for the basic slipper used in the baby shoe pendants, the ornamentation with french enamel in bright colors, and diamonds arranged on bow or strap, are too similar to the design choices made by Staurino Fratelli to be mere coincidence. The Etessamis did not decide to use Archangel's models until after Kevin Etessami began importing the MDC copies of Staurino Fratelli's design. Moreover, the Etessamis have never produced those of Archangel's designs which differ from the Staurino Fratelli designs, such as a bootie version, a slipper without a strap or bow, and a slipper with a bow on the side of the strap. This chain of circumstances weakens the Etessamis assertions of independent creation, and re-establishes the conclusion that Linea Aurea's pendants were created to imitate Staurino Fratelli's designs.

### 2. Actual Copying by Tess

Copying by Tess was established by indirect evidence of access and probative similarity. Evidence of access included Tess' visit to the Staurino Fratelli booth at the Vicenza show in January 1997 with her brother in law Kevin Etessami, when she attempted to order Staurino Fratelli baby shoe pendants at that time. Also, Tess admitted seeing Basha's promotional postcard sometime in January or February 1997. It is also probable that Tess would have seen Basha's advertisements in various magazines.

In March or April 1997, Tess produced a promotional postcard that resembled Basha's both in design and in the individual shoes depicted. She obtained baby shoe

pendants from Kevin Etessami and arranged them within the photograph in a chain across the top of the picture, as Basha had done in his postcard. She inserted her business' name above the chain in fancy script similar to that used by Basha. Tess' postcard is almost identical in size and shape to Basha's. While the shoes in the bottom half of Tess' postcard are loosely grouped, rather than linked by a fine gold chain as in Basha's, this difference does not outweigh the similarity between Tess' other design decisions and the choices used by Basha. Moreover, 21 of the 28 pendants in Tess' postcard were manufactured by Linea Aurea, and these pendants closely resembled Basha's.

### 3. Actual Copying by Behnam

**\*15** Copying by Behnam was also established by indirect evidence. Behnam obtained access to Basha's pendants when Fox attended the Vicenza show in January 1996 and the Basel show in April 1996 and read the catalogues produced for those trade fairs. While Fox denied reading some of the magazines in which the Basha pendants were advertised, he acknowledged that it was his job to keep abreast of trends in the jewelry trade. Given the pervasive advertising of the pendants by both Basha in the United States and Staurino Fratelli in Europe, it is unlikely that Fox could have failed to note their designs. Finally, Behnam used six pendants for a promotional mailing which closely resembled Basha's shoes. Because not all of Behnam's pendants are similar to those of Basha, the choice of those which most closely resemble the Staurino Fratelli designs raises the inference that Behnam had access to Basha's ads and was attempting to benefit from the popularity of his pendants.

As detailed above, probative similarity has been established between the six Behnam

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

pendants depicted in the post card and Basha's pendants, as follows:

(a) several of Basha's pendants are made of enamel-covered gold with a diamond-covered strap across the instep, contrasting colors of enamel on toe and back, and seven diamonds set in the enamel on its toe, four in a cluster on the right and three scattered on the left. Behnam has two pendant with a diamond-covered strap across the instep and diamonds arranged in an identical manner to the stones on Basha's pendants, although Behnam's pendants are not coated with enamel, and one is silver rather than gold;

(b) one of Basha's pendants is made of gold with a diamond-covered bow set on a diamond-covered band across the toe. Behnam has two gold pendants with a diamond-covered bow, although there is no band across the toe, and one of the pendants has a colored stone set in the center knot of the bow;

(c) one of Basha's pendants is made of gold, with a plain strap across the instep and diamonds covering the toe only. Behnam also carries a gold pendant with a plain strap across the instep and a diamond-covered toe;

(d) one of Basha's pendants is gold with a diamond-covered strap across the instep and no decoration on the toe. Behnam carries a pendant made of gold with a diamond-covered strap and a plain gold band across the toe.

Finally, both Basha's and these six of Behnam's pendants are similar in their rounded proportions, although the Behnam pendants are slightly smaller and have a circular opening rather than an oval opening, as in the Basha pendants. This evidence of access and similarity leads to a conclusion that the six shoes depicted in

Behnam's postcard were copied from Staurino Fratelli's design.[FN11]

> [FN11.] The other 42 Behnam pendants differ from Basha's because of their smaller size, different ornamentation or both.

Behnam attempts to rebut this conclusion with the defense of independent creation, but its evidence is unpersuasive. Behnam did not offer testimony by the designer, "the one person who knows first hand whether [the pendants] were copied." *Tienshan,* 895 F.Supp. At 658. Behnam's witness, Fox, testified that he provided sketches of baby shoes to a designer, but could not assert from first hand knowledge that the designer had used only his sketches when preparing her drawings. The details of Behnam's pendants differed from the details in the designer's drawings, but resembled the details in Staurino Fratelli's pieces. As set forth above, Fox had ample opportunity to observe the Staurino Fratelli pendants at trade shows and in Basha's advertisements. It is not unlikely that his designer, also a member of the jewelry trade, would have had equal access to Staurino Fratelli's designs.

### C. Substantial Similarity

**\*16** Once actual copying is established, Basha must show that "the copying amounts to an improper appropriation by demonstrating that substantial similarity to protected material exists between the two works." *Laureyssens, 964 F.2d at 140.* Analysis of substantial similarity requires a "sharper focus" than that of probative similarity, for it includes only the protectible elements of the two works. *Fisher Price, 25 F.3d at 123.* "That is, the plaintiff must show that the defendant appropriated the plaintiff's particular means of expressing an idea, not merely that he expressed the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 18
Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078
**(Cite as: Not Reported in F.Supp.)**

same idea." This determination is not an exact science. *Id.*

In most cases the test for substantial similarity is the "ordinary observer test", which determines whether an ordinary lay observer would recognize the alleged copy as having been appropriated from the copyrighted work. *Knitwaves,* 71 F.3d at 1002 (citing *Folio Impressions,* 937 F.2d at 766); *Laureyssens,* 964 F.2d at 141 (citing *Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274 F.2d 487, 489 (2d Cir.1960)* (L.Hand., J.)). Where, as here, the works contain both protected and unprotected elements, the Second Circuit applies the "discerning ordinary observer test", which examines similarity between the protectible elements of the plaintiff's work and the copy. *Knitwaves,* 71 F.3d at 1002; *Fisher-Price,* 25 F.3d at 123; *Laureyssens,* 964 F.2d at 141; *Tienshan,* 895 F.Supp. at 657. However, the Second Circuit cautions that in applying the more discerning inquiry, district courts should compare "the works' total concept and feel." *Knitwaves,* 71 F.3d at 1003, (citing *Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 358, 362, 111 S.Ct. 1282, 113 L.Ed.2d 358).*

There is a tension between the discerning ordinary observer test, which requires extraction and comparison only of protectible elements, and the *Knitwaves* court's direction that a determination of substantial similarity should rely on the work's "total concept and feel." *See M.H. Segan Limited Partnership v. Hasbro, Inc., 924 F.Supp. 512, 520 (S.D.N.Y.1996)* ("Although the [more discerning ordinary observer test] requires that the Court exclude unprotectible ideas ... it must examine the 'total concept and feel' of the executed works.") At the root of these conflicting values is a concern that extraction of protectible elements would eliminate protection for works which are an original compilation of un-

protected elements which, as the Supreme Court made clear, should be included under the aegis of the copyright statute. *Feist, 499 U.S. at 358.* As the *Knitwaves* court observed, if extracting only protectible elements was taken to its logical conclusion, "[courts] might have to decide that there can be no originality in a painting because all colors of paint have been used somewhere in the past." *Knitwaves 71 F.3d at 1003.* To avoid this extreme, this Court must strike a balance between extraction of protected elements and consideration of overall look and feel when applying the discerning ordinary observer test:

*\*17* Through *Knitwaves,* the Second Circuit has recently reconfirmed that the more discerning ordinary observer test is not an invitation to dissect a work into its constituent elements or features. The works as a whole must be compared to each other.

*M.H. Segan,* 924 F.Supp. at 521.

The question of substantial similarity is largely answered by the comparison conducted in the probative similarity analysis. *Tienshan,* 895 F.Supp. at 658. However, it is necessary to identify the protectible elements of Basha's pendants. *Id.* Staurino Fratelli created three basic designs of baby shoe pendant: one with a bow set on a band running across the toe; one with a strap across the instep and a band running across the toe; one with a strap and no band across the toe. The proportions of the shoe were specifically adjusted to be round, even bulbous, with an ovoid opening to the shoe, creating an overall look of chubbiness. Protectible elements are found in Staurino Fratelli's different arrangements of the ornamentation with french enamel and diamonds, such as the setting of diamonds on strap or bow and band, the use of contrasting colors of french enamel on toe and sides, and the pattern of the seven stones on the toe. *See, Knitwaves,* 71 F.3d 1004

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(finding selection of leaves and squirrels as dominant design elements, fall palette of colors, and arrangement of elements into pattern to be protectible); *Tienshan,* 895 F.Supp. at 658-59 (finding placement on box of text, trademark, logo and photographs of actual plates and bowls to be protectible); *Saban Entertainment, Inc. v. 222 World Corp.,* 865 F.Supp. 1047, 1051 (S.D.N.Y.1994) (features in Power Ranger cartoon characters rarely found in combination distinguish them from generic masked heroic figures).

As set forth above, comparison of Linea Aurea's pendants to those sold by Basha reveals a close resemblance in protected features as well as overall look and feel. The shoes are almost identical in size and shape. Linea Aurea's shoes also incorporate two of the three basic variations established by Staurino Fratelli. Linea Aurea's shoes are ornamented similarly to those carried by Basha, for example, Linea Aurea coats its shoes with french enamel and insets diamonds on the band and strap. Even the choice of colors for the enamel is similar. While the Linea Aurea shoes are slightly smaller, they closely resemble Basha's pendants in their rounded proportions. In sum, sufficient similarities exist in both protectible elements and in the "total concept and feel" that a discerning observer would conclude that one was the copy of another.

As set forth above, comparison of Behnam's line of pendants to the Basha pendants reveals substantial similarity in six of Behnam's 48 pendants. These include the two pendants with the seven stones arranged on the toe, the two pendants with diamond-covered bows on the toe, the pendant with a plain strap across the instep and diamonds covering the toe, and the pendant with the diamond-covered strap across the instep.

### D. Merger Defense: Idea/Expression

**\*18** Both Linea Aurea and Behnam contend that Staurino Fratelli's expression of baby shoes is merged with the idea of baby shoes, and is therefore unprotectible, and that the similarities between their pendants and those of Basha/Staurino Fratelli are common to any execution of the idea of baby shoes. Citing *Herbert Rosenthal Jewelry Corporation v. Kalpakian,* 446 F.2d 738 (9th Cir.1971). In *Rosenthal,* the court ruled that despite evidence of actual copying and substantial similarity between the jeweled bee pins created by plaintiff and defendant, no infringement had occurred, because "the idea and its expression appear to be indistinguishable" and the similarities observed were "inevitable from the use of jewel-encrusted bee forms in both." *Id.* at 742. According to this doctrine, "[t]he idea and expression will coincide when the expression provides nothing new or additional over the idea," *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corporation,* 562 F.2d 1157, 1168 (2d Cir.1977), however, "[t]he complexity and artistry of the expression of an idea will separate it from even the most banal idea." *Id.*

While there is no dispute that the simple idea of baby shoe pendant is unprotectible, "from an artistic standpoint, there is, indeed, a virtually infinite variety of ways to express the idea of [baby shoes]." *Kurt S. Adler,* 897 F.Supp. at 95. In the instant case, Staurino Fratelli has designed a version of a baby shoe pendant which is more complex and artistic than the banal idea of baby shoe pendants. David Staurino testified that he spent two months adjusting the exact size, style and proportions of the pendant. He then designed several specific ornamentations of the shoe, using diamonds, french enamel, gold and silver. These specific choices as to size, shape,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078
**(Cite as: Not Reported in F.Supp.)**

proportion, and ornamentation constitute an artistic expression of a baby shoe pendant beyond its stereotypical features. In sum, the Staurino Fratelli pendants contain far more than the "dash of originality" needed to provide copyright protection. *Tienshan,* 895 F.Supp. at 658 (citing *Rogers,* 960 F.2d at 307).

Moreover, the Counterclaim Defendants' own evidence undercuts their claims of idea/expression merger. First, Defendants produced an actual baby shoe and a silver baby shoe ornament to establish that Staurino Fratelli merely used the basic idea of a baby shoe, but, in fact, the shoe and ornament differed in design from the pendants made by Staurino Fratelli: both sported both strap and bow; neither included a band across the toe. Second, the drawings by the defendants' own designers contained variations on a baby shoe which do not appear in Staurino Fratelli's designs, such as a bootie, a sneaker, a slipper without bow or strap, and a strapped instep with a bow on the side. In light of these many alternative versions of baby shoe design, the Counterclaim Defendants merger defense must fail.

**\*19** For the reasons set forth above, Basha has demonstrated a likelihood of success on the merits in its claim of copyright infringement.

## II. Irreparable Harm

Where a plaintiff makes out a prima facie case of copyright infringement, irreparable injury can be presumed. *Fisher-Price,* 25 F.3d at 123; *Kurt S. Adler,* 897 F.Supp. at 96; *Tienshan,* 895 F.Supp. at 659; *Golden Bear,* 27 U.S.P.Q.2d at 1552. As explained by the Second Circuit:
[T]his is because the confusion created in the marketplace will damage the copyright holder in incalculable and incurable ways

... confusion may cause purchasers to refrain from buying either product and to turn to those of other competitors. Furthermore, if an infringer's product is of poor quality, a more lasting but not readily measurable injury may be inflicted on the plaintiff's reputation in the market.

*Fisher-Price,* 25 F.3d at 124 (internal quotations and ellipses omitted). Basha presented testimony to support this presumption; customers and authorized retailers have complained about the presence of "knock-off" versions being sold in the marketplace at a lower price, and several exclusive retailers have informed him that they will not market his baby shoe pendants if the presence of knock-offs continues. Linea Aurea, Tess and Behnam have not presented any evidence to rebut this presumption.

## IV. Motion for Recall

Basha requests an order directing the Counterclaim Defendants to recall all infringing pendants sold to customers. Linea Aurea claims that it has sold 100,000 baby shoe pendants since September 1996. Behnam has not provided a figure of its total sales, although the figure would have to be adjusted to include only those shoes which have been determined to be substantially similar to the Staurino Fratelli pendants.

"[T]he imposition of a recall requirement is well within the district court's broad powers as a court of equity." *Perfect Fit Industries, Inc. v. Acme Quilting Co. Inc.,* 646 F.2d 800, 805 (2d Cir.1981). A district court must consider the likely burden and expense of a recall to the defendant, and balance that burden against the benefit that would accrue to the plaintiff. *Id.* at 807. In this case, the burden to the Counterclaim Defendants in recalling existing stock

Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078
**(Cite as: Not Reported in F.Supp.)**

ordered by other jewelry businesses would not be unduly burdensome. The Counterclaim Defendants need only write a letter to its wholesale customers and pay the cost of the return for customers who comply. *Id.* The recall of wholesale orders would significantly benefit Basha, who has testified that he risks losing customers if the infringing shoes are disseminated in the general marketplace.

However, the recall order will not apply to existing stock ordered by individual customers for personal use. *Eve of Milady v. Impression Bridal, Inc., 957 F.Supp. 484, 491 (S.D.N.Y.1997).* In *Eve of Milady,* the court issued a recall order as to infringing bridal gowns which had been ordered by retailers, but not as to gowns which had been ordered by individual customers because "such an order would be a source of immediate prejudice to the brides who had planned to wear the defendants' dresses at their weddings." *Id.* In the instant case, the baby shoe pendants are likely presents for new parents, and recall would impose prejudice to the individual customers who have already formed sentimental associations between the pendants and their babies. Recall to individual customers would also impose a greater burden on the Counterclaim Defendants.

### V. Motion for Expedited Discovery

**\*20** Basha also moves for expedited discovery pursuant to Rules 30(a), 33(a) and 34(a) of the Federal Rules of Civil Procedure in order to discover the full nature of each counterclaim defendant's infringing activities. District Courts have broad power to permit expedited discovery in appropriate cases, see Rules 26(d), 33(a) and 34(b), Fed.R.Civ.P., and such discovery is routinely granted in actions involving infringement and unfair competition. *See, e.g., Revlon Consumer Products Corp. v.*

*Jennifer Leather Broadway, 858 F.Supp. 1268, 1269 (S.D.N.Y.1994),* aff'd without opinion, 57 F.3d 1062 (2d Cir.1995); *Francis S. Denney, Inc. v. I.S. Lab, Inc., 737 F.Supp. 247, 248 (S.D.N.Y.1990).* Basha's discovery motion will be granted.

### Conclusion

For the reasons set forth above, and pending a trial on the merits of this action, it is hereby ordered that J.D. Finesse d/b/a Linea Aurea, Katherine Tess Inc. and Behnam are enjoined from manufacturing or selling any baby shoe pendants which are substantially similar to the Staurino Fratelli pendants licensed to Aron Basha. It is also ordered that Behnam and Finesse recall infringing pendants which have been sold to its wholesale customers.

Basha's motion for expedited discovery regarding the full nature of each Counterclaim Defendant's infringing and improper activities is also hereby granted.

It is so ordered.

S.D.N.Y.,1997.
Benham Jewelry Corp. v. Aron Basha Corp.
Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                          Page 1
Slip Copy, 2007 WL 1893603 (D.N.M.)
**(Cite as: Slip Copy)**

C
Capitol Records, Inc. v. Does 1-16
D.N.M.,2007.
Only the Westlaw citation is currently
available.
  United States District Court,D. New Mex-
ico.
    CAPITOL RECORDS, INC., et al.,
              Plaintiffs,
                   v.
      DOES 1-16, Defendants.
        **No. Civ. 07-485 WJ/LFG.**

            May 24, 2007.

<u>John R. Matney, Jr.,</u> Gardere Wynne
Sewell LLP, Dallas, TX, for Plaintiff.

         EX PARTE APPLICATION
GARCIA, Chief Magistrate J.
**\*1** THIS MATTER is before the Court on
Plaintiffs' *Ex Parte* Application for Leave
to Take Immediate Discovery [Doc. 4]. For
the reasons stated herein, the motion is
DENIED.

Plaintiffs, companies who own copyrights
in various sound recordings, bring an ac-
tion against unnamed Defendants, Does
1-16, for copyright infringement. They
contend that the Doe Defendants, without
authorization, used online media distribu-
tion systems, for example, a peer-to-peer or
"P-2-P" system, to download Plaintiffs'
copyrighted works and to distribute copy-
righted works to others.

Plaintiffs state that they have identified
Doe Defendants by an Internet Protocol
("IP") address assigned to each Defendant
on the date and at the time of the alleged
infringing activity. Plaintiffs contend that
the Internet Service Provider ("ISP") is the
University of New Mexico, and they claim
that the University can easily identify the
name and address of Doe Defendants. That
information, with other private data, is al-
leged to be contained in each ISP sub-
scriber's activity log files.

Plaintiffs intend to serve Rule 45 subpoen-
as on the University of New Mexico, not
on individual subscribers, and thereby seek
access to private information. If, indeed,
the Does are faculty or students at the Uni-
versity, disclosure of subscriber log files
may contain highly confidential and sensit-
ive files, disclosure of which could well be
violative of the subscribers' privacy rights.
Access to a subscriber's Internet informa-
tion may include a wealth of information
including name, address, social security
numbers, credit card information, purchase
histories, as well as road map of the sub-
scribers' Internet activities, and perhaps
disclosure of their private e-mail commu-
nications.[FN1]

> FN1. Plaintiffs state they seek only
> each proposed Defendant's true
> name, current and permanent ad-
> dress and telephone numbers, e-
> mail addresses, and media control
> addresses.

Plaintiffs contend that unless the Court al-
lows *ex parte* immediate discovery, they
will be irreparably harmed. While the
Court does not dispute that infringement of
a copyright results in harm, it requires a
Coleridgian "suspension of disbelief"[FN2]
to accept that the harm is irreparable, espe-
cially when monetary damages can cure
any alleged violation. On the other hand,
the harm related to disclosure of confiden-
tial information in a student or faculty
member's Internet files can be equally
harmful.

> FN2. This phrase, introduced by
> Samuel Coleridge in Ch. XIV of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Biographia Literaria,* describes a voluntary withholding of skepticism on the part of a reader with regard to incredible events. John A. Cuddon, *A Dictionary of Literary Terms and Literary Theory,* 1044 (3d ed.1991).

As the Plaintiffs do not presently know the identity of the Defendants, there is no reasonable way to ensure that those prospective Defendants are given notice or even an opportunity to respond in opposition to the request for disclosure. Rather, Plaintiffs seek to obtain information directly from the University of New Mexico. Plaintiffs propose that the University will be able to notify subscribers that a subpoena was served. However, the Court needs to ensure that subscribers actually receive notification and are given a reasonable opportunity to intervene in order to stop the disclosure of sensitive information.

In any event, the Court's sees no need to act on an *ex parte* application. Rather, it would appear appropriate that Plaintiffs and the University of New Mexico confer on an appropriate process to ensure that, if a subpoena is served, the University not turn over information until it has given notice to individual subscribers that a subpoena has been issued and allow those subscribers to intervene in this proceeding to protect disclosure of sensitive information. Moreover, *ex parte* proceedings should be the exception, not the rule. Accordingly, the Court declines to grant Plaintiffs' request for *ex parte* application.

**\*2** Further, the federal rules prohibit discovery until the parties have met and conferred, formulated an appropriate discovery plan, and made arrangements for disclosure of information. Fed.R.Civ.P. 26. Here, of course, the individual subscribers are unknown, have not been sued and cannot

"meet and confer" with Plaintiffs. However, the University of New Mexico, the entity from which discovery is sought, has a right to be heard on this matter.

Accordingly, the Court directs Plaintiffs to contact University counsel, apprise the University that it is seeking discovery from the University, and attempt to agree on a fair and reasonable process that would allow Plaintiffs to identify limited information about the subscribers. If Plaintiffs and the University can agree on a process that includes prior notification to subscribers and a reasonable period of time to intervene or object, a proposed consent order should be submitted. If Plaintiffs and the University cannot agree, the Court will conduct a status conference with Plaintiffs' counsel and University counsel on the appropriate manner to initiate discovery and provide notice to affected individuals. Once Plaintiffs' counsel confers with the University of New Mexico legal division, Plaintiffs' counsel is to notify the Court concerning the status of their agreements, if any.

IT IS THEREFORE ORDERED that Plaintiffs' *Ex Parte* Application for Leave to Take Immediate Discovery [Doc. 4] is DENIED.

D.N.M.,2007.
Capitol Records, Inc. v. Does 1-16
Slip Copy, 2007 WL 1893603 (D.N.M.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2002 WL 1997918 (S.D.N.Y.), 2002 Copr.L.Dec. P 28,483
**(Cite as: Not Reported in F.Supp.2d)**

Arista Records, Inc. v. Mp3Board, Inc.
S.D.N.Y.,2002.

United States District Court, S.D. New York.
ARISTA RECORDS, INC., et al., Plaintiffs,
v.
MP3BOARD, INC., Defendant.
**No. 00 CIV. 4660(SHS).**

Aug. 29, 2002.

Record companies brought action against Internet site operator, alleging that operator provided users with links to pirated copies of copyrighted musical recordings, thereby facilitating copyright infringement. Site operator asserted third-party claim against trade association of record companies, asserting tortious interference and knowing misrepresentation of infringement claims. Cross motions for summary judgment were filed. The District Court, Stein, J., held that: (1) fact questions existed as to whether any direct infringement resulted from operation of web site and whether operator materially contributed to copyright infringement; (2) letter from record companies' trade organization substantially complied with Digital Millennium Copyright Act (DMCA) notification requirements; (3) fact question existed as to whether operator was a "service provider" within DMCA; (4) factors weighed against finding that operator made fair use of copyrighted recordings; and (5) notice of copyright infringement sent to operator's Internet service provider (ISP) would not support tort claims by operator.

Motions granted in part and denied in part.
West Headnotes
**[1] Copyrights and Intellectual Property**

**99 ⌀89(2)**

99 Copyrights and Intellectual Property
    99I Copyrights
        99I(J) Infringement
            99I(J)2 Remedies
                99k72 Actions for Infringement
                    99k89 Judgment
                        99k89(2) k. Summary Judgment. Most Cited Cases
Genuine issue of material fact existed as to whether any direct infringement of record companies' copyrights resulted from Internet site operator's operation of web site that allegedly allowed and encouraged web site visitors to download music files, precluding summary judgment on record companies' copyright infringement claims against operator. 17 U.S.C.A. § 501(a).

**[2] Copyrights and Intellectual Property**
**99 ⌀66**

99 Copyrights and Intellectual Property
    99I Copyrights
        99I(J) Infringement
            99I(J)1 What Constitutes Infringement
                99k66 k. Musical Works. Most Cited Cases
Record companies were required to show that unlawful copy of copyrighted work was disseminated to the public, in companies' action against Internet site operator alleging that operator provided Internet users with links to pirated copies of copyrighted musical recordings, thereby facilitating copyright infringement. 17 U.S.C.A. § 106(3).

**[3] Copyrights and Intellectual Property**
**99 ⌀89(2)**

99 Copyrights and Intellectual Property
    99I Copyrights

Not Reported in F.Supp.2d, 2002 WL 1997918 (S.D.N.Y.), 2002 Copr.L.Dec. P 28,483
**(Cite as: Not Reported in F.Supp.2d)**

        99I(J) Infringement
          99I(J)2 Remedies
            99k72 Actions for Infringement
            99k89 Judgment
              99k89(2) k. Summary
Judgment. Most Cited Cases
Genuine issue of material fact existed as to
whether Internet site operator, which al-
legedly provided users with links to pirated
copies of copyrighted musical recordings,
and which solicited third parties to post
links to sites containing audio files, materi-
ally contributed to copyright infringement,
precluding summary judgment on record
companies' infringement claims against op-
erator. 17 U.S.C.A. § 101 et seq.

**[4] Copyrights and Intellectual Property**
**99 ☞89(2)**

99 Copyrights and Intellectual Property
    99I Copyrights
      99I(J) Infringement
        99I(J)2 Remedies
          99k72 Actions for Infringe-
ment
          99k89 Judgment
            99k89(2) k. Summary
Judgment. Most Cited Cases
Genuine issues of material fact existed re-
garding whether Internet site operator
could be imputed to have constructive
knowledge of activity by site users that al-
legedly infringed on record companies'
copyright to recordings, based upon site
operator's technology's capabilities, pre-
cluding summary judgment on record com-
panies' contributory copyright infringement
claims against site operator. 17 U.S.C.A. §
101 et seq.

**[5] Copyrights and Intellectual Property**
**99 ☞50.1(1)**

99 Copyrights and Intellectual Property
    99I Copyrights

      99I(F) Notice
        99k50.1 Notice on Copies
          99k50.1(1) k. In General.
Most Cited Cases
Letter sent by record companies' trade or-
ganization to Internet service provider
(ISP), pursuant to Digital Millennium
Copyright Act (DMCA), failed to put Inter-
net site operator on notice of any alleged
copyright infringement; letter solely listed
recording artists' names, and failed to spe-
cify any infringing links or even particular
songs. 17 U.S.C.A. § 512(d)(1)(C)(3).

**[6] Copyrights and Intellectual Property**
**99 ☞50.1(1)**

99 Copyrights and Intellectual Property
    99I Copyrights
      99I(F) Notice
        99k50.1 Notice on Copies
          99k50.1(1) k. In General.
Most Cited Cases
Letter from record companies' trade organ-
ization to Internet site operator substan-
tially complied with Digital Millennium
Copyright Act (DMCA) notification re-
quirements to put site operator on notice of
alleged copyright infringement; letter
named particular artists and specified
songs, and was accompanied by printouts
of screen shots of site operator's web site,
with the allegedly infringing material high-
lighted, although organization did not
provide site operator with the specific Uni-
versal Resource Locators (URL) of the
pages to which the links connected. 17
U.S.C.A. § 512(d)(1)(C)(3).

**[7] Copyrights and Intellectual Property**
**99 ☞89(2)**

99 Copyrights and Intellectual Property
    99I Copyrights
      99I(J) Infringement
        99I(J)2 Remedies
          99k72 Actions for Infringe-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1997918 (S.D.N.Y.), 2002 Copr.L.Dec. P 28,483
**(Cite as: Not Reported in F.Supp.2d)**

ment

99k89 Judgment
99k89(2) k. Summary
Judgment. Most Cited Cases
Genuine issue of material fact existed as to
whether Internet site operator had actual
knowledge of actual copyright infringe-
ment by site users, based on notification
sent by record companies' trade organiza-
tion to site operator, pursuant to Digital
Millennium Copyright Act (DMCA), pre-
cluding summary judgment on record com-
panies' contributory copyright infringement
claims against site operator. 17 U.S.C.A. §
512(d)(1)(C)(3).

**[8] Copyrights and Intellectual Property
99 89(2)**

99 Copyrights and Intellectual Property
99I Copyrights
99I(J) Infringement
99I(J)2 Remedies
99k72 Actions for Infringe-
ment
99k89 Judgment
99k89(2) k. Summary
Judgment. Most Cited Cases
Genuine issues of material fact existed as
to whether Internet site operator was a
"service provider" within the meaning of
the Digital Millennium Copyright Act
(DMCA) who was entitled to safe harbor
protections from vicarious copyright in-
fringement claims asserted by record com-
panies, precluding summary judgment on
companies' infringement claims against op-
erator. 17 U.S.C.A. § 512(d)(1).

**[9] Copyrights and Intellectual Property
99 89(2)**

99 Copyrights and Intellectual Property
99I Copyrights
99I(J) Infringement
99I(J)2 Remedies
99k72 Actions for Infringe-

ment

99k89 Judgment
99k89(2) k. Summary
Judgment. Most Cited Cases
Genuine issues of material fact existed as
to whether Internet site operator had right
and ability to supervise allegedly infringing
activities of site users, such as supervision
of postings made to site or by deleting
links from database, precluding summary
judgment on vicarious copyright infringe-
ment claims against site operator by record
companies. 17 U.S.C.A. § 101 et seq.

**[10] Copyrights and Intellectual Prop-
erty 99 89(2)**

99 Copyrights and Intellectual Property
99I Copyrights
99I(J) Infringement
99I(J)2 Remedies
99k72 Actions for Infringe-
ment
99k89 Judgment
99k89(2) k. Summary
Judgment. Most Cited Cases
Genuine issue of material fact existed as to
whether Internet site operator possessed a
direct financial interest in exchange of files
that infringed on record companies' copy-
rights, precluding summary judgment on
vicarious copyright infringement claims by
record companies against site operator. 17
U.S.C.A. § 101 et seq.

**[11] Copyrights and Intellectual Prop-
erty 99 66**

99 Copyrights and Intellectual Property
99I Copyrights
99I(J) Infringement
99I(J)1 What Constitutes In-
fringement
99k66 k. Musical Works.
Most Cited Cases
All factors for determining whether an al-
legedly infringing use of copyrighted ma-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Case 1:07-cv-01649-CKK     Document 8-6     Filed 11/13/2007     Page 4 of 22    Page 4
Not Reported in F.Supp.2d, 2002 WL 1997918 (S.D.N.Y.), 2002 Copr.L.Dec. P 28,483
**(Cite as: Not Reported in F.Supp.2d)**

terial was a "fair use" weighed against finding that Internet site operator made fair use of copyrighted recordings, on record companies' copyright infringement claims; the use was commercial, the copied works were retransmitted and not transformed, the nature of the copyrighted sound recordings was close to the core of intended copyright protection, entireties of copyrighted works were allegedly infringed, and the allegedly infringing use could harm the market for the original works. 17 U.S.C.A. § 107.

**[12] Copyrights and Intellectual Property 99 87(3.1)**

99 Copyrights and Intellectual Property
    99I Copyrights
        99I(J) Infringement
            99I(J)2 Remedies
                99k72 Actions for Infringement
                    99k87 Damages and Profits
                        99k87(3) Statutory Damages; Minimum Award
                            99k87(3.1) k. In General. Most Cited Cases
Copyright Act would permit record companies to elect to recover award of statutory damages against Internet site operator, upon a showing of infringement. 17 U.S.C.A. § 504(c).

**[13] Copyrights and Intellectual Property 99 66**

99 Copyrights and Intellectual Property
    99I Copyrights
        99I(J) Infringement
            99I(J)1 What Constitutes Infringement
                99k66 k. Musical Works. Most Cited Cases

**Torts 379 241**

379 Torts

379III Tortious Interference
    379III(B) Business or Contractual Relations
        379III(B)2 Particular Cases
            379k241 k. Business Relations or Economic Advantage, in General. Most Cited Cases
    (Formerly 379k12, 379k10(3))

**Torts 379 242**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)2 Particular Cases
                379k242 k. Contracts in General. Most Cited Cases
    (Formerly 379k12, 379k10(3))
Notice of alleged copyright infringement, sent by record companies' trade organization to Internet service provider (ISP), allegedly containing knowing and material misrepresentations, would not support cause of action by Internet site operator for tortious interference with contractual relations and prospective economic advantage and knowing misrepresentation of infringement in violation of Digital Millennium Copyright Act (DMCA), absent showing of damages incurred by site operator. 17 U.S.C.A. § 512(f).

**[14] Fraud 184 58(2)**

184 Fraud
    184II Actions
        184II(D) Evidence
            184k58 Weight and Sufficiency
                184k58(2) k. Falsity of Representations and Knowledge Thereof. Most Cited Cases
    (Formerly 99k83(6))
Letter by record companies' trade organization to Internet service provider (ISP), alleging that Internet site operator was violating the Digital Millennium Copyright Act

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 1997918 (S.D.N.Y.), 2002 Copr.L.Dec. P 28,483
**(Cite as: Not Reported in F.Supp.2d)**

(DMCA) by making available copyrighted songs on site, did not support site operator's claim that organization made knowing and material misrepresentations to ISP in violation of DMCA; evidence of misrepresentation was insufficient, no evidence showed that the alleged misrepresentation was made knowingly, and vagueness was not material misrepresentation, although letter may have misrepresented that ISP could have been liable for hosting site. 17 U.S.C.A. § 512(c)(3)(A), (f).

**[15]** Torts 379 ☜202

379 Torts
    379III Tortious Interference
        379III(A) In General
            379k202 k. What Law Governs.
Most Cited Cases
    (Formerly 379k2)
Under New York's choice of law rules, California tort law applied to claim by Internet site operator against record companies' trade organization, alleging that organization tortiously interfered with contractual relations and prospective economic advantage; site operator was located in California, and its contractual relationship with another California corporation was allegedly interfered with in California.

**[16]** Torts 379 ☜241

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)2 Particular Cases
                379k241 k. Business Relations or Economic Advantage, in General. Most Cited Cases
    (Formerly 379k12, 379k10(3))

Torts 379 ☜242

379 Torts
    379III Tortious Interference

379III(B) Business or Contractual Relations
    379III(B)2 Particular Cases
        379k242 k. Contracts in General. Most Cited Cases
    (Formerly 379k12, 379k10(3))
Under California law, record companies' trade organization was justified in writing letter to Internet service provider (ISP), claiming that copyrights were being infringed upon by Internet site operator, as required for justification affirmative defense to Internet site operator's tortious interference with contract and tortious interference with prospective economic advantage claims against organization; organization acted in good faith in making notification of alleged infringement.

**[17]** Torts 379 ☜241

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)2 Particular Cases
                379k241 k. Business Relations or Economic Advantage, in General. Most Cited Cases
    (Formerly 379k10(3))
No evidence showed that Internet service provider (ISP) was believed, by record companies' trade organization, to have been engaged in "transitory digital network communications," as required to support Internet site operator's California law claim that trade organization intentionally interfered with site operator's prospective economic advantage; by all outward appearances, ISP was hosting Internet site on its network, leaving trade organization to conclude that activities allegedly infringing on copyrights were being conducted on ISP's system at site operator's direction. 17 U.S.C.A. § 512(a), (c).

OPINION & ORDER

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 1997918 (S.D.N.Y.), 2002 Copr.L.Dec. P 28,483
**(Cite as: Not Reported in F.Supp.2d)**

STEIN, District J.

**\*1** Plaintiffs, several leading record companies, have sued MP3Board, Inc. for contributory and vicarious copyright infringement, 17 U.S.C. §§ 101 *et seq.,* and state law unfair competition. The record companies allege that MP3Board operates an Internet site which provides users with links to pirated copies of the record companies' copyrighted musical recordings, thereby facilitating the users' infringement of the record companies' copyrights. MP3Board has instituted a third-party claim against the Recording Industry Association of America ("RIAA"), a trade association of record companies, for tortious interference and knowing material misrepresentation of infringement in violation of the Digital Millennium Copyright Act ("DMCA"), stemming from the RIAA's sending copyright infringement notices to MP3Board's Internet Service Providers ("ISPs").

The record companies have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56, seeking an order finding MP3Board liable for contributory and vicarious copyright infringement and unfair competition. MP3Board has moved for summary judgment on the grounds that its activities are protected by the First Amendment to the United States Constitution, and has alternatively moved for partial summary judgment on each of the counts of the complaint for a variety of reasons and on the grounds that the record companies have failed to show damages. The RIAA has also moved for summary judgment with respect to MP3Board's third party claims against it.

The record companies' motion for summary judgment is denied because material issues of fact exist regarding whether any direct infringement occurred with the aid of the MP3Board site. MP3Board's motion for summary judgment is denied because its activities are not protected by the First Amendment and because material issues of fact exist regarding whether MP3Board has engaged in contributory or vicarious copyright infringement. The RIAA's motion for summary judgment is granted because its actions were justified and it did not materially misrepresent that links to infringing material were posted on the MP3Board site.

### OVERVIEW

Several major record companies have brought suit against MP3Board for operating a Web site, located at http://www.mp3board.com, which provides Internet users with resources enabling them to locate sound recording files from publicly available Web sites. Such audio files can be created by using computer software to digitally copy an audio recording directly onto a computer's hard drive, compressing the digital information via a technology such as MP3 in order to allow for more efficient storage and transmission of the file over the Internet. The record companies have alleged that many of the audio files which can be located with the assistance of MP3Board's Web site are pirated copies of the record companies' copyrighted works.

During the relevant time period, no music files were located on the MP3Board Web site; rather, the Web site featured an automated search engine that searched for, aggregated and organized links to media files on the Web, and provided a tutorial offering users instruction in how to locate and download such files. (MP3Board's Objections to Pls.' Resp. Ex. A; Eli Mapstead Dep. at 118, 227, 304, 308; Mathewson Dep. at 79-80; Pls.' Exs. 24, 25, 35, 36; Am. Answer ¶ 41.) MP3Board additionally solicited users to post links on the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 1997918 (S.D.N.Y.), 2002 Copr.L.Dec. P 28,483
**(Cite as: Not Reported in F.Supp.2d)**

MP3Board site to other sites containing audio files and provided a link to a third party named Freedrive where users could store audio files online. (MP3Board's Objections to Pls.' Resp. Ex. A; Pls.' Exs. 8, 9, 10; Am. Answer ¶ 39.) The MP3Board site also featured a message board which allowed users to post questions or song requests to be replied to by other users or MP3Board staff. (MP3Board's Objections to Pls.' Resp. Ex. A.) In response to users' posted requests, MP3Board personnel personally searched for links to songs and posted the links on the message board, solicited other users to provide the requested works, and obtained and posted passwords to enable users to access certain music files. (Eli Mapstead Dep. at 199-200, 202-03, 205-06, 342; Mathewson Dep. at 52; MP3Board's Objections to Pls.' Resp. Exs. A, B; Am. Answer ¶ 41; Pls.' Ex. 22 .)

**\*2** On October 27, 1999, the RIAA, acting on behalf of its member record companies, served a subpoena and notice letter to AboveNet Communications, Inc., the ISP that connected MP3Board's Web site to the Internet. The letter identified artists whose work was being allegedly infringed and requested that AboveNet remove or disable access to the MP3Board site or MP3Board's links to infringing works. (Creighton Decl. ¶ 7 and Ex. A; McDevitt Decl. ¶ 4; McDevitt Dep. at 8-10.) AboveNet did not substantially interrupt MP3Board's service as a result of this letter, and MP3Board suffered no injury. (Eli Mapstead RIAA Dep. at 26, 27; *see also* Lars Mapstead RIAA Dep. at 385-86.) MP3Board did not dismantle access to any links to the identified artists' works. (Noah Mapstead Dep. at 175-77, 194-98 .)

On April 18, 2000, the RIAA sent a notice to Metromedia Fiber Network, Inc., AboveNet's corporate successor. (Creighton Decl. ¶ 8.) Like the October 1999 notice, the April 2000 notice also named representative artists whose works were allegedly being infringed and requested that Metromedia remove MP3Board site or the infringing links from its system. (Creighton Decl. Ex. B.) Moreover, the letter warned Metromedia that failure to comply could subject it to liability pursuant to the DMCA. (Creighton Decl. Ex. B.) In response, Metromedia disabled Internet access to the MP3Board Web site beginning on April 19, 2000. (Eli Mapstead RIAA Dep. at 37-38, 40.) MP3Board requested that Metromedia restore its service, and Metromedia replied that it would only restore MP3Board's service if MP3Board supplied a counter notification in accordance with the DMCA. On April 21, 2000, MP3Board supplied a counter notification to Metromedia asserting that it had removed the infringing material identified in the RIAA's notice. (Lars Mapstead RIAA Dep. at 498; Knowles Decl. Ex. K.) Metromedia restored MP3Board's Internet connectivity on May 5, 2000. (Eli Mapstead RIAA Dep. at 197.)

On May 25, 2000, the RIAA wrote directly to MP3Board and demanded that MP3Board remove all infringing links from its site by June 2, 2000, naming twenty-one artists and twenty-two song titles which were representative of the titles being infringed, and also attaching printouts of screen shots of MP3Board's Web site on which the RIAA identified 662 links which the RIAA believed to lead to material infringing upon the record companies' copyrights. (Pls.' Ex. 36, Ex. C.) MP3Board failed to dismantle access to any of the identified links in response to this letter. (Noah Mapstead Dep. at 175-77, 194-98.) On June 23, 2000, the record companies filed suit against MP3Board in the Southern District of New York.

## DISCUSSION

Summary judgment may be granted "only when the moving party demonstrates that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (quoting Fed.R.Civ.P. 56(c)); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor, and may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.' " *Allen,* 64 F.3d at 79 (citation omitted) (quoting *Lund's, Inc. v. Chemical Bank,* 870 F.2d 840, 844 (2d Cir.1989)).

**\*3** Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with specific facts to show there is a factual question that must be resolved at trial. Fed.R.Civ.P. 56(e); *see also Legal Aid Soc'y v. City of New York,* 114 F.Supp.2d 204 (S.D.N.Y.2000). A nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993). In short, a nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

I. The Record Companies' Motion for Summary Judgment is Denied Because Issues of Material Fact Exist Regarding Whether the Record Companies' Copyrights Were Infringed by MP3Board's Users.

In order to establish liability for contributory or vicarious copyright infringement, a plaintiff must first prove that direct infringement of its works occurred by showing that it owned a valid copyright and unauthorized infringement of its protected material occurred. *See Sony Corp. of Amer. v. Universal City Studios,* 464 U.S. 417, 434, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984); *Feist Publ'ns v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *Rogers v. Koons,* 960 F.2d 301, 306 (2d Cir.1992). The record companies' ownership of the sound recordings at issue has not been disputed. (Plts.' Rule 56.1 Stmt. ¶¶ 23-24.) The RIAA has also confirmed that the 58 files listed in the complaint as available through MP3Board's Web site constituted unauthorized copies of the copyrighted recordings. (Creighton Reply Decl. ¶ 8.)

[1] However, the record companies have failed to prove that any direct infringement resulted from MP3Board's operations. Pursuant to 17 U.S.C. § 501(a), infringement occurs when one of the exclusive rights granted to copyright holders by 17 U.S.C. § 106 is violated. *See A & M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1014 (9th Cir.2001). While the structure of MP3Board's site and the scale of the operation certainly give rise to a strong statistical inference that MP3Board users downloaded files containing copyrighted music in violation of the record companies' reproduction rights under Section 106(1), the record companies have failed to eliminate all genuine issues of material fact.

MP3Board freely acknowledges the possibility that infringement is conducted with the aid of its site. MP3Board has stated that it "is generally aware that some of the music files ... may contain infringing material," and it admits that it "allows" and "generally encourages" site visitors to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d Case 1:07-cv-01649-CKK    Document 8-6    Filed 11/13/2007    Page 9 of 22    Page 9
Not Reported in F.Supp.2d, 2002 WL 1997918 (S.D.N.Y.), 2002 Copr.L.Dec. P 28,483
**(Cite as: Not Reported in F.Supp.2d)**

download music files, thus promoting the "highly effective facilitation of access to popular music."(Am. Answer ¶¶ 2, 3, 40, 52.) "MP3Board acknowledges that users *may* use its systems for purposes of infringement."(MP3Board's Statement of Material Facts in Opp'n to Pls.' Mot. for Summ. J. ¶ 56 (emphasis in original).) MP3Board's principals also testified that they were aware that some of MP3Board's links connected to copyrighted works, and they assumed that those unauthorized copies were downloaded by users of the service through those links. (Eli Mapstead Dep. at 313, 316; Lars Mapstead Dep. at 249.). One principal admitted that it was "particularly likely" that MP3Board's users have used links on MP3Board's Web site to download full-length copies of major record labels' songs. (Noah Mapstead Dep. at 107.) There is also evidence that MP3Board personally assisted users in obtaining particular songs that the users requested, *see* Section II(A)(1) *infra,* and a finder of fact could certainly infer that it is likely that those users subsequently downloaded the songs they had requested. However, the record companies have not eliminated all issues of material fact by setting forth any direct evidence of infringement, such as user logs or other technical data showing the downloading of copyrighted and unauthorized files. At the summary judgment stage, the record companies cannot rely solely upon circumstantial evidence and admissions by MP3Board officers that it is statistically "likely" that direct infringement occurred.

**\*4** [2] Additionally, while the record companies and the RIAA have conclusively established that links to unauthorized infringing files were posted on the MP3Board Web site by describing how the RIAA investigators followed the links on the MP3Board Web site and determined that they lead to audio files that infringed

upon plaintiffs' copyrights, (Creighton Decl. ¶ 10; McDevitt Decl. ¶ 5), to show the unlawful "distribution" of a copyrighted work pursuant to 17 U.S.C. § 106(3) the record companies must show that an unlawful copy was disseminated "to the public." *Hotaling v. Church of Jesus Christ of Latter-Day Saints,* 118 F.3d 199, 203 (4th Cir.1997) (internal quotations omitted)."Infringement of the distribution right requires an actual dissemination of ... copies."*National Car Rental Sys. v. Computer Assocs. Int'l, Inc.,* 991 F.2d 426, 434 (8th Cir.1993) (citing 2 Nimmer on Copyright § 8.11[A], at 8-124.1); *see also Napster,* 239 F.3d at 1014. While a copyright holder may not be required to prove particular instances of use by the public when the proof is impossible to produce because the infringer has not kept records of public use, *see Hotaling,* 118 F.3d at 204, in the present case there has been no showing that the record companies did not have access to such data. Accordingly, the record companies' motion for summary judgment regarding contributory and vicarious copyright infringement and unfair competition is denied.

## II. MP3Board's Motion for Summary Judgment is Denied Because Issues of Material Fact Exist Regarding Whether MP3Board is Liable for Contributory Copyright Infringement, Vicarious Infringement, and Unfair Competition.

### A. Issues of Material Fact Exist Regarding Whether MP3Board is Liable for Contributory Copyright Infringement.

"A party 'who, with knowledge of ... infringing activity ... materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer.'" *Matthew Bender & Co., Inc. v. West Publ'g Co.,* 158 F.3d 693, 706 (2d Cir.1998) (quoting *Gershwin Publ'g Corp.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-01649-CKK    Document 8-6    Filed 11/13/2007    Page 10 of 22

Not Reported in F.Supp.2d                                                                      Page 10
Not Reported in F.Supp.2d, 2002 WL 1997918 (S.D.N.Y.), 2002 Copr.L.Dec. P 28,483
**(Cite as: Not Reported in F.Supp.2d)**

*v. Columbia Artists Mgmt., Inc.,* 443 F.2d 1159, 1162 (2d Cir.1971)); *see also Ex-Tixz, Inc. v. Hit Tix, Inc.,* 919 F.Supp. 728, 732 (S.D.N.Y.1996). In order to carry its burden, MP3Board must demonstrate the absence of material facts regarding (1) the noninfringing conduct of MP3Board's users, (2) MP3Board's lack of material contribution to that infringement, or (3) MP3Board's lack of knowledge of the infringing activity. MP3Board has failed to demonstrate the absence of material facts with respect to any of the elements. As an initial matter, for the reasons set forth in Section I, *supra,* material facts exist regarding the first element of direct infringement; while the record companies did not eliminate all issues of material fact, they showed statements by MP3Board's officers and circumstantial evidence regarding MP3Board's Web site which suffice to defeat summary judgment against them on the issue of direct infringement.

1. Issues of Material Fact Exist Regarding Whether MP3Board Materially Contributed to Any Infringement.

**\*5** [3] MP3Board cannot obtain summary judgment on the contributory infringement claim on the grounds that no material issues of fact exist regarding MP3Board's material contribution to any infringement. Liability for contributory infringement exists if the defendant engages in "personal conduct that encourages or assists the infringement."*Matthew Bender,* 158 F.3d at 706. Merely supplying the " 'means' to accomplish an infringing activity" cannot give rise to the imposition of liability for contributory copyright infringement. *Sony,* 464 U.S. at 436;*see also Napster,* 239 F.3d at 1020-21. "Participation in the infringement must be substantial. The ... assistance must bear a direct relationship to the infringing acts, and the contributory infringer must have acted in concert with the direct

infringer."*ZVI Livnat v. Shai Bar Lavi,* No. 96 Civ. 4967, 1998 WL 43221, at \*3 (S.D.N.Y. Feb.2, 1998) (internal quotation marks and citations omitted). MP3Board argues that the record companies have not shown that MP3Board substantially participated in any infringement. MP3Board styles itself a "passive" tool, contending that "[a]ny participation by MP3Board in its users' infringement is tangential to their direct downloading from a third-party website."(MP3Board Mem. in Opp'n at 14, 15.)

However, there is sufficient evidence from which a factfinder could determine that MP3Board engaged in an overall course of conduct which materially contributed to copyright infringement. The MP3Board site featured a search engine: an automated system devoted to searching for, aggregating and organizing links. (MP3Board's Objections to Pls.' Resp. Ex. A.) The site also solicited third parties to post links to sites containing audio files. (MP3Board's Objections to Pls.' Resp. Ex. A; Pls.' Exs. 8, 9, 10; Am. Answer ¶ 39.) MP3Board provided a link to a third party named Freedrive where users could store audio files online. (MP3Board's Objections to Pls.' Resp. Ex. A.) MP3Board offered new users "getting started" information and a tutorial containing instructions on how to locate and download audio files via MP3Board-actually using one of the record companies' copyrighted recordings as an example. (Eli Mapstead Dep. at 118, 227, 304, 308; Mathewson Dep. at 79-80; Pls.' Exs. 24, 25, 35, 36; Am. Answer ¶ 41.)

The site also contained a message board which allowed users to post questions to be answered by other users or MP3Board staff. (MP3Board's Objections to Pls.' Resp. Ex. A.) Significantly, when individual users posted messages on the message board requesting particular songs which they could not find links to on the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1997918 (S.D.N.Y.), 2002 Copr.L.Dec. P 28,483
**(Cite as: Not Reported in F.Supp.2d)**

MP3Board site, MP3Board personnel personally searched for links to the requested song files and posted the links on the message board. (Eli Mapstead Dep. at 202-03, 205-06; Mathewson Dep. at 52; MP3Board's Objections to Pls.' Resp. Ex. B; Am. Answer ¶ 41.) When one MP3Board employee could not find any links to one particular work, he solicited users to provide the work. (Pls.' Ex. 22.) MP3Board also obtained and posted passwords to enable users to access certain music files. (Eli Mapstead Dep. at 199-200, 342.)

**\*6** Thus, based upon all the foregoing facts, genuine issues of material fact exist regarding whether MP3Board materially contributed to infringement. Not only could a jury find that MP3Board provided the facilities to promote infringing activity, *see, e.g., Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259, 261, 264 (9th Cir.1996); *Sega Enters. v. Maphia,* 857 F.Supp. 679, 687 (N.D.Cal.1994); *Sega Enters. Ltd. v. Sabella,* No. 93 Civ. 4260, 1996 WL 780560, at \*8 (N.D.Cal. Dec.18, 1996), but also that it directly assisted users in locating and downloading infringing files, *see Intellectual Reserve, Inc. v. Utah Lighthouse Ministry, Inc.,* 75 F.Supp.2d 1290, 1294-95 (D.Utah 1999). Viewed in totality, the record companies have introduced evidence that raises a material issue of fact regarding whether MP3Board's active role in facilitating its users' copying constituted substantial material participation in infringement.

### 2. Issues of Material Fact Exist Regarding Whether MP3Board Knew that Infringing Activity Was Taking Place.

A defendant must possess either actual or constructive knowledge of the infringing activity to be found contributorily liable. *See ZVI Livnat,* 1998 WL 43221, at \*3; *see*

*also Napster,* 239 F.3d at 1020 (requiring that the secondary infringer "know or have reason to know" of direct infringement). Issues of fact exist regarding MP3Board's constructive knowledge as well as whether MP3Board obtained actual knowledge of infringement occurring via its site.

#### a. Issues of Material Fact Exist Concerning Whether MP3Board Possessed Constructive Knowledge of Infringing Activity.

[4] As an initial matter, it is axiomatic that without any knowledge of infringing activity, a defendant cannot be found strictly liable for contributory infringement simply for providing a technology that may allow others to exchange copyrighted material. A court may not impute constructive knowledge of infringement to a defendant "merely because ... [a] technology may be used to infringe plaintiffs' copyrights," where the system is "capable of commercially significant noninfringing uses."*Napster,* 239 F.3d at 1020-21 (citing *Sony,* 464 U.S. at 436, 442-43). In *Sony,* the U.S. Supreme Court refused to permit liability to be imposed upon Sony for providing customers with equipment (the Betamax video cassette recorder) with "constructive knowledge ... that their customers may use that equipment to make unauthorized copies of copyrighted material."*Sony,* 464 U.S. at 439. Rather, a plaintiff must actually show the defendant knew that infringing activity was taking place instead of simply relying on the technology's potential. At this stage of the litigation, material facts exist regarding whether the Court can impute constructive knowledge to MP3Board based upon its technology's capabilities; the parties have not set forth sufficient facts for the Court to determine whether MP3Board's activities are covered by the *Sony* doctrine and whether MP3Board's Web site is "capable of commercially significant noninfringing uses."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-01649-CKK    Document 8-6    Filed 11/13/2007    Page 12 of 22
Not Reported in F.Supp.2d                                                                    Page 12
Not Reported in F.Supp.2d, 2002 WL 1997918 (S.D.N.Y.), 2002 Copr.L.Dec. P 28,483
**(Cite as: Not Reported in F.Supp.2d)**

**\*7** However, the record companies have introduced direct evidence that MP3Board should have known of any infringement. There is evidence from which a jury could find that MP3Board possessed constructive knowledge of infringement, despite the fact that this case does not share the same strong indicia of constructive knowledge as in the cases cited by the record companies. *See Fonovisa,* 76 F.3d at 261;*Napster,* 114 F.Supp.2d at 919;*Playboy Enters., Inc. v. Russ Hardenburgh, Inc.,* 982 F.Supp. 503, 513, 514 (N.D.Ohio 1997) (the defendant had an active screening procedure by which the defendant's employees personally viewed all files posted on the bulletin board service); *Maphia,* 857 F.Supp. at 683 ("the uploading and downloading of unauthorized copies of Sega's copyrighted video games is particularly known to defendant"); *Sabella,* 1996 WL 780560, at \*8 (the defendant, the operator of the bulletin board service, read the user log containing files labeled as Sega Genesis games several times a day, advertised copiers which played unauthorized copies of Sega games, gave downloading privileges to customers that bought copiers, and offered a gift award that would enable users to 'get started right away with [their] collection of games"'). Nor does the operating of an audio file search engine have "no other imaginable [noninfringing] use," thus inevitably suggesting infringement to a rational person. *RSO Records, Inc. v. Peri,* 596 F.Supp. 849 (S.D.N.Y.1984) (where the defendant was engaged in photographing the packaging of copyrighted records and tapes).

The record companies contend that evidence of MP3Board's knowledge can be found in the fact that MP3Board created 16 genre categories on its site, such as "Pop" and "Classical," in which link contributors could display their posted links, and one of these categories was entitled "Legal MP3s." (Eli Mapstead Dep. at 153.) The record companies urge that the category heading "Legal MP3s" constitutes evidence that MP3Board recognized that the other categories contained MP3s which were *not* legal. MP3Board responds that the genre heading "Legal MP3s" does not constitute an admission as to the contents of the other genres, particularly because Epitonic, a third-party MP3 supplier, specifically requested the title "Legal MP3" to describe the category, which contained exclusively Epitonic content. (Eli Mapstead Dep. at 105; Lars Mapstead Dep. at 128.) The record companies also argue that a substantial number of the posted links themselves promoted their illegal nature, as the posters of the links gave themselves such names as "SUPERiLLEGAL MP3z," "FREE ILLEGAL MP3 FILES DIRECT DOWNLOAD,""FREE FAST ILLEGAL MP3 DIRECT DOWNLOAD,""The BIGGEST Archive of ILLEGAL MP3 FLZ," "100% ILLEGAL FAST DOWNLOADS," "a HUGE Archive of Illegal MP3 Files!!" and "any song you want." (Pls.' Ex. 23.) MP3Board contends in response that there is no evidence that it monitored the posting of links, and it has stated that it does not investigate the links, and perceived the names of the posters to be the site-owners' efforts to boost traffic on their sites by means of attention-getting methods. (Lars Mapstead Decl. ¶ 11; Lars Mapstead Dep. at 129.)

**\*8** Nonetheless, the above-stated facts, combined with the fact that MP3Board's principals acknowledged a statistical possibility that some of the links found on MP3Board's Web site went to copyrighted works and that users had downloaded unauthorized copies of copyrighted sound recordings through the links, (Lars Mapstead Dep. at 249, 451; Eli Mapstead Dep. at 313, 355; Noah Mapstead Dep. at 107), give rise to triable issues of fact regarding

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-01649-CKK    Document 8-6    Filed 11/13/2007    Page 13 of 22

Not Reported in F.Supp.2d                                                                                              Page 13
Not Reported in F.Supp.2d, 2002 WL 1997918 (S.D.N.Y.), 2002 Copr.L.Dec. P 28,483
**(Cite as: Not Reported in F.Supp.2d)**

whether MP3Board possessed constructive knowledge of the infringing nature of links.

### b. Issues of Material Fact Exist Regarding Whether MP3Board Acquired Actual Knowledge of Infringement.

[5] There is also much stronger evidence that MP3Board acquired actual knowledge of infringement from a notice that the RIAA sent to MP3Board pursuant to the DMCA. In order for a notice to be considered effective pursuant to the DMCA, it must provide "identification of the reference or link, to material or activity claimed to be infringing ... and information reasonably sufficient to permit the service provider to locate that reference or link."17 U.S.C. § 512(d)(1)(C)(3). The RIAA sent notification letters on October 27, 1999 and April 18, 2000 to MP3Board's ISPs, who forwarded copies of the letters to MP3Board, and also sent a notification letter on May 25, 2000 directly to MP3Board. While the letters dated October 27, 1999 and April 18, 2000 fell short of the DMCA's standard in providing MP3Board with knowledge of infringement, the letter dated May 25, 2000 did provide MP3Board with sufficient knowledge.

The letter from the RIAA to AboveNet dated October 27, 1999 failed to put MP3Board on notice of any infringement. It stated that the MP3Board site:

offers over one thousand direct links to sound files on other Internet sites for download. Many of these files contain recordings owned by our member companies, including songs by such artists as Sugar Ray, Ricky Martin, Radiohead, TLC, Red Hot Chili Peppers, Madonna, Shania Twain, Lou Bega, the Fugees and Ace of Base. We have a good belief that the above-described activity is not authorized by the copyright owner, its agent, or the law.

(Pls.' Ex. 34.) By solely listing artists' names, and neglecting to specify any infringing links or even particular songs, the letter did not include "identification of the reference or link, to material or activity claimed to be infringing ... and information reasonably sufficient to permit the service provider to locate that reference or link."17 U.S.C. § 512(d)(1)(C)(3).

The record companies' citation to the Fourth Circuit's decision in *ALS Scan, Inc. v. RemarQ Communities, Inc.,* 239 F.3d 619, 622 (4th Cir.2001), cannot save this letter. *ALS Scan* set forth that "[w]hen a letter provides notice equivalent to a list of representative works that can be easily identified by the service provider, the notice substantially complies with the notification requirements."239 F.3d at 622. The plaintiff in *ALS Scan* alerted the defendant to infringement in sufficient detail when it **9** (1) identified two sites created for the sole purpose of publishing ALS Scan's copyrighted works, (2) asserted that virtually all the images at the two sites were [ALS Scan's] copyrighted material, ... (3) referred RemarQ to two web addresses where RemarQ could find pictures of ALS Scan's models and obtain ALS Scan's copyright information ... [and (4) ] noted that material at the site could be identified as ALS Scan's material because the material included ALS Scan's 'name and/or copyright symbol next to it.'

*Id.*

However, by merely listed ten artists in the October 27 letter, the RIAA fell short of "substantially compl[ying]" with the notification requirement."*Id.* The citation to a handful of performers does not constitute a representative list of infringing material, and certainly did not provide information reasonably sufficient to enable MP3Board to locate the particular infringing works.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-01649-CKK    Document 8-6    Filed 11/13/2007    Page 14 of 22

Not Reported in F.Supp.2d                                                              Page 14
Not Reported in F.Supp.2d, 2002 WL 1997918 (S.D.N.Y.), 2002 Copr.L.Dec. P 28,483
**(Cite as: Not Reported in F.Supp.2d)**

Therefore, MP3Board's failure to delete links to sites containing music files of the enumerated artists in response to the October 1999 letter, (Lars Mapstead Dep. at 399), cannot give rise to any liability. *C.f. Religious Tech. Ctr. v. Netcom On-Line Communication Servs., Inc., 907 F.Supp. 1361, 1374 (N.D.Cal.1995)* (where a bulletin board service operator cannot reasonably verify a claim of infringement due to the copyright holder's failure to provide the necessary documentation to show that there is likely infringement, the operator's lack of knowledge is reasonable and there is no liability for contributory infringement for allowing the continued distribution of the works).

The email from the RIAA to Metromedia dated April 18, 2000, and subsequently forwarded to MP3Board, similarly stated that the MP3Board site:

is offering direct links to files on other Internet sites containing full-length sound recordings for other users to download, including songs by such artists as Third Eye Blind, Rage Against the Machine, No Doubt, Rammstein and the Bloodhound Gang. We have a good faith belief that the above-described activity is not authorized by the copyright owner, its agent, or the law.

(Pls.' Ex. 35.) This email, nearly identical in form to the October 27, 1999 letter, similarly failed to put MP3Board on notice of any infringement because it listed solely artists' names, and neglected to specify any links or even particular songs.

[6] However, in contrast with the earlier letters, the letter from the RIAA to MP3Board dated May 25, 2000 substantially complied with the DMCA notification requirements. The letter not only named particular artists along with specified songs, but was accompanied by print-

outs of screen shots of MP3Board's Web site, on which the RIAA highlighted and placed an asterisk next to 662 links which the RIAA believed to infringe upon the record companies' copyrights. (Pls.'s Ex. 36, Ex. C.) Despite the fact that the RIAA did not provide MP3Board with the specific Universal Resource Locators ("URLs") of the pages to which the links connected, the RIAA provided MP3Board with the pages on MP3Board's own site where the links appeared. (Pls.'s Ex. 36, Ex. C.) Overall, the letter and its attachments identified the material or activity claimed to be infringing and provided information reasonably sufficient to permit MP3Board to locate the links and thus complied with the DMCA. *See* 17 U.S.C. § 512(d)(1)(C)(3); *ALS Scan;* 239 F.3d at 622; *see also Napster,* 239 F.3d at 1021-22 & n. 6; *Fonovisa,* 76 F.3d at 261, 264; *Olan Mills, Inc. v. Linn Photo Co.,* 23 F.3d 1345, 1348 (8th Cir.1994); *Napster,* 114 F.Supp.2d at 918.

**\*10** [7] MP3Board failed to dismantle access to any of the identified links in response to these letters. (Noah Mapstead Dep. at 175-77, 194-98.) MP3Board's argument, that it was not required to disable access to or even investigate the links because the RIAA did not submit the links in electronic form or accompanied with the URLs of the pages to which the links connected, are baseless and not grounded in the text of the DMCA or any judicial interpretation of that statute. Despite the fact that the RIAA did not provide MP3Board with specific URLs, it provided MP3Board with the pages on MP3Board's own site where the links appeared, thus identifying the links to material or activity claimed to be infringing and information reasonably sufficient to permit MP3Board to locate the links. Therefore, because issues of material fact exist regarding whether MP3Board materially contributed to infringing activity and had acquired knowledge of the in-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1997918 (S.D.N.Y.), 2002 Copr.L.Dec. P 28,483
**(Cite as: Not Reported in F.Supp.2d)**

fringement, summary judgment in favor of MP3Board with respect to the claim of contributory copyright infringement is denied.

 B. Issues of Material Fact Exist Regarding Whether MP3Board is Liable for Vicarious Infringement.

[8] A company may be found vicariously liable for copyright infringement if it has the right and ability to supervise infringing activity and also has a direct financial interest in that activity. *See Gershwin Publ'g, 443 F.2d at 1162.* Vicarious liability, "commonly imposed upon publishers, printers, and vendors of copyrighted materials," is appropriate where a company is "in a position to police the conduct of the 'primary' infringer."*Shapiro, Bernstein & Co. v. H.L. Green Co.,* 316 F.2d 304, 308 (2d Cir.1963) (citations omitted).

As an initial matter, although the record companies correctly state that, in general, vicarious infringement is a tort of strict liability and hence the vicarious infringer need not possess knowledge of the infringement, the record companies do not address the additional limitations upon copyright infringement liability relating to online material provided by the DCMA-albeit an affirmative defense only vaguely raised in MP3Board's answer. Nonetheless, the DMCA provides that a service provider:
shall not be liable ... for infringement of copyright by reason of the provider referring or linking users to an online location containing infringing material or infringing activity, by using information location tools, including a directory, index, reference, pointer, or hypertext link, if the service provider does not have actual knowledge that the material or activity is infringing [or] in the absence of such actual knowledge, is not aware of facts or circum-

stances from which infringing activity is apparent.

17 U.S.C. § 512(d)(1). There are material issues of fact as to whether MP3Board qualifies as a "service provider" entitled to the "safe harbor" protections of section 512(d). MP3Board contends that it is a "traditional search engine," (Def.'s Statement of Material Facts ¶ 20), while plaintiffs contend that MP3Board provides a host of services not provided by traditional search engines, (Pls.' Resp. to Def.'s Statement of Material Facts ¶ 20). Even if MP3Board meets the definition of a "service provider" it must still surmount the other hurdles of section 512-a proposition of doubtful certainty-to qualify for the liability limitations the statute affords. Notably, the statute limits liability rather than providing a complete exemption. *See*17 U.S.C. § 512(d); *see also Perfect 10, Inc. v. Cybernet Ventures, Inc.,* No. CV 01-2595, 2002 U.S. Dist. LEXIS 7333, at *77 (C.D.Cal. Apr. 22, 2002); 3 Nimmer on Copyright § 12B.01[C][2], at 12B-18. Moreover, because there are material issues of fact regarding MP3Board's knowledge of the infringing activity-another factor weighed in the availability of the "safe harbor" provision-MP3Board cannot obtain summary judgment pursuant to the defense of lack of knowledge. *See*17 U.S.C. § 512(d); *see also* Section II(A)(2), *supra.*

 1. Issues of Material Fact Exist Regarding Whether MP3Board Had the Right and the Ability to Supervise the Infringing Activities.

**\*11** [9] The record companies have introduced evidence showing that MP3Board possessed the right and the ability to supervise its users and the information displayed on its site. A defendant's "ability to block infringers' access to a particular environment for any reason" constitutes proof of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

its right and ability to supervise and control the infringing activities.*Napster, 239 F.3d at 1023;see also Fonovisa, 76 F.3d at 262-63* (a swap-meet operator could exclude vendors for any reason); *Shapiro, 316 F.2d at 306-08.* The facts have shown that MP3Board had the right and ability to police those who posted links to the site, as well as the ability to delete the links themselves from being displayed to users.

While there is no evidence that MP3Board could control which links were initially found by its automated procedures, MP3Board could delete links from its database and thus prevent them from being displayed in response to user queries. (Lars Mapstead Dep. at 338, 488-89.) Moreover, MP3Board had stated a policy of restricting users from posting certain types of links, such as those linking to pornography, hate, and hacker and "warez" (illegally copied and distributed commercial software) sites, and did in fact remove offending links from the site and banned repeat offenders of MP3Board's rules from posting any additional links. (Lars Mapstead Dep. at 338; Eli Mapstead Dep. at 328-31, 408-13.) Thus, there is evidence that MP3Board had the right and ability to remove links to infringing works and bar the participation of users who transmitted those infringing files. *See Napster, 239 F.3d at 1024;see also Fonovisa, 76 F.3d at 260, 262.*

### 2. Issues of Material Fact Exist Regarding Whether MP3Board Possessed a Direct Financial Interest in the Infringing Activities.

[10] The record companies have also introduced evidence indicating that MP3Board possessed a direct financial interest in the exchange of infringing files. Infringement which increases a defendant's user base or otherwise acts as a draw for customers con-

stitutes a direct financial interest. *See Napster,* 239 F.3d 1023;*Fonovisa, 76 F.3d at 262-64* (financial benefit exists where "infringing performances enhance the attractiveness of a venue"); *Shapiro, 316 F.2d at 307.* MP3Board's principals testified that the revenue MP3Board received from banner advertisements on the site was directly tied to the number of users who were exposed to those ads. (Lars Mapstead Dep. at 173, 219, 507-08; Eli Mapstead Dep. at 383; Eli Mapstead RIAA Dep. at 87.) Furthermore, the RIAA's letter dated May 25, 2000 set forth that an extremely high proportion of the links on MP3Board's site went to infringing works. (Pls.'s Ex. 36, Ex. C.) The MP3Board site is exclusively and consciously devoted to locating audio files, and its financial interest in the locating and copying of music files is thus far more substantial and direct than the general interest, content neutral search engines with which MP3 wishes to compare itself. A jury could certainly find that MP3Board possessed a direct financial interest in infringing activities.

### C. Issues of Material Fact Exist Regarding Whether MP3Board Is Liable for Unfair Competition.

**\*12** The record companies have also sued MP3Board for unfair competition pursuant to New York common law with respect to the record companies' pre-1972 sound recordings, which are not subject to federal statutory copyright protection. *See*17 U.S.C. § 301(c); *Firma Melodiya v. ZYX Music, GmbH, 882 F.Supp. 1306, 1316 (S.D.N.Y.1995).* Summary judgment on this claim in favor of MP3Board is also denied.

In New York, an unfair competition claim may be grounded in the appropriation of the exclusive property of the plaintiff by the defendant. *See H.L. Hayden Co. v.*

Not Reported in F.Supp.2d, 2002 WL 1997918 (S.D.N.Y.), 2002 Copr.L.Dec. P 28,483
**(Cite as: Not Reported in F.Supp.2d)**

*Siemens Med. Sys., Inc.,* 879 F.2d 1005, 1025 (2d Cir.1989). Pursuant to New York common law, "[a]n unfair competition claim involving misappropriation usually concerns the taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property."*Roy Export Co. v. CBS,* 672 F.2d 1095, 1105 (2d Cir.1982). Due to the legal overlap between the New York tort of unfair competition based upon misappropriation and federal copyright infringement, *see* *Kregos v. Associated Press,* 3 F.3d 656, 666 (2d Cir.1993), summary judgment in favor of MP3Board is denied for the reasons stated above denying summary judgment on the copyright infringement claims.

D. Summary Judgment is Denied with Respect to MP3Board's Argument That Its Activities Are Entitled to First Amendment Protection.

[11] MP3Board's argument that its activities are protected by the First Amendment to the U.S. Constitution is without merit. The U.S. Court of Appeals for the Second Circuit has held that "the fair use doctrine encompasses all claims of first amendment in the copyright field."*New Era Pubs. Int'l, ApS v. Henry Holt & Co.,* 873 F.2d 576, 584 (2d Cir.1989); *see also*17 U.S.C. § 107; *Napster,* 239 F.3d at 1028 (rejecting Napster's asserted free speech right to publish a "directory" in the form of a music file search index because Napster's users were not fair users); *Nihon Keizai Shimbun v. Comline Business Data, Inc.,* 166 F.3d 65, 74 (2d Cir.1999) ("First Amendment concerns are protected by and coextensive with the fair use doctrine"); *Netcom,* 923 F.Supp. at 1258 (stating that the Copyright Act balances First Amendment concerns with the rights of copyright holders).

In its summary judgment papers, MP3Board has not asserted that the activities in question constitute "fair use" and therefore do not violate plaintiffs' copyrights. Moreover, even if it had, the evidence indicates that such a claim would fail. In analyzing the defense of "fair use," the Copyright Act specifies four factors that must be considered:
(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.

**\*13** 17 U.S.C. § 107. Other relevant factors may also be considered in order to apply the test in light of the overall purposes of the Copyright Act. *See* *Harper & Row, Publishers, Inc. v. Nation Enters. .,* 471 U.S. 539, 549, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985); *Sony,* 464 U.S. at 448, 454.

Assuming plaintiffs' allegations to be true, all four mandatory factors weigh against a finding of fair use in the present case. Regarding the first factor, "the purpose and character of the use," the purpose of MP3Board and its users was commercial, as they were allegedly "profit[ing] from the exploitation of the copyrighted work without paying the customary prices."*Harper & Row,* 471 U.S. at 562. Moreover, the copied works were simply retransmitted, not transformed. *See* *Napster,* 239 F.3d at 1015. Regarding the second factor, "the nature of the copyrighted work," the published creative sound recordings copied are "close to the core of intended copyright protection," and, conversely, far removed from the more factual or descriptive type of work that is more amenable to fair use. *See* *UMG Recordings, Inc. v. MP3.com, Inc.,* 92 F.Supp.2d 349, 351-52 (S.D.N.Y.2000)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 1997918 (S.D.N.Y.), 2002 Copr.L.Dec. P 28,483
**(Cite as: Not Reported in F.Supp.2d)**

(citations omitted). Regarding the third factor, "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," plaintiffs contend that entireties of copyrighted works were infringed rather than small portions. Regarding the fourth factor, "the effect of the use upon the potential market for or value of the copyrighted work," the alleged activities of MP3Board and its users on their face could harm the market for the original works. *See* Napster, 239 F.3d at 1017. Thus, because all four factors weigh against a finding of fair use, and there are no other relevant factors apparent, MP3Board's motion for summary judgment based upon the theory that its activities are protected by the First Amendment is denied.

E. Issues of Material Fact Exist Regarding Damages.

[12] MP3Board briefly argues that the record companies have not shown that they have suffered actual damages, or that MP3Board obtained any profits as a result of any infringement. MP3Board is correct: the amount of damages has not been litigated or established at this juncture. However, MP3Board also summarily-and incorrectly-argues that the record companies cannot prove statutory damages. The Copyright Act permits a copyright owner to elect to recover an award of statutory damages simply upon a showing of infringement. 17 U.S.C. § 504(c). Should the record companies establish copyright infringement, they may elect to pursue an award of statutory damages.

III. The RIAA's Motion for Summary Judgment with Respect to MP3Board's Claims Against the RIAA Is Granted.

[13] MP3Board has asserted two claims against the RIAA stemming from the RI-

AA's notices of copyright infringement sent to MP3Board's ISPs: (a) knowing material misrepresentation of infringement in violation of the DMCA, and (b) tortious interference with contractual relations and prospective economic advantage. The RIAA is entitled to summary judgment on those claims.

**\*14** On October 27, 1999, the RIAA served a subpoena and DMCA notice letter to AboveNet that identified representative artists and requested AboveNet's "immediate assistance in stopping this unauthorized activity. Specifically, we request that you remove the site, delete the infringing links or that you disable access to this site or the infringing links being offered via your system."(Creighton Decl. ¶ 7 and Ex. A; McDevitt Decl. ¶ 4; McDevitt Dep. at 8-10.) However, the October 27, 1999 letter caused at most a very short-term interruption in MP3Board's service and, by MP3Board's own statements, no injury to MP3Board. (Eli Mapstead RIAA Dep. at 26-27; Lars Mapstead RIAA Dep. at 385-86.)

On April 18, 2000, the RIAA sent a second DMCA notice to Metromedia, identifying a URL of an MP3Board page, naming representative artists whose works were allegedly being infringed, and requesting Metromedia's
immediate assistance in stopping this unauthorized activity. Specifically, we request that you remove the site or the infringing links from your system and that you inform the site operator of the illegality of his or her conduct.
You should understand that this letter constitutes notice to you that this site operator may be liable for the infringing activity occurring on your server. In addition, under the Digital Millennium Copyright Act, if you ignore this notice, you and/or your company may be liable for any resulting

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1997918 (S.D.N.Y.), 2002 Copr.L.Dec. P 28,483
**(Cite as: Not Reported in F.Supp.2d)**

infringement.

(Creighton Decl. ¶ 8 and Ex. B.) In response to this letter, Metromedia disabled Internet access to the MP3Board Web site beginning April 19, 2000 and did not restore service until May 5, 2000. (Eli Mapstead RIAA Dep. at 37-38, 40, 197.) As an initial matter, because MP3Board was only damaged by the April 18, 2000 notice, only that notice is potentially actionable.

A. The RIAA Is Entitled to Summary Judgment with Respect to MP3Board's Claim of "Knowing Material Misrepresentation of Infringement" in Violation of the DMCA.

[14] MP3Board asserts that the RIAA's notice contained knowing and material misrepresentation. Pursuant to 17 U.S.C. § 512(f),
Any person who knowingly materially misrepresents ... that material or activity is infringing ... shall be liable for any damages ... incurred by the alleged infringer ... who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing.

As set forth in Section II(A)(2)(b), *supra,* the RIAA's letter dated April 18, 2000 did not constitute an effective notification to MP3Board pursuant to the DMCA because it listed solely artists' names, and neglected to specify any links or even particular songs. For the same reasons, the letter did not substantially comply with the notification requirements for Metromedia, as it did not provide location information reasonably sufficient to permit Metromedia to locate the material pursuant to 17 U.S.C. § 512(c)(3)(A).See ALS Scan, 239 F.3d at 625;see also Netcom, 907 F.Supp. at 1374.

*15 The April 2000 letter was simply not specific enough to provide adequate notice.

Although the DMCA permits a copyright owner to identify a "representative" list of works, 17 U.S.C. § 512(c)(3)(A)(ii), in this case, a bare list of musical artists whose songs were allegedly linked to did not constitute a representative list of works, or notice equivalent to a list of representative works that can be easily identified by the service provider. *See ALS Scan,* 239 F.3d at 625. While the DMCA only requires that a copyright owner need only comply "substantially" with the prescribed format, the RIAA's April notice fell short of even that standard. 17 U.S.C. § 512(c)(3)(A); *see also ALS Scan,* 239 F.3d at 625. The RIAA cannot shift the DMCA's duty to identify infringing material from the copyright holders or their agents to ISPs, which is what the April 18, 2000 letter seeks to do.

Nonetheless, liability cannot be incurred by the RIAA pursuant to Section 512(f) for merely sending a letter that constitutes insufficient notification; rather, the DMCA standard is whether the copyright owner's agent "knowingly materially misrepresents ... that material or activity is infringing."There is no evidence that the RIAA incorrectly stated that MP3Board was "offering direct links to files on other Internet sites containing full-length sound recordings for other users to download, including songs by [the listed] artists."The sole evidence of any misrepresentation in this notice consists of the fact that Eli Mapstead stated that he later found one link on the MP3Board site leading to a song by one of the listed artists that was authorized to be on the Internet. (Eli Mapstead Dep. at 481-87.) However, the presence of one authorized song file does not constitute a material misrepresentation in light of the facts of this case. Moreover, MP3Board's claim must fail because there is no evidence that any misrepresentation by the RIAA was made knowingly.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 1997918 (S.D.N.Y.), 2002 Copr.L.Dec. P 28,483
**(Cite as: Not Reported in F.Supp.2d)**

MP3Board also contends that the RIAA's notification constituted "knowing material misrepresentation" because it improperly threatened a suit for money damages against a service provider that was immune from suit pursuant to 17 U.S.C. § 512(a). However, Section 512 only penalizes copyright holders for knowingly materially misrepresenting "that material or activity is infringing ."It does not provide a cause of action for knowingly materially misrepresenting that a service provider may be liable for hosting certain material.

In addition, MP3Board appears to seek liability for vagueness in the RIAA's notice, and the possibility that vagueness may have induced Metromedia to take the entire MP3Board site offline because Metromedia could not reasonably ascertain which of MP3Board's activities constituted infringing activity. However, vagueness does not constitute a material misrepresentation "that material or activity is infringing" pursuant to Section 512(f). MP3Board stretches Section 512 beyond its breaking point.

B. The RIAA Is Entitled to Summary Judgment with Respect to MP3Board's Claims of Tortious Interference with Contractual Relations and Prospective Economic Advantage.

**\*16** [15] MP3Board contends in its third claim for relief that when the RIAA caused Metromedia to disrupt MP3Board's service, the RIAA thereby tortiously interfered with MP3Board's contracts with Metromedia as well as MP3Board's expectation of prospective economic advantage from future visitors to its site. (Am.Countercl.¶¶ 80-81.) By applying the New York choice of law rules, see Arochem Int'l Inc. v. Buirkle, 968 F.2d 266, 269 (2d Cir.1993), the Court finds that California tort law applies in this matter; California has the greater interest in the litigation of this issue due to the fact that MP3Board is located in California and its contractual relationship with another California corporation was allegedly interfered with in California.

The elements of intentional interference with contractual relations are (1) a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of this contract; (3) intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the relationship; and (5) resulting damage. Quelimane Co. v. Stewart Title Guar. Co., 19 Cal.4th 26, 77 Cal.Rptr.2d 709, 960 P.2d 513, 530 (Cal.1998).

The RIAA contends that MP3Board cannot assert a claim for tortious interference with contract because MP3Board never had a contract with Metromedia, but only had an arrangement with Lars Mapstead's company, Cyberzine, which in turn had a preexisting relationship with AboveNet (later Metromedia). (Noah Mapstead RIAA Dep. at 17-23; Lars Mapstead RIAA Dep. at 33, 407-08.) However, because there is evidence that the contract or a later modification of it was made expressly for MP3Board's benefit-for example, AboveNet/Metromedia assigned a static IP address to MP3Board and agreed to serve as the contact for MP3Board in connection with MP3Board's registration with Network Systems, Inc., (Mapstead Decl. in Opp'n to RIAA's Mot. For Summ. J. ¶¶ 2, 4-5),-at this juncture the Court cannot conclude that there was no valid contract with AboveNet/Metromedia that MP3Board could enforce as a third party beneficiary.

The RIAA also contends that the letter to Metromedia on April 18, 2000 was a simple pre-litigation demand letter. However, to assert the litigation privilege-

Case 1:07-cv-01649-CKK    Document 8-6    Filed 11/13/2007    Page 21 of 22
Not Reported in F.Supp.2d                                                              Page 21
Not Reported in F.Supp.2d, 2002 WL 1997918 (S.D.N.Y.), 2002 Copr.L.Dec. P 28,483
**(Cite as: Not Reported in F.Supp.2d)**

an affirmative defense-the RIAA must prove that its statements were made in good faith contemplating a suit. *See Sade Shoe Co. v. Oschin & Snyder, 162 Cal.App.3d 1174, 1180, 209 Cal.Rptr. 124 (1984); Aronson v. Kinsella, 58 Cal.App.4th 254, 263-65, 68 Cal.Rptr.2d 305 (1997); see also Matsushita Electronics Corp. v. Loral Corp., 974 F.Supp. 345, 354-55 (S.D.N.Y.1997).* Material issues of fact exist regarding whether the RIAA contemplated filing a suit against Metromedia in "good faith and on serious consideration."*Aronson, 58 Cal.App.4th at 266, 68 Cal.Rptr.2d 305.*

[16] Nonetheless, no material issues of fact exist regarding the RIAA's justification for its actions. Pursuant to California state law, justification is an affirmative defense to a charge of tortious interference with contract. *See Echazabal v. Chevron U.S.A., Inc., 221 F.3d 1347 (9th Cir.2000)* (unpublished); *Seaman's Direct Buying Serv., Inc. v. Standard Oil Co., 36 Cal.3d 752, 206 Cal.Rptr. 354, 686 P.2d 1158, 1165 (Cal.1984)* (overruled on other grounds). Seeking to protect a copyright by alerting a third party that the copyright is being infringed constitutes a justification defense to that claim. *See, e.g., Shapiro & Son Bedspread Corp. v. Royal Mills Assoc., 764 F.2d 69, 75 (2d Cir.1985); Montgomery County Ass'n of Realtors, Inc. v. Realty Photo Master Corp., 878 F.Supp. 804, 818 (D.Md.1995)* (notifying customers of an alleged copyright infringement in good faith is justified and does not constitute tortious interference with contractual relations). There have been no material issues of fact raised regarding whether the RIAA acted in good faith in notifying Metromedia of the infringement. Accordingly, the RIAA cannot be subjected to liability for tortious interference with contract and summary judgment should issue in its favor on this claim.

*17 The elements in California of the tort of intentional interference with prospective economic advantage are (1) the existence of a prospective economic relationship containing the probability of future economic rewards for the plaintiff; (2) the defendant's knowledge of this relationship; (3) intentional acts designed to disrupt the relationship; (4) actual causation; and (5) proximate damages. *PMC, Inc. v. Saban Entm't, Inc., 45 Cal.App.4th 579, 52 Cal.Rptr.2d 877, 886 (1996).* The tort, which is also called interference with prospective economic relations, "imposes liability for improper methods of disrupting or diverting the business relationship of another which fall outside the boundaries of fair competition."*Settimo Assocs. v. Environ Sys., Inc., 14 Cal.App.4th 842, 17 Cal.Rptr.2d 757, 758 (1993).*

Because the general wrong inherent in intentional interference with prospective economic advantage is the interference with a business opportunity through methods which are not within the privilege of fair competition, a plaintiff must also prove that the defendant "engaged in conduct that was wrongful by some legal measure other than the fact of interference itself."*Della Penna v. Toyota Motor Sales, U.S.A., Inc., 11 Cal.4th 376, 45 Cal.Rptr.2d 436, 902 P.2d 740, 751 (Cal.1995).* For tortious interference with prospective economic advantage, a plaintiff must prove that the defendant's conduct was not privileged; the defendant does not need to prove privilege as an affirmative defense. *See Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Square Venture Partners,52 Cal.App.4th 867, 60 Cal.Rptr.2d 830, 839 (1997).* As set forth above, the RIAA was justified in sending Metromedia the April 18 notification of infringement and no liability can lie for tortious interference with prospective economic advantage.

Not Reported in F.Supp.2d, 2002 WL 1997918 (S.D.N.Y.), 2002 Copr.L.Dec. P 28,483
**(Cite as: Not Reported in F.Supp.2d)**

[17] Moreover, MP3Board has not shown the additional element of wrongful conduct required for a claim of intentional interference with prospective economic advantage. *See Della Penna,* 45 Cal.Rptr.2d 436, 902 P.2d at 751. While threatening to litigate against a party who is known to be immune from suit-as MP3Board alleges-may sufficiently constitute wrongful conduct, *see PMC,* 52 Cal.Rptr.2d at 891; *see also Matsushita,* 974 F.Supp. at 354, MP3Board's claim that Metromedia was known to be immune from suit pursuant to 17 U.S.C. § 512(a) has no support. There is no evidence showing that the RIAA believed that Metromedia was engaged in "transitory digital network communications," pursuant to Section 512(a), which deals with the transient storage of material in the course of transmitting, routing or providing connections.

Rather, by all outward appearances Metromedia was hosting MP3Board's site on its network, leaving the RIAA to conclude that Metromedia was not merely transmitting, routing or providing connections for infringing material but that infringing activities were being conducted on Metromedia's system at MP3Board's direction. Pursuant to Section 512(c), entitled "information residing on systems or networks at direction of users," a service provider is "liable for monetary relief ... for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider," unless the service provider does not have knowledge or reason to know of infringing activity and fails to expeditiously to remove or disable access to the infringing material. 17 U.S.C. § 512(c)(1). Absent a showing that Metromedia was immune from liability pursuant to Section 512(a), and that the RIAA knew that Metromedia was immune, liability cannot be grounded on the RIAA's statement that Metromedia could be liable for hosting MP3Board's activities if Metromedia knew of MP3Board's infringement but failed to disable access. MP3Board has pointed to no evidence whatsoever in support of its claim that the RIAA threatened legal action against a party that it knew to be immune from liability and therefore the RIAA is entitled to summary judgment on this claim.

CONCLUSION

*18 For the reasons stated forth above, the record companies' motion for summary judgment is denied, MP3Board's motion for summary judgment is denied, and the RIAA's motion for summary judgment is granted.

SO ORDERED:

S.D.N.Y.,2002.
Arista Records, Inc. v. Mp3Board, Inc.
Not Reported in F.Supp.2d, 2002 WL 1997918 (S.D.N.Y.), 2002 Copr.L.Dec. P 28,483

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1990 WL 120642                    FOR EDUCATIONAL USE ONLY                         Page 1
1990 Copr.L.Dec. P 26,587, 16 U.S.P.Q.2d 1142
(Cite as: 1990 WL 120642 (W.D.Wis.))
<KeyCite Citations>

United States District Court, W.D. Wisconsin.

**PARAMOUNT PICTURES**
CORPORATION, the Walt Disney Company,
Universal City
Studios, Inc., Warner Bros., Inc., Orion
Pictures Corporation, Columbia
Pictures Industries, Inc., Metro-Goldwyn-
Mayer Pictures, Inc., United Artists
Pictures, Inc., Tri-Star Pictures, Inc., and
Twentieth Century Fox Film
Corporation
v.
Thadeus A. LABUS d.b.a. Happy Landing
Resort.

No. 89-C-797-C.

March 23, 1990.

David J. Cannon, James E. Bauman, Michael,
Best & Friedrich, Milwaukee, Wis., Jeffrey A.
Rosen, Emily Kraus, Sargoy, Stein, Rosen &
Shapiro, New York City, for plaintiffs.

Bruce M. Davey, Lawton & Cates, S.C.,
Madison, Wis., for defendant Thadeus A.
Labus.

Order

CRABB, District Judge:

**\*1** Plaintiffs, motion picture distribution
companies, bring this action against defendant
for copyright infringement under 17 U.S.C. §
106 and trademark infringement under § 43(a)
of the Lanham Act, 15 U.S.C. § 1121. This
court has subject-matter jurisdiction pursuant
to 28 U.S.C. §§ 1331 and 1338. The case is
before the court on plaintiffs' motion for
partial summary judgment on its copyright
claims.

Plaintiffs contend that they are entitled to a
judgment that defendant infringed their
exclusive rights under 17 U.S.C. § 106 to
reproduce and distribute 436 motion pictures,
unauthorized copies of which were seized from
defendant pursuant to this court's order of
August 31, 1989. In support of their motion,
plaintiffs have submitted copies of the
copyright registration certificates for these
436 motion pictures. They contend that each
unauthorized copy constitutes an
infringement, and that, furthermore, every
offer made by defendant to rent these
videocassettes constitutes unauthorized
distribution of copyrighted material.
Plaintiffs seek an award of $436,000 in
statutory damages. In addition, plaintiffs
seek a permanent injunction precluding
defendant from any future infringement of
any and all works presently owned by
plaintiffs or which may be owned by plaintiffs

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1990 WL 120642      FOR EDUCATIONAL USE ONLY      Page 2
(Cite as: 1990 WL 120642, *1 (W.D.Wis.))

in the future; an order declaring that the 436 motion picture videocassettes whose copyright certificates have been presented to the court be delivered up to plaintiffs' counsel for disposition as plaintiffs may determine appropriate; and an award of costs and attorneys' fees incurred by plaintiffs in this action.

Defendant contends that his copying of the motion pictures from television constitutes a "fair use" under *Sony v. Universal City Studios*, 464 U.S. 417 (1984). He contends further that any action based on all but 44 of the allegedly unauthorized copies of motion pictures subject to plaintiffs' copyrights is barred by the three-year statute of limitations in 17 U.S.C. § 507. Also, defendant argues that a mere offer to distribute the tapes to members of the public does not constitute an infringement, and that plaintiffs have proved only nine instances of distribution of copies of motion pictures to which they hold copyrights. Finally, defendant disputes the amount of the minimum statutory damages for infringements occurring prior to March 1, 1989.

For the reasons that follow, I conclude that defendant's copying of motion pictures from television broadcasts does not constitute a fair use under *Sony*, that an offer to distribute does not constitute an infringement, and that defendant is liable for all copying infringements and actual rentals that occurred within the statutory period of limitations. I find that this is a total of 53 infringements. I find also that 44 of these infringements arose before March 1, 1989, that 9 arose after March 1, 1989, that the infringements were willful, and that it is appropriate to impose upon defendant the minimum amount of damages authorized by the statute at the time each infringement arose. Therefore, I will impose $15,500 as statutory damages. In addition, I conclude that plaintiffs are entitled to a permanent injunction against future infringements, the delivery of all videocassettes for which they have submitted copyright registration certificates, and an award of costs and attorneys' fees.

*2 From the proposed findings of fact and supporting affidavits submitted by the parties, and for the purpose only of deciding this motion, I find the following material facts to be undisputed.

### Undisputed Facts

Plaintiffs are motion picture distribution companies. Defendant is the owner of a resort in Hayward, Wisconsin, known as the Happy Landing Resort. The Happy Landing Resort consists of eight cabins and a home that is used by members of defendant's family. The cabins are usually rented for a week or less. The resort does not have a lodge or dining facility. It is open from approximately mid-May to October 15 each year. The only individuals employed at Happy Landing Resort other than defendant are one or two part-time cleaning persons and a part-time groundskeeper.

Defendant has an extensive collection of videotapes of movies, cartoons, and television programs, which totals approximately 5000 videotapes. He acquired a large part of this collection by taping movies and other programs from television. He also made copies of rented videocassettes and obtained copies of other videocassettes as gifts.

Sometime in 1986, defendant decided to make videocassette recorders (VCR's) available to guests staying at the resort. He charged $10.00 per day for a VCR and provided three tapes from his collection with the rental of the VCR. Defendant recorded the titles of thousands of motion pictures in his collection in a handwritten notebook, which was provided to guests at the resort.

On August 31, 1989, plaintiffs filed the complaint in this action. Pursuant to this court's order of August 31, 1989, plaintiffs seized 701 videocassette copies of motion pictures from defendant. Plaintiffs hold exclusive copyright to 436 of these motion pictures. Defendant does not and did not at any time have authorization from any plaintiff to reproduce or distribute any of these motion pictures. Commercial videotapes contain

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1990 WL 120642                   FOR EDUCATIONAL USE ONLY                    Page  3
(Cite as: 1990 WL 120642, *2 (W.D.Wis.))

written warnings that unauthorized copying is a violation of copyright laws that may result in criminal or civil penalties.

The parties dispute the number of these videocassettes that were copied before August 31, 1986, when the three-year statutory period of limitations began to run.  However, it is undisputed that at least 44 motion pictures were copied on or after the date. [FN1] Twenty-eight of these 44 videocassettes were taped from other videocassettes rather than from television.    An additional five videocassettes were taped from other videocassettes and are copies of motion pictures that were not released in videocassette form until after August 30, 1986. [FN2]  One additional motion picture, Stand by Me, was not copyrighted until October 3, 1986, and could not have been duplicated prior to August 31, 1986.  To sum up, it is undisputed that at least 50 of the 436 videocassettes were made after August 30, 1986, and at least 34 of these tapes were made from other videocassettes rather than from television broadcasts.

*3 Also, it is clear that, of the remaining 386 videocassettes, three of the four videocassettes rented to Richard Carr in June 1986 must have been taped prior to August 1986. [FN3]

On several occasions, Richard Carr, an investigator for plaintiffs, stayed at the Happy Landing Resort and rented a VCR.   During this visit, defendant informed Carr of the extent of defendant's tape collection and permitted Carr to look through the notebook for the tapes he wanted.      There were approximately 4,200 tapes listed in the notebook.    Carr chose to borrow sixteen videotaped motion pictures, four of which are subject to plaintiffs' exclusive copyright. [FN4]

On July 27, 1988, Carr visited the resort again and was provided three videotaped motion pictures, one of which is subject to plaintiffs' exclusive copyright. [FN5]  At this time, defendant showed Carr the six videocassette recorders defendant had set up for duplicating motion picture videocassettes. [FN6]  From September 12 to September 14, 1988, Carr again stayed at the resort, rented a VCR and was provided with eight videocassettes, five of which are subject to plaintiffs' exclusive copyright. [FN7]  On July 14, 1989, Carr visited the resort and was given three videocassettes with the rental of a VCR, all of which are subject to plaintiff's exclusive copyright. [FN8]

The parties dispute how many resort guests other than Carr ever rented VCRs from defendant.  However, it is undisputed that in 1987, VCRs were provided to two guests in addition to Carr (Keating for $10.00, and Kazmieski for $40.00).  In 1989, a VCR was provided to at least one other guest (Buchegar for $10.00).  The resort does not have records showing which tapes were provided to these customers along with the rental of the VCRs. Defendant also permitted guests to hook up their own VCRs for $1 per day.  However, no guest ever did this, and defendant did not offer to rent movies or tapes to individuals bringing their own VCRs to the resort.

Gross revenues for the entire resort from rental of cabins, boats, etc. were $11,152.00 in 1986, $17,748.00 in 1987, $21,253.00 in 1988 and $14,544.80 in 1989.  The total number of groups renting cabins at the resort each year was 30 in 1986, 63 in 1987, 64 in 1988 and 30 in 1989.

Since this action started, defendant has not rented VCR's with or without motion pictures to individuals staying at his resort, and does not intend to do so if this court determines that this activity violates copyright laws.

*Disputed Facts*

Whether the 383 videocassettes not discussed above were taped within the statutory limitations period is disputed.

Whether defendant rented tapes to individuals other than Carr and the three other individuals in 1987 and 1989 is disputed.  Defendant contends that these were the only people who ever rented a VCR and tapes at the resort.    Based on statements made by defendant to Carr in 1988, plaintiffs

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

contend that many people rented tapes from petitioner between 1986 and 1989.

*4 The parties dispute whether defendant actually knew that his copying and distributing activities were illegal. Defendant asserts that neither Carr nor any plaintiff informed him specifically that his activities were illegal or requested that he refrain from copying motion pictures from television or other sources.

Also, the parties dispute whether the tapes were originally made from television for defendant's personal use.

## Opinion
### A. Statute of Limitations

The statutory period of limitations for civil actions under the provisions of Title 17 of the United States Code is three years. 17 U.S.C. § 507(b). Plaintiffs' complaint was filed on August 31, 1989. Therefore, they can recover damages only for infringements that occurred between August 31, 1986 and August 31, 1989.

### B. Fair Use Defense

The owner of a copyright has the exclusive rights to reproduce the copyrighted work and to authorize its reproduction by others. 17 U.S.C. § 106(1). Notwithstanding these rights, the fair use of a copyrighted work is not an infringement. 17 U.S.C. § 107. One such fair use is the taping of copyrighted works from television broadcast for home time-shifting purposes. *Sony v. Universal City Studios*, 464 U.S. at 455.

It is undisputed that defendant made unauthorized copies of plaintiffs' motion pictures on at least 50 occasions within the limitations period. It is also undisputed that 34 of these videocassette copies were made from other videocassettes. It is defendant's position that the remaining 16 videocassettes were made from television broadcasts for his own enjoyment and fall within the fair use doctrine.

Defendant's position does not hold up to

examination. It is undisputed that by August 31, 1986, defendant had begun to offer videocassettes for rent to guests at his resort and had listed the titles of the motion pictures in his videocassette collection in a notebook from which the guests could choose the tapes they wanted to borrow. Even if defendant originally accumulated his collection of videocassettes as a personal hobby, by August 31, 1986, his taping of motion pictures from television served a commercial purpose. I conclude as a matter of law that this commercial purpose was sufficient to taint his activity and remove it from the realm of the fair use doctrine. *Sony* at 449. Therefore, I will grant plaintiffs' motion for summary judgment for fifty infringements based on defendant's unauthorized reproduction of copyrighted motion pictures.

### C. Distribution Claims

Title 17, § 106(3) of the United States Code gives the owner of a copyright the exclusive rights to distribute copies of the copyrighted work "to the public by ... rental lease or lending." Under the predecessor federal copyright statute, courts held that there was no infringement of the vending right where there was an offer to sell, but no sale was consummated. *Obolensky v. G.P. Putnam's Sons*, 628 F.Supp. 1552, 1555 (S.D.N.Y.1986), *citing Greenbie v. Noble*, 151 F.Supp. 45, 63-64 (S.D.N.Y.1957). This ruling has been extended to the distribution rights under 17 U.S.C. § 106(3), *id.* at 1555-56, and plaintiffs do not contest its application in this case.

*5 At this stage of the proceedings, there is undisputed evidence that, within the statutory period of limitations, defendant rented to Richard Carr nine videocassettes of movies subject to plaintiffs' exclusive copyrights. Defendant argues that because Carr is plaintiffs' agent, he is not a member of the public. This argument is completely without merit. Therefore, I will grant plaintiffs' motion for summary judgment for the one distribution infringement occurring in July 1988, the five occurring in September 1988, and the three occurring in July 1989.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

### D. Damages

The copyright owner is entitled to elect, instead of actual damages and profits of the infringer, an award of statutory damages "for all infringements involved in the action, with respect to any one work." 17 U.S.C. § 504(c)(1) . Statutory damages must be imposed in an amount between $500 and $20,000 per infringement "as the court considers just." *Id.* If the court finds that the infringer "was not aware and had no reason to believe that his or her acts constituted an infringement of copyright," the court may reduce the award to a sum of not less than $200 per infringement. 17 U.S.C. § 504(c)(2). For causes of action arising prior to March 1, 1989, the statutory minimum is $250 and the maximum is $10,000, and the amount for unwillful infringement is not less than $100. Pub.L. 100-568, §§ 10(b), 13, Oct. 31, 1988, 102 Stat. 2860, 2861.

Defendant contends that he did not know and it was not reasonable for him to know that his copying and distributing activities were copyright infringements. He argues that because he is not well-educated, he did not have the sophistication to anticipate that his conduct violated the law. Although it is disputed whether defendant knew his conduct was illegal, I cannot accept the argument that it was not reasonable for him to know that he was violating copyright laws. Commercial videotapes display FBI warnings that unauthorized copying is a violation of the copyrights laws. If anything, legal sophistication is needed to know that certain activities might be considered fair use, not the opposite. Therefore, I decline to reduce the minimum statutory damages in this case.

Based on the undisputed facts, I have concluded that defendant is liable for 50 infringements of plaintiffs' reproduction rights and nine infringements of plaintiffs' distribution rights. However, six of the distribution infringements relate to the works that also constitute reproduction infringements. [FN9] Therefore, the total number of infringements for which statutory damages may be imposed is 53.

I conclude that it would be unjust in this case to impose any greater damages than the minimum allowed by law. Even accepting plaintiffs' contention that defendant rented videocassettes to many of his guests, the relatively small number of persons who stayed at the resort indicates that defendant did not make much profit from videocassette rental, if he made any at all. I do not minimize the effect of defendant's activities upon plaintiffs. Although they may have sustained only a small loss of business in authorized copies and rental of their motion pictures as a result of defendant's activities, many small operations such as defendant's would eat away at plaintiffs' profits. However, I believe that imposing the minimum amount of damages in this case will be sufficient to deter defendant and others like him from committing further infringements in the future.

*6 Determining the proper amount of minimum statutory damages in this case is not easy. From the undisputed facts, it is clear that six of the enumerated infringements must have occurred prior to March 1, 1989 because defendant distributed six of the works at issue before that date. [FN10] It is also clear that one work was the subject of an infringement that arose after March 1, 1989. [FN11] However, with respect to the remaining 46 infringements, neither party has adduced evidence that permits a conclusion that specific infringements occurred either before or after the minimum statutory damages were increased from $250 to $500.

With respect to these 46 infringements, it is fair to assume defendant was videotaping at a fairly regular rate between the dates of August 31, 1986 and August 31, 1989. There are 1096 days in this time period (913 days between August 31, 1986 and March 1, 1989, and 183 days between March 1, 1989 and August 31, 1989). Prorating the infringements between these two time segments, I conclude that 38 of the infringements arose before March 1, 1989, and 8 infringements arose after March 1, 1989.

Therefore, I will impose statutory damages of $250 per infringement for 44 of the 53

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

infringements that are the subject of this motion for summary judgment, and statutory damages of $500 per infringement for the other nine infringements. These statutory damages total $15,500.00

### E. Additional Relief

In addition to statutory damages, plaintiffs have requested a permanent injunction, the delivery of the impounded videocassettes to plaintiffs, and an award of costs and attorneys' fees.

Title 17, § 502 of the United States Code permits the court to grant "final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." Defendant has indicated that he does not intend to continue any activity that this court rules is an infringement of the copyright laws. However, in light of the extent of defendant's prior infringements and his ownership of multiple videocassette recorders that could easily be used for future infringements, I conclude that a permanent injunction is appropriate. Therefore, I will enter an order enjoining defendant from making any videocassette copies from television broadcasts except for personal timeshifting purposes, and from making any videocassette copies from other videocassettes for any purpose, and from distributing any videocassettes in his collection to guests at his resort.

The copyright laws permit the court to order "the destruction or other reasonable disposition of all copies ... found to have been made or used in violation of the copyright owner's exclusive rights." 17 U.S.C. § 503(b). In this case, plaintiffs have submitted copyright registration certificates for the motion pictures copied on 436 of the 701 videocassettes that were seized pursuant to this court's order of October 31, 1989. Although the date that 383 of these videocassettes were recorded remains in dispute, I conclude that all 436 copies were unauthorized and should be delivered to plaintiffs. The remaining 265 videocassettes should be returned to defendant at the

conclusion of this case unless plaintiffs can prove at trial that they are subject to plaintiffs' exclusive copyrights.

*7 Because plaintiffs have prevailed in showing defendant's willful infringement of their exclusive rights under 17 U.S.C. § 106, an award of reasonable attorneys' fees is appropriate, *Taylor v. Meirick,* 712 F.2d 112, 1122 (7th Cir.1983), in an amount to be determined after trial.

### Order

IT IS ORDERED that plaintiffs' motion for partial summary judgment is GRANTED.

FURTHER IT IS ORDERED that plaintiffs are entitled to $15,500 in statutory damages plus reasonable costs and attorneys' fees, to be determined after the conclusion of this case.

FURTHER IT IS ORDERED that the 436 videocassettes for which plaintiffs have submitted copyright registration forms are to be delivered to plaintiffs. The remaining 265 videocassettes are to remain in the possession of the United States Marshal pending final resolution of this case.

FURTHER IT IS ORDERED that defendant is enjoined permanently from making any videocassette copies from television broadcasts except for personal time- shifting purposes, and from making any videocassette copies from other videocassettes for any purpose, and from distributing any videocassettes in his collection.

FN1. In an affidavit, defendant states that "to the best of [his] knowledge" all but a specified 44 motion pictures were taped prior to August 30, 1986. Plaintiffs contend that this statement is incapable alone of proving that the remaining videocassettes were copied prior to the statutory period of limitations. Plaintiffs are correct. However, defendant's statement is buttressed by the undisputed fact that by June 1986, plaintiff's videotape collection was as large as 4,200 tapes and that at least four of those tapes were among the 436 tapes that are the subject of this summary judgment motion. Taken together, these facts are sufficient to put into dispute the date on which all but the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

following tapes were made:

1.   Alice in Wonderland Part I
2.   Alice in Wonderland Part II
3.   Armed and Dangerous
4.   Back to School
5.   Big Trouble in Little China
6.   Color Purple
7.   The Color of Money
8.   Critical Condition
9.   Disorderlies
10.  Donald Duck's 50 Crazy Years
11.  Double Agent
12.  The Fly
13.  The Golden Child
14.  Good Morning Vietnam
15.  Hannah and Her Sisters
16.  Heart Break Ridge
17.  I-Man
18.  Karate Kid Part II
19.  Less Than Zero
20.  Lethal Weapon
21.  Malone
22.  Lost Boys
23.  Miracle of the Heart
24.  No Man's Land
25.  The Other Woman
26.  Police Academy III
27.  Police Academy IV
28.  Police Academy V
29.  The Presidio
30.  The Principal
31.  The Road House
32.  Robocop
33.  Rock-n-Roll Mom
34.  Solarbabies
35.  Stakeout
36.  Star Trek IV
37.  Throw Momma from the Train
38.  Tin Men
39.  Tough Guys
40.  The Untouchables
41.  Wall Street
42.  Wise Guys
43.  Witches of Eastwick
44.  Young Harry Houdini

FN2. Plaintiffs have submitted the sworn statement of an expert regarding six of the motion pictures that, "to the best of [defendant's] knowledge" were taped prior to August 30, 1986. In the expert's opinion, these six tapes were copied from other videocassettes, rather than from television. Because the motion pictures on these videocassettes were not released in videocassette form until after August 30, 1986, I conclude that defendant's statement is insufficient to put into dispute the fact that these six

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

videocassettes were taped within the statutory period
of limitations. These six motion pictures are

```
Cinderella
E.T. the Extra-terrestrial
Lady and the Tramp
Wildcats
Wild Rovers
The Wolf Man
```

However, it is undisputed that plaintiff's agent,
Richard Carr, rented one of these videocassettes,
"E.T. the Extra-terrestrial," in June 1986. Therefore,
I conclude that it is a disputed issue of fact whether
"E.T." was taped prior to August 31, 1986.

FN3. These three videocassettes were copies of the
following motion pictures:

```
Beverly Hills Cop
Ghostbusters
Unfaithfully Yours
```

The fourth videocassette rented by Carr in June
1986, "E.T. the Extraterrestrial," is subject to
conflicting testimony, as explained above.

FN4. These four are videocassettes of the following
motion pictures.

```
Beverly Hills Cop
Ghostbusters
Unfaithfully Yours
E.T. the Extra-terrestrial
```

FN5. That videocassette is a taped copy of
"Malone."

FN6. Defendant attempts to dispute this fact by
pointing out that it was not included in plaintiffs'
original proposed findings of fact. This is not a
valid ground on which to raise a dispute. This
court's order of February 27, 1990 directed the
parties to submit more complete findings of fact.

FN7. These are tapes of the following motion
pictures:

```
Policy Academy IV
I Never Sang for My Father
Ruthless People
The Fly
```

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1990 WL 120642                    FOR EDUCATIONAL USE ONLY                    **Page  9**
(Cite as: 1990 WL 120642, *7 (W.D.Wis.))

Solarbabies

   FN8. These three are:

Tin Men
Murphy's Romance
Lethal Weapon

   FN9. These six works are:

Malone (rented by Carr in July 1988)
Police Academy IV (rented by Carr in September 1988)
The Fly (rented by Carr in September 1988)
Solarbabies (rented by Carr in September 1988)
Tin Men (rented by Carr in July 1989)
Lethal Weapon (rented by Carr in July 1989)

   FN10. These works were the motion picture videocassettes rented to Carr in July 1988, September 1988. and July 1989.

   FN11. "Murphy's Romance" was rented to Carr in July 1989.  The other two videocassettes rented on that date were also subject to copying infringements of uncertain date.

1990 WL 120642, 1990 WL 120642 (W.D.Wis.),
1990 Copr.L.Dec.  P 26,587,  16  U.S.P.Q.2d
1142

END OF DOCUMENT

Slip Copy                                                                                          Page 1
Slip Copy, 2007 WL 2408484 (S.D.Cal.)
**(Cite as: Slip Copy)**

C

**Interscope** Records v. **Rodriguez**
S.D.Cal.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. California.
**INTERSCOPE** RECORDS, UMG Recording, Inc., and Atlantic Recording Corporation, Plaintiff,
v.
Yolana **RODRIGUEZ**, Defendant.
**Civ. No. 06cv2485-B (NLS).**

Aug. 17, 2007.

Jonathan Gavin Fetterly, Holme Roberts & Owen, Los Angeles, CA, for Plaintiffs.

RUDI M. BREWSTER, United States Senior District Court Judge.

## I. INTRODUCTION

**\*1 Interscope** Records, UMG Recordings, Inc., and Atlantic Recording Corp. (collectively, "Plaintiffs") move the Court for entry of default judgment against Yolanda **Rodriguez** ("Defendant"). Because the Court finds that the complaint fails to sufficiently plead a claim upon which relief can be granted, the Court **DENIES** the motion, **VACATES** the Clerk's entry of default and **GRANTS** Plaintiffs leave to amend and re-serve the complaint within thirty (30) days of the date of this order

## II. BACKGROUND

Plaintiffs filed a complaint against Defendant on November 14, 2007, alleging copyright infringement. According to the complaint, Defendant used and continued to use an online media distribution system to download Plaintiffs' copyrighted record-

ings and distribute and/or make them available for distribution to the public. Defendant was served with the summons and complaint by personal service on December 14, 2006. Plaintiff did not file a responsive pleading and on April 13, 2007, the Clerk entered default. Notice of entry of default was served on Defendant by mail on April 18, 2007. Plaintiffs then filed the instant motion for entry of default judgment on July 19, 2007.

## III. STANDARD OF LAW

It is within the district court's discretion whether or not to enter default judgment. Albade v. Aldabe, 616 F.2d 1089, 1092 (9th Cir.1980). Seven factors are generally considered before entering default judgment: "(1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy ... favoring decisions on the merits."Eitel v. McCool, 782 F.2d 1470, 1471-1472 (9th Cir.1986).

## IV. ANALYSIS

In considering Plaintiffs' instant motion for default judgment, the Court has reviewed the complaint and the circumstances of the default according to the factors set forth in Eitel.The Court finds that entry of default judgment is not presently warranted because the complaint fails to sufficiently state a claim upon which relief may be granted.

The recent Supreme Court case, Bell Atlantic Corp. v. Twombly, ---U.S. ----, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), sets forth a "plausibility" standard which a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

complaint must meet to sufficiently state a claim. "[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic, 127 S.Ct. at 1964-1965 (2007).* "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.*

As such, Plaintiff here must present at least some facts to show the plausibility of their allegations of copyright infringement against the Defendant. However, other than the bare conclusory statement that on "information and belief" Defendant has downloaded, distributed and/or made available for distribution to the public copyrighted works, Plaintiffs have presented no facts that would indicate that this allegation is anything more than speculation. The complaint is simply a boilerplate listing of the elements of copyright infringement without any facts pertaining specifically to the instant Defendant. The Court therefore finds that the complaint fails to sufficiently state a claim upon which relief can be granted and entry of default judgment is not warranted.

**\*2** Accordingly, the Court **DENIES** Plaintiffs' motion for entry of default judgment and **VACATES** the Court Clerk's entry of Default. The Court **GRANTS** Plaintiffs leave to amend the complaint. Plaintiffs shall have thirty (30) days from the date of this Order to amend the complaint and serve it on Defendant. Defendant shall then have twenty (20) days from the date of service to answer or otherwise file a responsive pleading.

**IT IS SO ORDERED.**

S.D.Cal.,2007.
Interscope Records v. Rodriguez

Slip Copy, 2007 WL 2408484 (S.D.Cal.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2004 WL 953888 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

C
BMG Music v. Does 1-203
E.D.Pa.,2004.
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
BMG MUSIC, et al. Plaintiffs
v.
DOES 1-203, Defendants.
**No. Civ.A. 04-650.**

April 2, 2004.

Barbara L. Delaney, Vincent V. Carissimi, Pepper Hamilton L.L.P., Philadelphia, PA, for Plaintiffs.
Malia N. Brink, ACLU of Pennsylvania, Philadelphia, PA, for Movants.

NEWCOMER, J.
**\*1** AND NOW, this day of April, 2004, upon consideration of Plaintiffs' Motion for Reconsideration (Doc. 9), it is hereby ORDERED that said Motion is DENIED in part and GRANTED in part. Part 5 of the Court's Order of March 5, 2004, is VACATED. Plaintiffs may, in due course and with all reasonable speed, file complaints and submit filing fees for those Defendants against whom they wish to proceed.

This Court has ruled, *sua sponte,* that two-hundred and two Defendants in the above-captioned case have been improperly joined pursuant to Fed. R. Civ. Pro. 20 and 21. Plaintiffs have asked that the Court vacate its earlier Order and refrain from ruling on the issue of joinder until after Plaintiffs are able to ascertain Defendants' identities through discovery. Defendants' identities are believed to be known by Comcast, a third-party that provides internet access to the Internet Protocol (IP) address range utilized by the Defendants. Although it would be convenient and economical (for Plaintiffs) to have this Court preside over Plaintiffs' expedited discovery request, the Court simply cannot overcome its finding that the Defendants are not properly joined parties.[FN1] In light of the Court's continuing conviction that joinder is improper, deferring consideration of the joinder issue is inappropriate despite the fact that it would reduce costs for Plaintiffs and mitigate the risk of disparate treatment at the hands of the learned Judges of this District (a risk, the Court notes, that is present in every case that involves developing areas of law).

> FN1. Even after new complaints are filed, this Court has no mechanism at its immediate disposal to retain authority over all of the cases during discovery; under this District's local rules of civil procedure, the cases against the individual Defendants will not meet the requirements of relatedness. Loc. R. Civ. Pro. 40.1.

This Court's Order of March 5, 2004, was entered after inspection of Plaintiffs' Complaint revealed that Plaintiffs are attempting to bring over two-hundred factually distinct actions in one lawsuit. Each claim involves different property, facts, and defenses. John Doe 104, for example, is alleged to have infringed nine works held by five Plaintiffs. John Doe 113 is alleged to have infringed ten works owned by a different (sometimes overlapping) group of Plaintiffs, with only one copyright identical to John Doe 104 ("Guilty Conscience," by the popular rap lyricist Eminem). John Doe 199, meanwhile, is alleged to have infringed seven works, none of them the same as John Doe 58. Plaintiffs' Complaint, Exh. A. In other words, in addition

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 953888 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

to the individual acts of infringement encompassing separate transactions and occurrences, the actual property at issue is different for each Defendant. Each Defendant will also likely have a different defense. Comcast subscriber John Doe 1 could be an innocent parent whose internet access was abused by her minor child, while John Doe 2 might share a computer with a roommate who infringed Plaintiffs' works. John Does 3 through 203 could be thieves, just as Plaintiffs believe, inexcusably pilfering Plaintiffs' property and depriving them, and their artists, of the royalties they are rightly owed. Given this panoply of facts, law, and defenses, the Court does not see any reason to vacate its March 5, 2004, Order. Wholesale litigation of these claims is inappropriate, at least with respect to a vast majority (if not all) of Defendants. Joinder is improper. Defendants 2 through 203 shall be severed.

**\*2** AND IT IS SO ORDERED.

E.D.Pa.,2004.
BMG Music v. Does 1-203
Not Reported in F.Supp.2d, 2004 WL 953888 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

INTERSCOPE RECORDS; CAROLINE
RECORDS, INC.; CAPITOL RECORDS,
INC.; MAVERICK RECORDING
COMPANY; WARNER BROTHERS
RECORDS, INC.; LONDON-SIRE
RECORDS, INC.; UMG RECORDINGS,
INC.; SONY MUSIC ENTERTAINMENT,
INC.; MOTOWN RECORD COMPANY,
L.P.; ARISTA RECORDS, INC.;
FONOVISA, INC.; BMG MUSIC;
ATLANTIC RECORDING
CORPORATION; ELEKTRA
ENTERTAINMENT GROUP, INC.;
PRIORITY RECORDS LLC;  and VIRGIN
RECORDS AMERICA, INC.,

                    Plaintiffs,

-vs-                                        Case No.  6:04-cv-197-Orl-22DAB

DOES 1–25,

                    Defendants.
_____

## ORDER

This cause comes before the Court for consideration of United States Magistrate

Judge David A. Baker's April 1, 2004 Report and Recommendation (R&R) (Doc. No. 11),

recommending that the undersigned judge sever all claims raised herein except those raised

by the first Plaintiff (Interscope Records) against the first Defendant (Doe 1). The Plaintiffs

filed objections (Doc. No. 12 ) on April 15, 2004.

13

Having reviewed the R&R (Doc. No. 11), the Plaintiffs' objections thereto (Doc. No. 12), and all relevant papers in the record, this Court **ADOPTS** Judge Baker's well reasoned memorandum opinion (Doc. No. 11), and **OVERRULES** the Plaintiffs' Objections (Doc. No. 12) thereto. On the face of the record, it is clear that permissive joinder is improper. None of the Defendants disseminated the same copyrighted material or songs belonging to the same set of Plaintiffs. The only similarity is that the Defendants apparently used the Fast Track network to make the songs available. Accordingly, each case presents a unique set of facts and circumstances.

Based on the foregoing, it is **ORDERED** that:

1.      The April 1, 2004 Report and Recommendation (Doc. No. 11) issued by United States Magistrate Judge David A. Baker is **APPROVED** and **ADOPTED**.

2.      All claims except those raised by the Plaintiffs against the first Defendant (Doe 1) shall be **SEVERED**.

3.      The Plaintiffs claims against the remaining twenty-four (24) Defendants shall be **DISMISSED** unless within eleven (11) days from the date of this Order, the Plaintiffs initiate twenty-four (24) separate new actions.

4.      If the Plaintiffs elect to initiate twenty-four (24) separate new actions, then the Plaintiffs shall present to the Clerk of Court at one time: (1) a JS-44 civil cover sheet for each new case; (2) the appropriate filing fee for each new case; and (3) a separate Complaint for each individual Doe Defendant.

5.    In accordance with Rule 1.04(a) of the Local Rules of the Middle District of

Florida, the Clerk shall directly assign each of the derivative cases filed by the Plaintiffs to

the undersigned judge and to Magistrate Judge David A. Baker.

6.    The Court reserves ruling on the issue of whether each individual Plaintiff

should be severed to proceed individually against each individual Defendant until responsive

pleadings are filed.

7.    On or before Friday, May 28, 2004, the Plaintiffs may file a motion for

individualized pre-service discovery in each of their respective cases.

**DONE** and **ORDERED** in Chambers, in Orlando, Florida this _27th_ day of April,

2004.

ANNE C. CONWAY
United States District Judge

✓Copies furnished to:

Counsel of Record
Unrepresented Parties
Administrative Law Clerk
United States Magistrate Judge David A. Baker

-3-

F I L E   C O P Y

Printed: 04/28/2004


.ce sent to:

      ____    Karen L. Stetson, Esq.
              Broad & Cassel
              Miami Center, Suite 3000
              201 S. Biscayne Blvd.
              Miami, FL  33131

              6:04-cv-00197    rdo

      ____    Randall C. Marshall, Esq.
              American Civil Liberties Union
              Foundation of Florida, Inc.
              4500 Biscayne Blvd., Suite 340
              Miami, FL  33137

              6:04-cv-00197    rdo

FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

2004 APR -1  AM 8:44

CLERK, US COURT
OF FLORIDA

INTERSCOPE RECORDS; CAROLINE
RECORDS, INC.; CAPITOL RECORDS,
INC.; MAVERICK RECORDING
COMPANY; WARNER BROTHERS
RECORDS, INC.; LONDON-SIRE
RECORDS, INC.; UMG RECORDINGS,
INC.; SONY MUSIC ENTERTAINMENT,
INC.; MOTOWN RECORD COMPANY,
L.P.; ARISTA RECORDS, INC.;
FONOVISA, INC.; BMG MUSIC;
ATLANTIC RECORDING
CORPORATION; ELEKTRA
ENTERTAINMENT GROUP, INC.;
PRIORITY RECORDS LLC;  and VIRGIN
RECORDS AMERICA, INC.,

Plaintiffs,

-vs-                                                    Case No.  6:04-cv-197-Orl-22DAB

DOES 1--25,

Defendants.

_____

## REPORT AND RECOMMENDATION

### TO THE UNITED STATES DISTRICT COURT

This cause came on for consideration without oral argument on Plaintiffs' Response to this

Court's Order to Show Cause entered on March 5, 2004. Doc. No. 7. Plaintiffs in this case are sixteen

record companies who own or license copyrights in popular sound recordings in the United States.

Plaintiffs have filed suit against twenty-five unidentified "John Doe" Defendants for copyright

infringement.  Doc. No. 1.  On February 17, 2004, Plaintiffs sought leave to serve immediate

11

discovery on the third-party Internet Service Provider Bright House Networks to determine the true

identities of the "John Doe" Defendants, asserting that venue and personal jurisdiction in this District

are proper. Doc. No. 1 at 2.

On March 5, 2004, this Court denied without prejudice Plaintiffs' Motion and ordered

Plaintiffs to show cause why this case should not be dismissed for improper joinder of Plaintiffs and

Defendants, for an inadequate showing that this Court has personal jurisdiction over the Defendants,

and for improper venue. Plaintiffs contend in their Response (Doc. No. 8) that the Court should

reserve judgment on these issues until such time as all Defendants have been identified and are before

the Court.

According to Plaintiffs, the unnamed Defendants in the case are individuals who are active

participants in allegedly disseminating Plaintiffs' copyrighted works unlawfully over a peer-to-peer

network[1]. Doc. No. 8 at 2. Defendants allegedly offered from their computers copyrighted sound

recordings via the "Fast Track Network," the largest peer-to-peer network. *Id.* Plaintiffs allege

Defendants' dissemination and copying of copyrighted material violates the copyright laws. *Id.*

Plaintiffs discovered the Internet Protocol ("IP") address[2] from which each Defendant was allegedly

making available Plaintiffs' copyrighted works, but could not discover the name, address, or any other

contact information for each of the Defendants. Plaintiffs filed a Motion for Leave to Take Immediate

Discovery seeking to obtain the identifying information for each Doe Defendant from Bright House

---

[1] A peer-to-peer network is an online media distribution system that allows users to transform their computers into an interactive Internet site, disseminating files for other users to copy. Doc. No. 8 at 2. When using a peer-to-peer network, participants typically use user names, and not their true names. Doc. No. 3 at 2 n.1.

[2] IP addresses are 10-digit numbers allotted in blocks to Internet Service Providers. The Internet Service Providers have complete control over the assignment of IP addresses to subscribers; there is no requirement that IP addresses be assigned according to where a subscriber lives.

Networks, the "Internet Service Provider with the majority of its subscribers located in Central Florida." Doc. No. 8 at 3. On March 5, 2004, the Court ordered Plaintiffs to show cause why this case should not be dismissed for improper joinder and lack of personal jurisdiction, and for improper venue. Plaintiffs' Motion was denied without prejudice to renewal after consideration of Plaintiffs' response to the Order to Show Cause. Doc. No. 7.

In their Response to the Court's Order to Show Cause[3], Plaintiffs contend that it is premature to raise the issues of improper joinder, personal jurisdiction, and venue before the Defendants are identified. Plaintiffs contend that the court must wait until the Defendants are identified and notified because personal jurisdiction and venue are defenses that depend on facts specific to each Defendant and may be waived; the Court cannot complete an analysis of Defendants contacts with the forum until Defendants are identified. The Court agrees that the issues of personal jurisdiction and venue can be addressed after the Defendants are identified.

However, the Court disagrees with Plaintiffs that it must also wait to determine whether severance will prejudice any party or result in undue delay of the litigation. The Court disagrees because the various Plaintiffs' claims against various Defendants are not logically related to each other.

*Federal Rule of Civil Procedure 20*

Plaintiffs rely on Civil Rule of Procedure 20, which allows permissive joinder of claims by plaintiffs or against defendants if the claims "aris[e] out of the same transaction, occurrences, or series

---

[3] In violation of Local Rule 1.05(d), the Response was not signed by Plaintiffs' counsel Karen Stetson, whose name was typed as counsel below the signature line, but by "K. Dowd," who is not listed with a typed name or Florida Bar number within the signature block. *See* United States District Court for the Middle District of Florida, Local Rule 1.05(d) ("All pleadings, motions, briefs, applications and other papers tendered by counsel for filing shall be signed personally by counsel as required by Rule 11, Fed. R. Civ. P. Immediately under every signature line, additional information shall be given as indicated . . .Typed Name of Counsel, Florida Bar Identification Number.")

of transactions or occurrences and if any question of law or fact common to all these persons will arise

in the action." Fed. R. Civ. P. 20(a)[4]. A party seeking joinder of claimants under Rule 20 must

establish two prerequisites: (1) a right to relief arising out of the same transaction or occurrence, or

series of transactions or occurrences, and (2) some question of law or fact common to all persons

seeking to be joined. *Alexander v. Fulton County,* 207 F.3d 1303, 1323 (11th Cir. 2000). The central

purpose of Rule 20 is to promote trial convenience and expedite the resolution of disputes, thereby

eliminating unnecessary lawsuits. *Id.* The purpose of the Rule is to entertain "the broadest possible

scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is

strongly encouraged." *United Mine Workers v. Gibbs,* 383 U.S. 715, 724 (1966). Although the

preconditions for permissive joinder are construed generously to permit the broadest scope of action

commensurate with traditional notions of justice and fair play, the court possesses equally broad

discretion to sever parties based on misjoinder. *See Alexander,* 207 F.3d at 1323. Rule 20(b) and

Rule 42(b) vest in the district court the discretion to order separate trials or make such other orders

as will prevent delay or prejudice. *Id.* "All logically related events entitling a person to institute a

legal action against another generally are regarded as comprising a transaction or occurrence." *Id.*

The determination of whether the situation constitutes the same transaction or occurrence for purposes

of Rule 20 is determined on a case by case basis. *Mosley v. General Motors Corp.,* 497 F.2d 1330,

1333 (8th Cir. 1974).

    The transactional test requires that, to be joined, parties must assert rights, or have rights

---

[4]Federal Rule of Civil Procedure 20(a) states in pertinent part:

All persons . . . may be joined in one action as defendants if there is asserted against them jointly, severally, or in the
alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or
occurrences and if any question of law or fact common to all defendants will arise in the action. A plaintiff or defendant
need not be interested in obtaining or defending against all the relief demanded. Judgment may be given for one or more of
the plaintiffs according to their respective rights to relief, and against one or more defendants according to their respective
liabilities. Fed.R.Civ.P. 20(a).

asserted against them, that arise from related activities – a transaction or an occurrence or a series of such. "In ascertaining whether a particular factual situation constitutes a single transaction or occurrence for purposes of Rule 20, a case by case approach is generally pursued. No hard and fast rules have been established under the rule." *Id.* at 1333. Courts look at each case individually to determine whether the claims are logically related, thereby allowing "all reasonably related claims for relief by or against different parties to be tried in a single proceeding." 7 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE 2D § 1653. Here, the record indicates that the parties and claims are not reasonably related or properly joined.

*Plaintiffs and Defendants Are Improperly Joined*

Plaintiffs contend that the Defendants "have participated in a common scheme or pattern of behavior," via the downloading and dissemination of Plaintiffs' sound recordings using the same network, "without which no Defendant would have been able to commit much of the infringing activity" that underlies Plaintiffs' Complaint. If Plaintiffs were not joined in a single lawsuit, they argue, each of the sixteen Plaintiffs would have to file separately against the 25 separate Defendants, which would result in 425 separate lawsuits.

The twenty-five Defendants' interactions with the sixteen different Plaintiffs fail to conform to the standards established by Federal Rule of Civil Procedure 20 because they do not arise out of the same transaction, occurrence, or series of transactions or occurrences. The record is bereft of any allegation that the twenty-five Defendants are jointly or severally liable to the sixteen Plaintiffs other than the Defendants use the Fast Track peer-to-peer network. Thus, Plaintiffs' claims against the Defendants must have arisen from the same transaction or occurrence to satisfy the permissive joinder preconditions.

Plaintiffs' Response to the Order to Show Cause indicates that the twenty-five Defendants use the Fast Track peer-to-peer network to offer music to other users of the system. Plaintiffs fail to show how or which of the Defendants have actually downloaded Plaintiffs' copyrighted songs from another Defendant (which could conceivably link such Defendants) as opposed to any other users of the systems. *See* Doc. No. 4 ¶ 13 ("offering files for download on various peer-to-peer networks") & ¶ 16 ("RIAA was . . . able to confirm files of each Defendant were illegal copies made available")

Beyond the circumstances that the Defendants used the Fast Track peer-to-peer network and that the Defendants access the internet through Bright House, no other facts connect the Defendants. Fast Track is the most popular peer-to-peer network with typically more than 3 million users online, compared with a million or fewer for the nearest competitors. Konstantinos Karagiannis, "Spyware-Free P2P—For Free," PC MAGAZINE, March 2, 2004. More than two million subscribers access the Internet through Bright House Networks. *See* Doc. No. 8 at 11.

None of the Defendants disseminated the same copyrighted material or songs belonging to the same set of Plaintiffs. *See generally* Doc. 1, Ex. A. For example, based on the "sample" of illegally disseminated material asserted in Plaintiffs' Complaint[5], Doe 1 made available for download eight songs owned by six different Plaintiffs and Doe 2 made available for download a different set of eight songs by a different set of six Plaintiffs. *See id.* The twenty-three other Defendants offered for download a unique set of copyrighted songs owned by an unique set of owner-Plaintiffs. *See id.* Viewing this scenario as satisfying the same transaction or occurrence standard effectively nullifies that test. When the meaning of a rule or statute is clear and unambiguous it must be given effect. Federal Rule of Civil Procedure 20 refers to the *same* transaction or occurrence not to *similar*

---

[5]According to Plaintiffs, each Defendant has offered hundreds or thousands of copyrighted sound recordings unlawfully on peer-to-peer networks. Doc. No. 8, Ex. A ¶ 5.

transactions or occurrences. Due to the lack of an uniformity between the Defendants, and the absence of any evidence attesting to joint action other than Defendants' use of "Fast Track", and the lack of any connective nexus among the Defendants, Plaintiffs have not satisfied the preconditions for permissive joinder set forth in Federal Rule of Civil Procedure 20.

Plaintiffs cite cases in support of their position, but those cases are readily distinguishable. In *Alexander v. Fulton County*, the Eleventh Circuit affirmed the joinder of the claims of eighteen white employees of the sheriff's department where all of the plaintiffs' claims stemmed from the same core allegation that they were subject to a *systemic* pattern or practice of race-based discrimination (against white law enforcement officers) by the same decision-maker in the same department during the same short time frame. 207 F.3d 1303, 1323 (11th Cir. 2000). The other case cited by Plaintiffs is equally inapposite. In *Moore v. Comfed Savings Bank,* the Eleventh Circuit held that joinder was proper for a class comprised of Georgia residents who secured loans backed by mortgages on Georgia land from the Land Bank. The Eleventh Circuit also affirmed joinder of the class of defendants who had purchased the Land Bank loan paper on the mortgages on the secondary market and the promissory notes and settlement papers signed by the borrowers were similar to each other. 908 F.2d 834, 836 (11th Cir. 1990).

Much more similar to the facts in this case are those cases in which severance was ordered on a finding that the parties and claims were misjoined because they held claims that superficially appeared to be related, but were actually unrelated. Directly on point is the case of *Bridgeport Music, Inc. v. 11C Music,* in which several plaintiff record companies brought suit against various music companies who "sampled" copyrighted music, alleging 477 claims of copyright infringement. 202 F.R.D. 229, 231 (M.D. Tenn. 2001). The court severed the claims against the various defendants,

finding that the songs giving rise to the counts in the plaintiffs' complaint and the activities leading to the production and distribution of the "sampled" songs were not a series of transactions or occurrences. Each song and the alleged sampling represented a discrete occurrence. *Id.* at 232. "The fact that certain defendants were involved in the production, publishing, and distribution of more than one allegedly offending song did not, in itself, cause the songs to be related occurrences in the manner contemplated by Rule 20(a)." *Id.*; *Rappoport v. Steven Spielberg, Inc.*, 16 F.Supp.2d 481, 496-97 (D.N.J. 1998) (severing claims against several defendants where they arose from separate and distinct acts of infringement by defendants involving separate and distinct ideas for movies or television series).

The court in *Bridgeport* rejected the identical argument Plaintiffs assert in this case, that the infringement counts are properly joined because the various Plaintiffs have suffered the same harm from copyright infringement in each of 425 instances. *Id.* "According to this logic, a copyright plaintiff could join as defendants any otherwise unrelated parties who independently copy material owned by a [single] plaintiff." That is precisely the situation at hand. Sixteen unrelated Plaintiffs have joined twenty-five unrelated Defendants who independently copied different songs owned by different Plaintiffs. Plaintiffs have failed to show the infringing activity arises from the same transaction or occurrence or series of transactions and occurrences. The only similarity is that Defendants apparently used the Fast Track network to make the songs available.

In *Tele-Media Co. of Western Connecticut v. Antidormi*, the district court found plaintiff cable service provider's single action against 104 defendants for violation of a pirating statute did not meet the same transaction requirement of Rule 20. 179 F.R.D. 75, 76 (D. Conn. 1998). As in the present case, the court ordered the plaintiff to show cause why joinder was permissible. *See id.* The plaintiff

argued the joint discovery of the alleged violations through the countermeasure satisfied the same transaction requirement of Rule 20. *Id.* The court found that the plaintiff's right to relief arose out of the defendants' alleged use of the altered converters and not out of the countermeasure that revealed their alleged use. The *Tele-Media* case is similar to the present case in that the Plaintiffs here base the "relatedness" of the transactions on nothing more than Defendants' alleged violations of the Copyright Act, and not on any related or interdependent actions of the Defendants. The same transaction requirement requires joint action or liability on the part of the Defendants and is not satisfied by the fact that the Defendants accessed the songs through Fast Track, the largest peer-to-peer network, or the fact that Defendant are 25 of the 2.1 million subscribers who access the Internet through Bright House Networks. *See* Doc. No. 8 at 2, 11.

Courts have consistently severed claims against unrelated defendants where the only similarly between the defendants are the allegations that they violated the same statute or acted in the same manner. *See, e.g., DIRECTV v. Loussaert,* 218 F.R.D. 639, 643-644 (S.D. Iowa 2003) (ordering severance of allegations against unrelated defendants who had allegedly violated the same statute, but where the alleged violations of each defendant did not arise out of the same transaction or occurrence); *Turpeau v. Fidelity Financial Services, Inc.,* 936 F.Supp. 975, 978 (N.D. Ga.1996) (misjoinder where each plaintiff had a separate and unrelated claim against separate unrelated lenders and life insurance defendants who happened to have engaged in a similar practice of allegedly overcharging for credit life insurance).

Moreover, as in *Bridgeport,* even "if the counts in Plaintiffs' complaint arose from the same series of occurrences, the Court would exercise the discretion afforded it to order a severance to avoid causing unreasonable prejudice and expense to Defendants and to avoid a great inconvenience in the

administration of justice." *Id.* (citing 7 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1652 (3d ed. 2001) ("[T]he court has discretion to deny joinder if it determines that the addition of the party under Rule 20 will not foster the objectives of the rule, but will result in prejudice, expense or delay."). The court recognized in *Bridgeport* that it could not try all of the various plaintiffs' 477 counts together because, if joined in one action, defendants would be subjected to an overwhelming onslaught of materials and information unrelated to the specific claims against them – all of which they would be required to pay their attorneys to review. *Id.* Thus, failure to sever the claims against the Defendants would unduly hinder and burden the Defendants. *See id.*

Severance is also necessary to avoid a great inconvenience to the Court. As another court has recognized, a single misjoined action may serve the interests of all the parties in reducing the plaintiff's fees and costs; however, it imposes a significant burden on the Clerk's office who, each time an order was docketed in the case, would be obliged to prepare and mail a copy of the order to every defendant. *Tele-Media Co. of Western Connecticut v. Antidormi,* 179 F.R.D. 75, 76 (D. Conn. 1998) (finding the advantages of a single action can also be achieved through consolidation for pre-trial purposes). In *Bridgeport,* the court severed the case with 477 claims in part finding it to be unmanageable because its "courtroom would seat only a small fraction of defendants and their attorneys, it [could] not even hold a hearing on the motions currently pending; it [could] not host a management conference; [and] it certainly [could] not try all– or even most – of the Plaintiffs' counts together." 202 F.R.D. 229 at 232-33.

Thereon, it is **RECOMMENDED** that all claims except those by the first Plaintiff (Interscope

-10-

Records) against the first Defendant (Doe 1[6]) be **SEVERED**. It is further **RECOMMENDED** that

the other Plaintiffs and clams against other Defendants be **DISMISSED unless within 11 days** of any

Order adopting this Recommendation the Plaintiffs initiate separate new actions. It is further

**RECOMMENDED** that Plaintiff Interscope Records be allowed to renew its motion for

individualized pre-service discovery, although Plaintiff has not shown how identification of the

subscriber will directly indicate the identity of the intended Defendant who allegedly disseminated the

copyrighted recordings.

Failure to file written objections to the proposed findings and recommendations contained in

this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking

the factual findings on appeal.

Recommended in Orlando, Florida this _1st_ day of April, 2004.

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Courtroom Deputy

---

[6] Doe 1 is identified by the IP address: 24.73.44.203 2003-11-07 14:16:38 (EST). Doc. No. 1, Ex. A.

F I L E    C O P Y

Date Printed: 04/01/2004


Notice sent to:

      \_\_\_    Karen L. Stetson, Esq.
            Broad & Cassel
            Miami Center, Suite 3000
            201 S. Biscayne Blvd.
            Miami, FL  33131

            6:04-cv-00197    rdo

      \_\_\_    Randall C. Marshall, Esq.
            American Civil Liberties Union
            Foundation of Florida, Inc.
            4500 Biscayne Blvd., Suite 340
            Miami, FL  33137

            6:04-cv-00197    rdo



IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | § | |
|---|---|---|
| **IN RE:** | § | |
| | § | **GENERAL ORDER** |
| **CASES FILED BY** | § | |
| **RECORDING COMPANIES** | § | |

### ORDER

A consortium of recording companies have filed several recent lawsuits in this Court, alleging that numerous unnamed defendants ("Does") have violated federal copyright laws by downloading music from an "online media distribution system." (See attached list of cases.) Each of these cases names multiple defendants, with as many as 151 "Does" being named in one of the actions. The recent cases actually encompass 254 defendants. It appears that the Plaintiffs may intend to file future suits as well. There are no allegations in any of the cases that the defendants are in any way related to each other, or that they acted in concert or as a group in their allegedly offending actions.

With regard to joinder of claims, the Federal Rules of Civil Procedure provide that multiple parties:

> may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action.

FED. R. CIV. P. 20(a). There is no allegation in the recently-filed cases that the claims against the joined defendants "arise out of the same transaction, occurrence or series of transactions or occurrences." The claim against each defendant is individual, based on individual acts of each

Does' Attachment 1, Civ-07-568-R

defendant, and, if proven, will result in unique damage claims. The defendants are not properly joined under Rule 20.

Moreover, there are practical reasons supporting severing the claims against the defendants. The filing fees for the recent four cases totaled $600, whereas the filing fees for 254 separate cases would have been $38,100. That is a considerable loss of revenue to the public coffers. Moreover, the closing of one 151-defendant case is treated as a single case for statistical purposes, when in fact each defendant should be treated as a single case for such purposes, given that the claim against each defendant is separate.

Because these four suits are in actuality 254 separate lawsuits, the Court *sua sponte* will dismiss without prejudice all but the first defendant in each case. Plaintiffs will be permitted to refile against the other defendants separately, upon the payment of the appropriate filing fee. In addition, Plaintiffs are ordered to file any future cases of this nature against one defendant at a time, and may not join defendants for their convenience.

IT IS SO ORDERED, this 17 day of November, 2004.

SAM SPARKS
UNITED STATES DISTRICT JUDGE

LEE YEAKEL
UNITED STATES DISTRICT JUDGE

Does' Attachment 1, Civ-07-568-R

## List of cases

1. *Fonovisa, Inc. et al. v. Does 1-41*; No. A-04-CA-550 LY

2. *Atlantic Recording Corporation, et al. v. Does 1-151*; No. A-04-CA-636 SS

3. *Elektra Entertainment Group, Inc., et al. v. Does 1-11*; No. A-04-CA-703 LY

4. *UMG Recordings, Inc., et al. v. Does 1-51*; No. A-04-CA-704 LY

Does' Attachment 1, Civ-07-568-R



News Release

# JUDICIARY COMMITTEE

*United States Senate • Senator Orrin Hatch, Chairman*

July 11, 2000             Contact: Jeanne Lopatto, 202/224-5225

### Statement of Senator Orrin G. Hatch
### Senate Judiciary Committee Hearing on
### The Future of Digital Music: Is There an Upside to Downloading?

Good Morning and welcome. This morning's hearing focuses on issues that have been much in the press and are near and dear to many of us on the dais and listening in the audience. In case you missed it, there has been an upheaval of sorts concerning how music is copied over the Internet. What Newsweek magazine dubbed "The Noisy War Over Napster" involves more parties and has much broader implications than that moniker implies. Fortune Magazine has called the technology embodied in Napster and Gnutella "The Next Big Thing" for the Internet.

At the outset, let me make it clear that it is not this Committee's purpose or intention to interfere with the litigation and settlement discussions taking place. Nor do I see our discussion entering into the wide array of issues concerning technology standards for players or related topics.

My reasons for holding this hearing are to learn more about what is taking place in the marketplace and, in doing so, better equip us to advance the interests of consumers and creators. Insofar as consumers are concerned, they desire access to downloadable music which is not unnecessarily restrictive or unduly burdensome. I want to insure that the marketplace provides them with the opportunity to access the music they want to hear over the Internet and to do so legally. Insofar as creators are concerned, I want to insure that artists and creators are protected through an approach to copyright that empowers them to generate maximum revenue for their creative works.

Recognizing the potential the Internet offered consumers and creators, I led the efforts pass the Digital Millenium Copyright Act which sought to harmonize the copyright laws with the technological changes taking place. This law sought to insure that copyrighted content would continue to be protected by copyright law in the digital environment, but also sought the flexibility necessary to allow the Internet technology and businesses to flourish while making copyrighted content available.

For the most-part, passage of the DMCA has proven to be a prescient achievement settling many complex liability issues up front and allowing online businesses to grow. It was our hope that it would give creators incentive to make their products available on the Internet. I short, it was believed that a stable, predictable legal environment would encourage the deployment of business models which would make properly licensed content more widely available. Sadly, this has not yet occurred to any great extent in the music industry, and the DMCA is now nearly two years old.

As Chairman of the Judiciary Committee, I take it as a basic premise that our copyright laws must play a role – a strong role – in protecting creative works over the Internet. These protections, however, must be secured in a manner which is mindful of the impact related regulation can have on the free flow of ideas that a decentralized, open network like the Internet creates. We must protect the rights of the creator. But we cannot, in the name of copyright, unduly burden consumers and the promising technology the Internet presents to all of us.

With this in mind, it is my hope that we can learn more about the online music marketplace and why there is so much disharmony. We have with us this morning a number of different models of online music services.

MP3.com is a Music Service Provider and offers a number of different services to users. MP3.com shares revenues with artists, often on a 50/50 basis.

And we have Emusic, which offers downloads of singles or whole albums, paid for either per song or per album. Emusic has deals with many independent record labels and offers deals to artists that are structured similarly to recording contracts.

Both Emusic and MP3.com can track usage levels to accurately account to the artists for use of their music and pay them accordingly. And both Emusic and MP3.com are structured with a central server website that makes music licensing relatively easy for creators and consumers. Their organization is similar to the chart on display which diagrams a traditional web-based search engine, where an individual's computer deals with information sources through the intermediary of a single server.

By way of contrast, consider the architecture of the Napster and Gnutella communities, as represented on these schematic charts. As you can see Napster, which is a business, operates with a central server site through which members submit requests. Requests proceeds from the central site out to other Napster users. And with Gnutella, there is no central point, but we are linked directly to other Gnutella users' PCs. We can download the music directly from any Gnutella user's computer to which we are linked.

This organization has implications for both music licensing and for broader Internet technology. To quote Andy Grove, "The whole Internet could be re-architected by Napster-like technology. Using this peer-to-peer technology to search for information on the Internet allows us to get the most up-to-date information direct from the source, as opposed to traditional web search engines that are made through intermediaries.

With regard to music licensing, however, as you might guess from the charts, peer-to-peer file sharing poses a much greater challenge than single-source licensing. With each user being a publisher to a greater or lesser degree with a relative lack of a real distribution center makes licensing somewhat chaotic and haphazard.

Which brings us to the nub of this hearing. This technology presents a unique opportunity to those who make a living by producing copyrighted works. They can be self-publishers dealing directly with their fans. But it also presents a unique threat if misused to rob them of their livelihood, which could rob all of us of their continued work by destroying the incentives to create and publish their works. All of which will require much greater creativity in licensing or distributing copyrighted creative works.

To illustrate the file-sharing technology that has proved so controversial, we will demonstrate how a search and download of music is done using Gnutella. If you will direct your attention to the monitors, you will be able to see the process from a live Internet connection. First, we submit a request for particular music or a particular artist. As I mentioned before, we do not submit the request to a central site, but rather we link directly to other Gnutella users and relay our requests through the individual hard drives of members of the Gnutella community who are online. If you look at the bottom left-hand corner of the screen, you can see how many connections we have made with other users. The search engine returns to us a list of the relevant music files available to us from other Gnutella users, together with information on the size of the file and the other users' bandwidth and, hence, probable download speed. We can choose from among the many options returned which files to download, and can watch the progress of the downloading. Since the downloading will take a few minutes, we will return to play the music after the Ranking Member's remarks.

Once the file is downloaded, because the music is in a digital format, I can copy it onto a number of different convenient listening devices to take the music with me. I think music fans have expressed a strong interest in getting popular, legitimate music in this format.

One continuing problem raised throughout the evolution of online music, however, is the complaint that the major record labels have not been willing to license online music distributors to provide their music, or have offered licenses on terms much different than online entities related to those labels. While I do not think that copyright owners have any general duty to license their products to others, a complete lack of licensing puts in question the labels' professed desire to be ubiquitous, and a policy of merely cross-licensing among major label-related entities might raise some competition concerns that this committee would have a duty to consider.

In short, I believe there are opportunities for synergy here between the creators of music and the technology companies who can help make that music available to consumers in more convenient and enjoyable forms. Some creative cooperation might be to everyone's benefit, especially consumers and creators. I look forward to hearing what each of our witnesses envisions for the future of digital music.



Mobile/PDA About Us Advertise here



User name   Password
Not registered yet? Register here.
Lost your password? Click here.

**Home News Guides Software Glossary Hardware Profiles Forums**

▷ **Latest news** ▷ **Press releases** ▷ **Search news** ▷ **Submit news** ▷ **Our RSS newsfeed** ▷ **Advertise at AfterDawn**

Wednesday 10.10.2007  Search: [    ] GO Quick links: [ ] GO In English

**Download Free Music Now**
Download Chart Topping Tracks Of Yesterday & Today. 100% Free!
www.MusicVixen.com

**Free Music Downloads**
Today's Top Choices for Free Music Downloads on our site
www.genieseeker.com

**Ultimate Downloads**
Unlimited downloads on 1000's of music, videos, and games
www.free-movies-and-music.co

**Music Downloads**
Top 6 Websites For Music Downloads
www.picks-finder.com

**afterdawn.com** > **news** > **illegal music downloading still on rise**

## *News*

# Illegal music downloading still on rise

7 February 2007 12:31 by Dela

Despite the lawsuits filed against thousands of U.S. citizens by the **Recording Industry Association of America (RIAA)**, the number of people engaged in so called *"illegal file sharing"* and the number of music transfers has soared in the past year. The record industry wants to stamp out P2P sharing, which it blames almost exclusively for a 23% worldwide decline in sales of music CDs between 2000 and 2006.



To give you an idea of the size of illegal file sharing, **Big Champagne** estimates that over 1 billion tracks are exchanged monthly. Compare that against **Apple**'s **iTunes** service, which has sold just over 2 billion songs since it launched back in 2003, which also represents over 70% of the legal music download **business**.

**Russ Crupnick**, an analyst at consumer research group **NPD**, noted a 7% rise in the number of U.S. households engaged in filesharing, and a 24% increase in illegal downloads over the past year. *"P2P remains an unacceptable problem,"* said **Mitch Bainwol**, RIAA president. *"The folks engaged in the practice are doing more of it."*

*Source:*
*Reuters*

0
diggs

**digg it**



**Click Here** for free music

Music.Starware.com  Ads by Goooooogle

## Latest news

Latest news from AfterDawn.com.

Sony announces second gen 4x Blu-ray burner
9 Oct, 2007 | 5 comments

Japan to get exclusive white PlayStation 40GB model
9 Oct, 2007 | 11 comments

LG gets certified with first set-top digital converter box
9 Oct, 2007 | 6 comments

Yahoo! VP says down with DRM
9 Oct, 2007 | 8 comments

TiVo adds to media options by offering Rhapsody
9 Oct, 2007

BitTorrent software to power Hollywood downloads
9 Oct, 2007 | 4 comments

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**Related articles:**

- RIAA vs. FAIR USE Act (1 March 2007)
- RIAA stepped up fight against college students (21 February 2007)
- Teen files lawsuit against record industry (31 January 2007)
- Movie piracy does nothing but rise (31 January 2007)
- RIAA wins judgement from 20 year old girl (13 January 2007)
- Judge says making files available for download is distribution (11 December 2006)
- RIAA seeks lower royalties for music publishers and songwriters (10 December 2006)
- Lawyer: RIAA wants to shut down the Internet (30 November 2006)



- **RIAA president speaks out on Fair Use** (14 November 2006)

--------------------------------------------------------------------------------

| « Previous news article | Next news article » |
|---|---|
| Video games are 'good' for your eyes? | Industry group predicts LCD growth |

**Post your comment**

**Discuss this article!**

--------------------------------------------------------------------------------

**solarf** (Member) 7 February 2007 13:00

Of course it is. A few lawsuits wont stop everyone not when its so easy to do it.

[ + quote ]

--------------------------------------------------------------------------------

**hughjars** (Member) 7 February 2007 13:35

Of course, it's absolutely nothing to do with the worthless re-treads and utter dross the 'industry' keeps serving up to us all, right?

I wonder how much P2P activity is people replacing LPs and tapes (that they already have paid for) of older stuff with a newer digital replacement?

[ + quote ]

--------------------------------------------------------------------------------

**georgeluv** (Member) 7 February 2007 16:27

file sharing will continue to grow and there is nothing the RIAA or MPAA can do about it. it has actualy gotten harder for the RIAA and MPAA to do anything about it. every time they stamp out a site or service 10 others pop up in other countries scattered all over the world. supernova was taken down but every major torrent site after that has been back up days after being taken down. i dont even ponder a near-future without total unfetterd file sharing as a constitutional right, its simply the will of the people. when the 15 - 25 year olds of now become the leaders of tomarow free file sharing will be as common as listening to the radio.

"I wonder how much P2P activity is people replacing LPs and tapes (that they already have paid for) of older stuff with a newer digital replacement?"

a sizeable amount, as much as the RIAA wont admit it. the music storage🔎 mediums we have been forced to adobt since portable music storage became common have been progressivly more and more fragile. tapes wear out after a wile, cds only have a shelf life of 10 years, even if simply placed in proper storage and never even used. dvds are just more fragile versions of cds. just one more reason i havent bought a cd since 2002

[ + quote ]

--------------------------------------------------------------------------------

**spydah** (Junior Member) 7 February 2007 16:54

Well I see this situation like this the RIAA and MPAA will always slap some fake numbers up because it makes what their doing look better to judges and lawyers they use against people that dont have the financial backing to fight SOB's off. As many of you have seen all they want to do is completely take of P2P networks🔎 and use them to make more money because thats what people are into today. They took sites like Napster, Kazaa and others and slapped a price on it and controlled the content in which you can get off there and thats pretty much what they want to do with all of them. But were they keep losing at is the quality of movies , music and so forth hasnt really been that good since 2000 and people dont want to spend all this money on some BS they pushing in stores for $14-$20+ or dvds that are $14 - whatver they mark it up too. It is easier to get from P2P sites and it is a better source to find what you want and need to hear and watch rather then spending extra time running store to store to hope you can get what you want there which more times then none you wont find what your looking for there on top of the cost of it. They need to give up and stop over charging people for some dumb#$@ &$#1t like downloading a file. I still go to the theaters and watch movies that i like and want to see. They dont lose a damn thing but they will consistently say they are for the sake of arguing and taking more money from people because they can. Thats all

--------------------------------------------------------------------------------



 Japanese firm to offer priority access to new data network
8 Oct, 2007 | 2 comments

 Windows Home Server OEM software now available
8 Oct, 2007 | 7 comments

KDDI Corporation chooses Corel software for direct-to-disc downloads
8 Oct, 2007

Phillips introduces new line of flash based media players
8 Oct, 2007

 Thomas to appeal P2P trial verdict
8 Oct, 2007 | 9 comments

Another iPhone lawsuit for Apple
8 Oct, 2007 | 10 comments

More news...

## Subscribe to our newsfeed

Get the latest headlines delivered directly to your favourite RSS reader or content aggregation service by using the links below.



## Latest threads

Recently updated discussion threads.

Converting flv to avi divx in super but audio delay
Category: Playback problems

psp games
Category: Sony PSP - Games

dvd decrypter
Category: DVD Shrink forum

HOW TO: Troubleshooting and FAQ for Xbox
Category: Xbox - General discussion

40GB PlayStation 3 coming to the US in November?
Category: News discussion

More...

## Last week's most popular software downloads

 DVD Shrink v3.2.0.15

I will say on this.

[ + quote]

**21Q** (Member) 7 February 2007 17:02

well if cd's didn't cost so much for the three good songs and the 7 worthless songs, people would buy the cd's

[ + quote]

**limelight** (Member) 7 February 2007 22:22

The 23% decline in music sales is simply because: The music that the record labels are putting out is stale, uninspired, and just plain boring.

[ + quote]

**AlmostOz** (Junior Member) 7 February 2007 23:51

I'm always on the lookout for good music, and im prepared to pay for it if i hear it, but all the stuff being put out since 2000 is utter crap, theres only a been a few good bands since 2000.

theres other reasons people download stuff. Especially  series

House comes out in america, and is finished before it is released in Australia.
You can either wait all that time to watch one episode each night at a certain time, which is clogged with advertising, or you can wait even longer until its all over and buy the boxset, or you can most likely find it on p2p and get it now. I would pay for the boxset if i could get it now.

thats the difference, the new generation wants everything now. We live in a world that demands results immediately, so we expect everything else immediately. Tv is becoming outdated.

[ + quote]

**tabletpc** (Inactive) 8 February 2007 2:08

and worse they cannot find half of these people because of hacks to hide there ip address's send the riaa's software to japan and china

so lawsuits dont do nothing

[ + quote]

**Blackjax** (Member) 8 February 2007 3:15

Want a laugh here's one......
I posted a message up on one of the big three networks  in response to a story about itunes from that companies ceo. I couldn't resist because I know the traffic that crosses that website. >:) Funny I looked at it tonight and my post is gone! LOL I must have offended someone as it simply stated get rid of the <u>DRM</u> junk on cd's and dvd's. Your customers are your most important asset and they are tired of your games. Maybe mister CEO read it and reported it as offensive. Anyhow I though it might give some of you a laugh.

[ + quote]

**davydham** (Newbie) 8 February 2007 9:36

If I were them I would just go over to http://www.generalzod.net and kneel.

[ + quote]

**Gradical** (Junior Member) 8 February 2007 11:15

The cocaine is destroying society, lets press charges against anyone who has any cocaine, whe throw them to jail and we put a big fine and then they wont do it again.

then we start making raids on cocaine distributors and they'll stop doing it

Bizarre Resemblance?
or

---

Software category: <u>DVD rippers</u>

<u>Nero Burning ROM v8.1.1.0</u>
Software category: <u>CD-R applications</u>

<u>Media Player Classic v6.4.9.0</u>
Software category: <u>Video players</u>

<u>FFDSHOW rev. 1524 (20071009)</u>
Software category: <u>Video codecs and filters</u>

<u>Internet Download Manager v5.11 Build 7</u>
Software category: <u>Other network tools</u>

## Most popular devices

Last week's most popular devices in our hardware section.

<u>Starview The Box</u>
Category: <u>Digital set top boxes (DVB-C)</u>

<u>Starview PVR ReadyTwin</u>
Category: <u>Digital set top boxes (DVB-C)</u>

<u>Dream-Multimedia Dreambox DM500 C</u>
Category: <u>Digital set top boxes (DVB-C)</u>

<u>Nokia 6300</u>
Category: <u>Mobile phones</u>

<u>Nokia N95</u>
Category: <u>Mobile phones</u>

<u>More products...</u>

## Latest software updates

<u>WebSite-Watcher v4.34 Beta 3</u>
Software category: <u>Network software</u>

<u>SmitFraudFix v2.240</u>
Software category: <u>Desktop software</u>

<u>PiMPStreamer v1.0.2 Beta</u>
Software category: <u>Video software</u>

<u>NewsBin Pro v5.40 Beta 2</u>
Software category: <u>Network software</u>

<u>IncrediMail v5.67 build 3132</u>
Software category: <u>Network software</u>

<u>More software updates...</u>

## Top links

Most popular links

<u>Blasteroids.com</u>
Download game trailers, demos and more

<u>TorrentReactor.Net</u>
The most active torrents on the web

<u>Digital-Digest</u>
Latest DivX, XviD, DVD, Blu-Ray, HD DVD News



**Concurrent Stupidity?**

[ + quote ]

**BludRayne** (Junior Member) 8 February 2007 13:04

I agree, today's music sucks. But then, why are people pirating crappy music? Hmmm…

[ + quote ]

**ZippyDSM** (AfterDawn Addict) 8 February 2007 14:30

> ***Originally posted by BludRayne:***
> ------------------------------------------------------------
> **I agree, today's music sucks. But then, why are people pirating crappy music? Hmmm…**
> ------------------------------------------------------------

Its alot like gaming you muddle threw hoping/wishing/praying soemthign better will come along.

[ + quote ]

**hughjars** (Member) 8 February 2007 18:45

Well that's the interesting thing, we're told all this piracy goes on but almost never what is being pirated.

I suspect a hell of a lot of it isn't the latest thing at all.

[ + quote ]

**ZippyDSM** (AfterDawn Addict) 8 February 2007 23:14

hughjars
from what I have seen maybe 30% of it is new stuff,new stuff is always available but theres just alot more old stuff.

[ + quote ]

**Unlockneo** (Junior Member) 9 February 2007 6:47

**lol I download my music on YouTube**

http://www.digital-digest.com/articles/F…uide_page1.html

[ + quote ]

**ggs** (Newbie) 10 February 2007 5:07

I legally purchased a DVD of Deep Purple in Cocert for group and Ochestra at the royal Albert Hall, only to find that one track had been edited by nearly three minutes. The pathetic excuse through EMI was that the recording had been made by the BBC and the tape had been cut to save time. I suggest the record companies look at themselves in the mirror first. I felt cheated.

[ + quote ]

**ZippyDSM** (AfterDawn Addict) 10 February 2007 5:24

ggs
agreed they edit change add and then wonder why people complain.

[ + quote ]

**borhan9** (AfterDawn Addict) 10 February 2007 15:35

Hasn't the RIAA realized yet they are fighting a loosing battle. But maybe they do this so they don't end up on the unemployment end of the **workforce** :P

[ + quote ]

**Xenores** (Newbie) 13 February 2007 17:34

RIAA is just needs to take what they can get and forget about the people doing it I mean come on you're dealing with a bunch of people doing these things, for them its a losing battle.

[ + quote ]

OpenSubtitles.org

download DivX subtitles from the biggest open database

CDRInfo.com

The Hardware Authority

DVDHelp.us

DVD help, tutorials, FAQ, and very popular free help forum

Torrentreactor.TO

The most active torrents on the web

www.K-probe.com

Kprobe, K-probe, Bitsetting, Booktype Information, FAQ, and Link Site.

**pmaknelho** (Member) 16 February 2007 21:40 

Have there been any cases against people ONLY downloading(like IRC and Usenet)? or are all the lawsuits against people using P2Ps and getting caught uploading a part of the file while they're downloading the whole thing? They cant really catch someone downloading unless that person tries to download from the MPAA or RIAA, right? Kind of like trying to buy crack from a cop in uniform.

[ + quote]

**emugamer** (Junior Member) 18 February 2007 13:52 

The RIAA and MPAA are attaching a dollar value to every transfer made on P2P. Just because someone downloads 50 songs, it doesn't mean that he would run to the store and buy them if he wasn't connected to other peers. That person may not have the money to drop on that much music….ever in his life. They want everything we see and hear to translate into $$$$. It's not going to happen….ever. If people can't have P2P, they will go to warez. Or record a good song off their old CD/Cassete recorder. Or ask a friend to rip it for them. Or have a friend make a mix CD for them. The "pirating" (as they like to call it) will always be there, they just wouldn't have a way to track it. These idiots in the big offices and plush leather chairs just don't understand the industry or what their customers want. Quantity, not quality should be their mantra. I don't care what any self-righteous person says about music sharing. I don't believe it is wrong at all. Music piracy is just a silly term made up to make people feel bad about themselves. Go ahead and flame if you want. I buy music all the time. I enjoy opening the wrapper of a fresh CD knowing that the artist put time and effort into his recording.

Last Albums purchased:
Pearl Jam
Red Hot Chilli Peppers - Mothers Milk to replace my cassette and Stadium Arcadium
Tom Petty - Damn the Torpedoes and Highway Companion
Bob Dylan - Blood on the Tracks

[ + quote]

**This message has been edited since posting. Last time this message was edited on 18 February 2007 13:55**

**scorpNZ** (Member) 18 February 2007 17:45 

Pirating is on the rise huh, so is leagal mp3 downloads on the rise,i'm not sure of the figures but something tells me the leagal swamp the illeagal,then there's the fact a good portion of so called illeagal downloads are people like myself sampling new music ready for buying a new album from a previously would'nt normally bother with that band...nough said...

RE: RIAA declining sales from my understanding the figures they quote are from declining cd sales can anyone confirm ?? if it is true it kinda puts things in perspective,i also believe a lot of the RIAA problems stem from not moving with the times kinda like SONY's online gaming aspect...lol...

[ + quote]

**This message has been edited since posting. Last time this message was edited on 18 February 2007 17:49**

**Post your comment**

**Digital video:** AfterDawn.com | AfterDawn Forums | DVD X Copy Forums
**Music:** MP3Lizard.com
**Gaming:** Blasteroids.com | Blasteroids Forums
**Software:** Software downloads
**Blogs:** User profile pages
**RSS feeds:** AfterDawn.com News | Software updates | AfterDawn Forums
**International:** fin.AfterDawn.com | download.fi | fin.MP3Lizard.com
**Navigate:** Search | Site map
**About us:** About AfterDawn Ltd | Advertise on our sites | Rules, Restrictions, Legal disclaimer & Privacy policy

**Contact us:** Send feedback | Contact our media sales team

© 1999-2007 by AfterDawn Ltd.

 **MSNBC.com**

# Starbucks to give away free iTunes music

## Company promoting new wireless service that's debuting in select markets

By Elizabeth M. Gillespie

**The Associated Press**

Updated: 12:29 a.m. ET Sept 24, 2007

SEATTLE - Starbucks Corp. plans to give away 50 million free digital songs to customers in all of its domestic coffeehouses to promote a new wireless iTunes music service that's about to debut in select markets.

From Oct. 2 to Nov. 7, baristas in the company's more than 10,000 U.S. stores will hand out about 1.5 million "Song of theDay" cards each day. The cards can be redeemed at Apple Inc.'s online iTunes Store.

Thirty-seven artists with featured songs include Paul McCartneyand Joni Mitchell — the first two to sign on with Starbucks' Hear Music label — along with Joss Stone, Dave Matthews, John Mayer,Annie Lennox and Band of Horses.

The first song will be Bob Dylan's "Joker Man."

Also on Oct. 2, Starbucks will start selling iTunes digital release cards that allow a full album of music and bonus material to be downloaded online. KT Tunstall's "Drastic Fantastic" and the soundtrack to the film "Into the Wild" with new music from Pearl Jam frontman Eddie Vedder will be the first two featuredalbums, retailing for $14.99 and $11.99, respectively.

Starbucks also will offer a limited-edition reloadable purchasing card that includes two free iTunes downloads whencustomers register their cards online.

Earlier this month, Starbucks and Apple announced a partnershipthat will allow users of Apple's iPhone and new iPod Touch to download songs playing in a Starbucks shop directly to theirportable devices.

The coffee chain's icon will light up on the iPhone or Touch whenever a user is within range of a Starbucks shop's Wi-Fi signal. People with the devices — or a laptop with iTunes software — will also be able to use the signal for free to browse and buy other iTunes music.

The service will launch at 600 Starbucks shops in Seattle and New York on Oct. 2, then roll out in San Francisco in early November.

Starbucks plans to have the service up and running in a quarter of its stores by the end of next year and in all U.S. stores with wireless networks by the end of 2009. There are no immediate plans to expand the service to international markets.

Starbucks has been selling CDs in its stores for years and added its music catalog to iTunes last fall.

Ken Lombard, president of Starbucks' entertainment division, declined to release any specifics on the company's digital music sales so far or compare how they've been stacking up to CD sales. He would only say that music in both formats has been selling well.

Expectations remain high for the upcoming wireless service.``We're going to see huge improvement in terms of the amount of tracks'' that are downloaded, Lombard said.

*© 2007 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.*

URL: http://www.msnbc.msn.com/id/20944937/

MSN Privacy . Legal

© 2007 MSNBC.com